IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JESSICA HICKLIN,

                    Plaintiff,

v.

GEORGE LOMBARDI,
            et al.,

                  Defendants.

Case No. 4:16-CV-01357-NCC

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

FACTS ........................................................................................................................................ 2

*Background on Gender Dysphoria and Standards of Care*.................................................... 2

*Ms. Hicklin's Gender Dysphoria* ............................................................................................ 3

ARGUMENT ............................................................................................................................. 6

I.    Ms. Hicklin Is Suffering Irreparable Harm That Will Continue In The Absence Of A Preliminary Injunction....................................................................................................... 7

II.   Ms. Hicklin Is Substantially Likely To Succeed On The Merits........................................... 9

   A.   Ms. Hicklin's Gender Dysphoria and Risk of Self-Harm Are Objectively Serious Medical Needs................................................................................................................ 10

   B.   Defendants Have Acted With Deliberate Indifference to Ms. Hicklin's Serious Medical Needs................................................................................................................ 11

III.  The Balance of Harms Strongly Favors Ms. Hicklin. ..................................................... 13

IV.  An Injunction Is In The Public Interest. .......................................................................... 14

CONCLUSION ......................................................................................................................... 15

i

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011)................................................................. 10

*Brown v. Plata*, 563 U.S. 493 (2011)........................................................................................ 9

*Coleman v. Rahija*, 114 F.3d 778 (8th Cir. 1997)..................................................................... 9

*De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630 (4th Cir. 2003) ............................... 11

*De'lonta v. Johnson* (*De'lonta II*), 708 F.3d 520 (4th Cir. 2013)................................. 13

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................................................................... 8

*Estelle v. Gamble*, 429 U.S. 97 (1976) ....................................................................... 9, 10, 12

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................................................. 11

*Fields v. Smith*, 712 F. Supp. 2d 830 (E.D. Wis. 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011) 10, 13

*Gammett v. Idaho State Bd. of Corr.*, No. CV05-257-S-MHW, 2007 WL 2186896 (D. Idaho July
     27, 2007)................................................................................................................ 14

*Helling v. McKinney*, 509 U.S. 25 (1993)......................................................................... 9, 10, 11

*Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958 (8th Cir. 1995) ............................... 7

*Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929 (E.D. Mo. 2004).................................. 15

*Jones v. Muskegon Ctny.*, 625 F.3d 935 (6th Cir. 2010); ................................................. 12

*Kirkeby v. Furness*, 52 F.3d 772 (8th Cir. 1995) ..................................................................... 6

*Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014) ................................................. 12

*Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010) ........................................................... 12

*Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981)....................................................................... 11

*Nelson v. Corr. Med. Servs.*, 583 F.3d 522 (8th Cir. 2009) ............................................. 9

*Norsworthy v. Beard*, 87 F. Supp. 3d 1164 (N.D. Cal. 2015)............................................. 8

*Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012) (en banc)................................. 14

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) ............................................................ 14, 15

*Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th

    Cir. 1991) ............................................................................................................... 10, 14

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d. 1030 (8th Cir.

    2016)................................................................................................................................. 15

*Roe v. Crawford*, 396 F. Supp. 2d 1041 (W.D. Mo. 2005)............................................................ 9

*Roe v. Elyea*, 631 F.3d 843 (7th Cir. 2011) ................................................................................ 11

*Soneeya v. Spencer*, 851 F. Supp. 2d 228 (D. Mass. 2012) .................................................. 11, 13

*White v. Farrier*, 849 F.2d 322 (8th Cir. 1988) ......................................................................... 10

*Winter v. Nat'l Res. Def. Council*, 555 U.S. 7 (2008) ................................................................... 7

**Federal Rules**

Fed. R. Civ. P. 65(c) ..................................................................................................................... 15

**Other Authorities**

George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in

    Incarcerated Persons with Gender Identity Disorder*, 12 Int'l J. of Transgenderism 31 (2010)

    ............................................................................................................................................ 11

## INTRODUCTION

Jessica Hicklin, a thirty-eight-year-old woman who is transgender, has been incarcerated since age sixteen in the Missouri Department of Corrections ("MDOC") system. Ms. Hicklin[1] lives every day with intense psychological and physical suffering due to the refusal of MDOC and its contracted medical provider, Corizon LLC ("Corizon"), (collectively, "Defendants"), to provide her with urgently needed medical care that Defendants' own mental health providers have deemed medically necessary to treat her gender dysphoria.

Ms. Hicklin has not suffered in silence; she has exhausted Defendants' grievance process. But, despite being aware of Ms. Hicklin's gender dysphoria diagnosis and her ongoing need for care, Defendants have refused to provide her with medically necessary treatment due, in part, to an unconstitutional "freeze-frame policy" that categorically prohibits the initiation of gender dysphoria treatment to inmates in need.

Because Ms. Hicklin remains at a substantial risk of irreparable harm, including ongoing mental and bodily anguish, she now moves for a preliminary injunction that: (1) directs Defendants to provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for gender dysphoria, including but not limited to providing her hormone therapy, access to permanent body hair removal, and access to gender-affirming canteen items; and (2) enjoining Defendants from enforcing the policies, customs, or practices that have served as a moving force behind their constitutional violations by denying inmates with gender dysphoria individualized medically necessary treatment and care, contrary to widely accepted standards of care and the recommendations of Ms. Hicklin's treating mental health professionals.

---

[1]In keeping with modern judicial practice (including this Court's instructions to the parties on November 16, 2016) and accepted medical protocol, this Memorandum refers to Ms. Hicklin using female pronouns and honorifics.

# FACTS

***Background on Gender Dysphoria and Standards of Care***

Gender dysphoria refers to the clinical distress caused by the incongruence between a person's gender identity—their innate sense of their own gender—and the sex they were assigned at birth. *See* Declaration of Dr. Randi C. Ettner ("Ettner Decl.") ¶¶ 12-13. Gender dysphoria appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"). *Id*. Individuals with untreated gender dysphoria experience clinically significant depression, anxiety, and mental impairment, and, when left untreated, additional serious medical problems including suicidality and the compulsion to engage in self-castration and self-harm. *Id*. at ¶¶ 15-16. The World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (the "Standards of Care") provide the authoritative treatment protocol for gender dysphoria and apply in incarcerated and non-incarcerated settings. *Id*. at ¶¶ 18-19; 23-24.

Under the Standards of Care, persons with gender dysphoria should be individually assessed by qualified health care providers and referred for treatment, which can include: (1) living in another gender role that is consistent with one's gender identity; (2) hormone therapy to feminize or masculinize the body; and/or (3) surgery to change primary and/or secondary sex characteristics. *Id.* at ¶¶ 20-21. Counseling can also provide support for some individuals, but it is not a substitute for medical intervention, and exclusive reliance on it constitutes a gross departure from medically accepted practice. *Id.* at ¶¶ 35-36.

The Standards of Care also recognize that hormone therapy, in particular, is fundamental to the treatment of gender dysphoria, and that the denial of hormone treatment leads to significant deterioration and impairment in patients, including a high likelihood of depression,

suicidal ideation, and surgical self-treatment by auto-castration (removal of the testicles) or autopenectomy (removal of the penis). *Id.* at ¶¶ 28-33.

### Ms. Hicklin's Gender Dysphoria

Throughout her life, Ms. Hicklin has experienced a marked incongruence between her internal sense of her own gender and the gender she was assigned at birth. Ms. Hicklin has always felt that her anatomy was wrong and she has struggled to understand why her anatomy was different from other women. *See* Complaint, D.E. 19 at ¶ 63 ("Complaint"); Ettner Decl. ¶¶ 44, 46. Growing up, Ms. Hicklin recalls feeling most comfortable when she played dress-up by wearing traditionally female clothing or playing with dolls with her sister and female classmates. *See* Complaint at ¶ 63; Ettner Decl. ¶ 43. For most of her life, Ms. Hicklin has felt different and uncomfortable in her own skin. *See* Complaint at ¶ 63.

While she has always felt different, only recently has Ms. Hicklin been able to articulate her core identity as a woman who is transgender. *See* Complaint at ¶¶ 64-65. Pursuant to Potosi Correctional Center ("PCC") policy, on or around March 4, 2015, Ms. Hicklin requested an initial evaluation for gender dysphoria. *Id.* at ¶ 70. As a result, Dr. Meredith Throop, a psychiatrist, evaluated Ms. Hicklin on March, 23, 2015. *Id*. at ¶ 71. Dr. Throop's notes detail how Ms. Hicklin has identified as female since she was eight years old. *See* Declaration of Dr. Meredith L. Throop ("Throop Decl.") Ex. B at EM 0111-12. Dr. Throop also documents Ms. Hicklin's longstanding discomfort with her body and with wearing traditionally male clothes and engaging in traditionally male activities. *Id*. at EM 0112. Ms. Hicklin explained to Dr. Throop that she continues to face serious impairments in her daily life because of distress around her body. *Id*. Based on this assessment, Dr. Throop determined that Ms. Hicklin met the diagnostic criteria for gender dysphoria outlined in the DSM-V. *Id.* at EM 0114.

Dr. Throop referred Ms. Hicklin to an endocrinologist, noting that "Currently, hormone therapy (estrogen, testosterone blockers) is the accepted treatment for individuals with Gender Dysphoria diagnoses." *Id.*; *see also* Complaint at ¶ 72. But Ms. Hicklin has never been treated by an endocrinologist because MDOC policy arbitrarily prohibits providing hormone therapy for inmates with gender dysphoria who were not receiving such therapy before incarceration. *See* Throop Decl. Ex. B at EM 0114 (an "addendum" to Dr. Throop's evaluation notes states that "after researching DOC protocols, it was found that endocrinology consult is NOT the appropriate next step for psychiatry in the txt of Gender Dysphoria.  Endocrinology consult was not requested"); *see also* Complaint at ¶ 73; D.E. 42, MDOC Answer at ¶ 79 (admitting that Defendant Kempker emailed Defendant Larkin citing this policy as the reason for denying Ms. Hicklin hormone treatment).

Despite MDOC policy, Dr. Throop continued to recommend proper gender dysphoria treatment for Ms. Hicklin, noting that "**neglecting to treat [Ms. Hicklin] with the currently accepted standards of care for gender dysphoria, as per APA and WPATH SOC is detrimental currently to [her] mental/emotional/psychiatric well-being**."  Throop. Decl. Ex. B at EM 0134 (emphasis added).

After receiving the diagnosis from Dr. Throop, Ms. Hicklin took steps to live her life in line with her gender identity. She legally changed her name to Jessica Hicklin in July of 2015 and has updated her Social Security card, PCC-issued clothing, and offender identification card. *See* Complaint at ¶ 3, n 2.

Around mid-December of 2015, Dr. Throop left MDOC for another position. Ms. Hicklin then began treatment with her new psychiatrist, Dr. Evelynn Stephens. *See* Declaration of Demoya R. Gordon ("Gordon Decl.") Ex. A at EM 0145-47, 0152; Complaint at ¶¶ 107-08. The

4

medical records from her visits with Dr. Stephens and other mental health staff show that Ms.

Hicklin continues to experience serious psychological and physical symptoms due to improperly

treated gender dysphoria, including panic attacks, anxiety, tachycardia (racing heartbeat),

shortness of breath, sleep disturbance, loss of appetite, headaches, and excessive sweating. *See,*

*e.g.*, Gordon Decl. Ex. A at EM 0138-39, 0145-47, 0161, 0822-27, 0832-33; Complaint at ¶ 67.

She also still experiences intrusive thoughts of cutting off her testicles. *See, e.g.*, Gordon Decl.

Ex. A at EM 0146, 0162, 0822-27; Complaint at ¶ 108.

Ms. Hicklin's hair, in sharp contrast to the rest of her body hair, is the only physical part

of her that does not contribute to her dysphoria. *See* Gordon Decl. Ex. A at EM 0146; Complaint

at ¶ 108. However, she now worries that her continued testosterone exposure will cause

permanent male pattern baldness. *Id.* The thought of losing her hair because of delayed hormone

treatment is extremely distressing. *Id.* Consistent with Dr. Throop, Dr. Stephens also diagnosed

Ms. Hicklin with gender dysphoria "with associated panic secondary to current body

characteristics" on December 16, 2015. *See* Gordon Decl. Ex. A at EM 0147; Complaint at ¶

109.

In agreement with Dr. Throop, Dr. Stephens recommended that Ms. Hicklin be treated

with "hair removal device and hormone therapy as these are likely to greatly decrease patient's

current level of discomfort and intrusive thoughts." *See* Gordon Decl. Ex. A at EM 0147.  Dr.

Stephens also recommended that Ms. Hicklin have access to the same self-care products as other

female inmates. *See id*; Complaint at ¶ 109. On or around, January 13, 2016, Dr. Stephens noted

in Ms. Hicklin's records that:

> [Ms. Hicklin's] symptoms are escalating with age given risk of
> male pattern baldness more likely at this time if hormone therapy
> not initiated. This should be taken into account when considering
> the time table for starting treatment. **The patient does meet the**

5

**requirements for diagnosis of gender dysphoria and has now been diagnosed by two psychiatrists.**

*See* Gordon Decl. Ex. A at EM 0152 (emphasis added). On March 16, 2016, Dr. Stephens again noted that Ms. Hicklin was at risk for "male pattern baldness" and recommended that finasteride or dutasteride be considered to stop hair loss. *Id.* at EM 0158, 0161; *see also* Complaint at ¶ 110.

Defendants admit that Ms. Hicklin has gender dysphoria. *See* D.E. 27, Corizon Answer at ¶ 8; D.E. 42, MDOC Answer at ¶ 8. Yet, they continue to withhold treatment as prescribed by the Standards of Care, namely: hormone therapy and access to gender-affirming care, including permanent body hair removal and canteen items such as clothing, hair accessories, and personal hygiene items available to other female prisoners. This denial of medically necessary care continues to cause severe psychological pain and physical discomfort and puts Ms. Hicklin at continued risk of depression, anxiety, mental impairment, self-harm, and suicidal thoughts or acts. *See* Ettner Decl. at ¶¶ 52-56, 61, 74-75; Throop Decl. Ex. B at EM 0134; Gordon Decl. Ex. A at EM 0822-27, 0832-33 (noting exacerbation of Ms. Hicklin's gender dysphoria symptoms, including her "overwhelming sense of dread" and worsening intrusive thoughts of engaging in self-harm by removing her testicles).

## ARGUMENT

Ms. Hicklin's motion for preliminary injunction meets all four factors considered in the Eighth Circuit: (1) the threat of irreparable harm to the movant; (2) the probability that the movant will succeed on the merits; (3) the balance between the harm to the movant and the injury that granting the injunction will inflict on other litigants; and (4) the public interest. *See Kirkeby v. Furness*, 52 F.3d 772, 774 (8th Cir. 1995) (citation omitted).

6

I.     **Ms. Hicklin Is Suffering Irreparable Harm That Will Continue In The Absence Of A Preliminary Injunction.**

To obtain a preliminary injunction, Ms. Hicklin need not demonstrate that irreparable injury is inevitable, but only that it "is *likely* in the absence of an injunction." *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis in original). Defendants' own doctors have documented the serious harms that Ms. Hicklin has suffered and will continue to suffer without medical treatment in accordance with the prevailing Standards of Care. Ms. Hicklin already suffers from depression, anxiety, and intrusive thoughts of self-castration as a result of Defendants' conduct and it will only worsen with time. *See* Ettner Decl. at ¶¶ 52-56, 59, 61, 74-75; Throop Decl. Ex. B at EM 112; Gordon Decl. Ex. A at EM 0138-39, 0145-47, 0161-62, 0822-27, 0832-33. Indeed, "gender dysphoria intensifies with age" and the longer an individual goes without treatment, the higher their levels of depression, anxiety, and social distress. *See* Ettner Decl. at ¶¶ 17, 32. Absent an injunction, Defendants' actions in withholding medically necessary care are likely to result in serious and irreparable physical and psychological harm to Ms. Hicklin, including the possibility of permanent injury or death. *Id.* at ¶¶ 56, 66-67, 74-75. As Dr. Ettner notes, "Without proper treatment, Jessica Hicklin is at imminent risk for serious psychological harm. She is presently overloaded by symptoms that signal a highly disruptive state. Elevations of autonomic hyperarousal, and dysregulation of mood, left untreated in a severely gender dysphoric individual become chronic aversive experiences that devolve into an ingravescent course." *Id.* at ¶ 74.

Denying access to medical treatment, as Defendants have done in this case, creates the threat of an irreparable injury. *See Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 961, 962 (8th Cir. 1995) ("It is hard to imagine a greater harm than losing a chance for potentially life-saving medical treatment" and "[u]rgent medical treatment is the kind of equitable relief that

cannot abide trial."); *see also Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015) ("Emotional distress, anxiety, depression, and other psychological problems can constitute irreparable injury."). Defendants' continuous denial of hormone therapy, gender-affirming canteen items, and permanent body hair removal causes Ms. Hicklin to experience both physical and psychological symptoms, including depression, panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, loss of appetite, headaches, and excessive sweating. *See* Ettner Decl. ¶ 54; Complaint at ¶ 67; Gordon Decl. Ex. A at EM 0138-39, 0145-47, 0161, 0822-27, 0832-33.

Ms. Hicklin has tried her best to express her gender identity without relying on Defendants for proper treatment. She styles her hair in a traditionally female manner, but she is worried that if she does not begin treatment soon she will experience male pattern baldness, the thought of which causes her further distress. Complaint at ¶ 108; *see also* Ettner Decl. at ¶ 31. Ms. Hicklin has tried to remove her other body hair with MDOC-issued razors, which has led to cuts, scarring, rashes, and other skin problems. *See* Gordon Decl. Ex. A at EM 0822, 825; *see also* Complaint at ¶ 90. Defendants' withholding of medically necessary gender dysphoria care has also caused Ms. Hicklin to experience thoughts of removing her testicles and she has attempted on one occasion to amputate them with a tourniquet. *See* Ettner Decl. at ¶¶ 46, 59; Gordon Decl. Ex. A at 0146, 0162, 0822-27.

In addition to the emotional and physical harm Ms. Hicklin experiences as a result of being denied gender dysphoria treatment, the deprivation of her Eighth Amendment right to medically necessary care independently establishes an irreparable harm. *See generally Elrod v. Burns*, 427 U.S. 347, 373 (1976) (loss of a constitutional right "for even minimal periods of time, unquestionably constitutes irreparable injury"); *Roe v. Crawford*, 396 F. Supp. 2d 1041, 1044

8

(W.D. Mo. 2005) (finding irreparable injury because "further delay by Defendants may cause Plaintiff substantial injury, exposing her to increased medical, financial, and psychological risks"). Defendants' deliberate indifference in denying medically necessary treatment continuously violates Ms. Hicklin's Eighth Amendment rights, and as such, she has demonstrated the threat of irreparable harm.

## II.    Ms. Hicklin Is Substantially Likely To Succeed On The Merits.

"A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. 493, 511 (2011). Corrections officials inflict cruel and unusual treatment on an incarcerated individual, in violation of the Eighth Amendment, when they are deliberately indifferent to their serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[D]eliberate indifference to serious medical needs of prisoners violates the [Eighth] Amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standards of decency." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle*, 429 U.S. at 104 (internal quotation marks omitted)). To establish an Eighth Amendment violation, an incarcerated individual must show that "she had an objectively serious medical need and that the defendant knew of and disregarded that need." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (citations omitted); *see also Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009). Ms. Hicklin suffers from an objectively serious medical condition that Defendants, acting with deliberate indifference, have failed to treat in violation of the Eighth Amendment.

### A.     Ms. Hicklin's Gender Dysphoria and Risk of Self-Harm Are Objectively Serious Medical Needs.

To meet the objective requirement of the deliberate indifference standard, an incarcerated individual must demonstrate the existence of a serious medical need, *Estelle*, 429 U.S. at 104, or demonstrate a substantial risk of future serious harm resulting from the action or inaction of prison officials, *Helling*, 509 U.S. at 35. Here, Ms. Hicklin has established both a serious medical need—serious psychological and physical symptoms of distress from untreated gender dysphoria—and a substantial risk of future serious harm—continued anguish, auto-castration, and possibly suicide—if her medically necessary treatment continues to be withheld.

Courts, including the Eighth Circuit, have routinely held that gender dysphoria (previously referred to as gender identity disorder or transsexualism) is a serious medical need. *See White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988) ("We therefore conclude that transsexualism is a serious medical need."); *see also Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011) (upholding district court decision recognizing gender identity disorder as a serious medical need); *Fields v. Smith*, 712 F. Supp. 2d 830, 862 (E.D. Wis. 2010) (gender identity disorder is a serious medical need for purposes of the Eighth Amendment), *aff'd*, 653 F.3d 550 (7th Cir. 2011); *Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792, 800 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991) (same). There is no question that Ms. Hicklin has persistent and well-documented gender dysphoria that requires treatment, and therefore, meets the requirement that her medical need is objectively serious. *See, e.g.*, Ettner Decl. at ¶¶ 52-56, 61, 66-67, 74-75; Throop Decl. Ex. B at EM 0111-12, 0114, 0134; Gordon Decl. Ex. A at EM 0138-39, 0145-47, 0161-62, 0822-27, 0832-33.

In addition, if access to hormone therapy, permanent body hair removal, and gender-affirming canteen items continues to be withheld, Ms. Hicklin is at very high risk of resorting to

self-harm. *See* Ettner Decl. at ¶¶ 56, 66-67, 74-75; Gordon Decl. Ex. A at EM 0822-27. In *De'lonta v. Angelone* (*De'lonta I*), 330 F.3d 630, 634 (4th Cir. 2003), the Fourth Circuit held that an incarcerated individual with diagnosed gender dysphoria's "need for protection against continued self-mutilation constitutes a serious medical need to which prison officials may not be deliberately indifferent." *See also Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981) ("[P]rison officials have a duty to protect prisoners from self-destruction or self-injury."); *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 244-52 (D. Mass. 2012) (incarcerated individual with gender identity disorder and history of suicide attempts and self-mutilation has serious medical condition for which surgery must be considered); *see generally* George R. Brown, *Autocastration and Autopenectomy as Surgical Self-Treatment in Incarcerated Persons with Gender Identity Disorder*, 12 Int'l J. of Transgenderism 31 (2010). The law is clear that "a remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33; *see also Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011) ("the Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health") (citation omitted) (emphases in original).

   **B.    Defendants Have Acted With Deliberate Indifference to Ms. Hicklin's Serious Medical Needs.**

   The deliberate indifference prong is subjective and "entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). If Defendants knew that the risk existed and either intentionally or recklessly ignored it, and will continue to do so in the future, then the subjective test has been met. *Id.* at 837-47. This indifference is impermissible "whether . . . manifested by prison doctors in their response to the

11

prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05. Here, Defendants are aware of and do not contest Ms. Hicklin's gender dysphoria diagnosis and they have direct knowledge of her escalating distress, anxiety, and thoughts of self-harm as a result of their failure to provide her care. Despite all of this, Defendants have continued to deny treatment that is medically necessary for Ms. Hicklin in accordance with the prevailing Standards of Care, even as their own mental health professionals have repeatedly warned them of the serious risks posed to Ms. Hicklin by this continued denial.

This Court should reject any contentions by Defendants that psychotherapy or anti-anxiety medications prescribed to Ms. Hicklin are sufficient to treat her gender dysphoria. The relevant inquiry is not whether *any* care has been provided but whether "constitutionally adequate" care has been provided. *See Estelle*, 429 U.S. at 103-06 (prison officials may not adopt an "easier and less efficacious treatment" that does not adequately address an incarcerated individual's serious medical needs). It is well established that, while incarcerated individuals may not be entitled to any particular treatment of their choosing, prison officials may not avoid liability "simply by providing some measure of treatment." *Jones v. Muskegon Ctny.*, 625 F.3d 935, 944 (6th Cir. 2010); *see also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("a total deprivation of care is not a necessary condition for finding a constitutional violation").

There is no gender dysphoria exception to these well-established principles. Courts have repeatedly held that limiting treatment for gender dysphoria to psychotherapy where hormone therapy is medically indicated violates the Eighth Amendment. *See, e.g.*, *Kothmann v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014) (denying qualified immunity to prison official who denied transgender prisoner hormone therapy while providing "anti-anxiety and anti-depression

12

medications, mental health counseling, and psychotherapy treatments"); *Fields*, 653 F.3d at 556 ("Although DOC can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying [gender dysphoria]."); *Soneeya*, 851 F. Supp. 2d at 246-50 (blanket ban on laser hair removal and surgery was deliberately indifferent even though transgender plaintiff was receiving some treatment, including psychotherapy and hormones). In *De'lonta v. Johnson* (*De'lonta II*), 708 F.3d 520, 526 (4th Cir. 2013), the court held that "just because Appellees have provided De'lonta with *some* treatment consistent with the GID Standards of Care, it does not follow that they have necessarily provided her with constitutionally adequate treatment" (emphasis in original).

The same is true here, where Defendants have taken "a gross departure from the evidence-based Standards of Care" by treating Ms. Hicklin's gender dysphoria solely with psychotherapy and psychotropic drugs. *See* Ettner Decl. at ¶ 73; *see also id.* at ¶¶ 35-37. Thus, Defendants have denied Ms. Hicklin constitutionally adequate treatment by withholding the medical care that she needs, despite having knowledge of the risk of harm caused by withholding such treatment. As a result, Ms. Hicklin is likely to succeed on the merits of her claim under the Eighth Amendment.

## III.   The Balance of Harms Strongly Favors Ms. Hicklin.

The balance of harms substantially weighs in favor of granting injunctive relief. Defendants' refusal to provide Ms. Hicklin with medically necessary care has placed her mental and physical health in extreme peril. In contrast, Defendants will not suffer any harm—much less irreparable harm—from providing medically necessary care to Ms. Hicklin consistent with their constitutional obligations. *See, e.g.*, *Gammett v. Idaho State Bd. of Corr.*, No. CV05-257-S-

MHW, 2007 WL 2186896, at *15-16 (D. Idaho July 27, 2007) (finding balance of harms "sharply" favored plaintiff, who would experience suicidality and mental harm without gender dysphoria treatment).

Any allegations of harm to the Defendants are undermined by Defendants' own admission that they are already providing at least hormone therapy to other transgender individuals incarcerated in MDOC facilities. *See* D.E. 27, Corizon Answer at ¶ 6; D.E. 42, MDOC Answer at ¶ 6. Accordingly, the balance of harms weighs in favor of Ms. Hicklin.

## IV.     An Injunction Is In The Public Interest.

The public interest also favors injunctive relief because Ms. Hicklin seeks to vindicate her right to medically adequate treatment under the Eighth Amendment. *See Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008) ("[I]t is always in the public interest to protect constitutional rights."), *overturned on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012) (en banc); *accord Phillips*, 731 F. Supp. at 801 (finding "the public interest will be served by safeguarding Eighth Amendment rights" of prisoners with gender dysphoria).

In addition to ensuring her own constitutionally protected rights, Ms. Hicklin's motion should also be granted because the public interest is served by enjoining enforcement of Defendants' policies, customs, or practices that hamper the provision of constitutionally adequate care to all inmates diagnosed with gender dysphoria. Thus, an injunction at this time will broadly serve to protect the rights of incarcerated transgender individuals throughout the State of Missouri.

## CONCLUSION

For the foregoing reasons, Ms. Hicklin respectfully requests that this Court issue a preliminary injunction: (1) directing Defendants to provide Ms. Hicklin with medically necessary treatment for gender dysphoria, including but not limited to providing her hormone therapy, access to permanent body hair removal, and access to gender-affirming canteen items, and (2) enjoining Defendants from enforcing the policies, customs, or practices that have served as a moving force behind their constitutional violations by denying inmates with gender dysphoria individualized medically necessary treatment and care, contrary to widely accepted standards of care and the recommendations of Ms. Hicklin's treating mental health professionals.

The Court should require no bond or at most a nominal bond under Fed. R. Civ. P. 65(c). It is within the Court's discretion to waive bond based on the enforcement of constitutional rights, which is always in the public interest. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d. 1030, 1043 (8th Cir. 2016); *Phelps-Roper*, 545 F.3d at 690. Additionally, Ms. Hicklin is unable to pay a bond under her current circumstances, which should not be a bar to the relief requested. *See Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004)("[A] district court has discretion to grant injunctive relief without requiring bond or other security, especially when doing so would function to bar poor people from obtaining judicial redress."). Ms. Hicklin respectfully requests oral argument on this Motion, which will assist the Court in resolving the issues presented.

Date: April 4, 2017                          Respectfully submitted,


                                             /s/ Kevin L. Schriener
                                             Kevin L. Schriener
Demoya Gordon*                               Law & Schriener, LLC
Richard Saenz*                               141 N. Meramac Avenue, Suite 314
LAMBDA LEGAL DEFENSE AND EDUCATION           St. Louis, MO 63105
FUND, INC.                                   Phone: (314) 721-7095
120 Wall Street, 19th Floor                  Fax: (314) 863-7096
New York, NY 10005-3919                      kschriener@schrienerlaw.com
Phone: (212) 809-8585
Fax: (212) 809-0055
dgordon@lambdalegal.org                      Kyle A. Palazzolo*
rsaenz@lambdalegal.org                       LAMBDA LEGAL DEFENSE AND EDUCATION
                                             FUND, INC.
                                             105 W. Adams, Suite 2600
                                             Chicago, IL 60603
                                             Phone: (312) 663-4413
                                             Fax: (312) 663-4307
*Admitted pro hac vice                       kpalazzolo@lambdalegal.org

16

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that service of the foregoing Memorandum in Support of Plaintiff's Motion for Preliminary Injunction was made on April 4, 2017 via the Court's CM/ECF system to:

Henry F. Luepke, #38782MO
Assistant Attorney General
Missouri Attorney General's Office
P.O. Box 861
St. Louis, MO  63188
Tel: 314-340-7652
bud.luepke@ago.mo.gov

Attorney for Defendants George Lombardi, Dwayne Kempker, Ian Wallace, Cindy Griffith, Stan Payne, Scott O'Kelly, and Deloise Williams

J. Thaddeus Eckenrode, MoBar #31080
Kevin K. Peek, MoBar # 67440
Eckenrode-Maupin
11477 Olde Cabin Rd
Suite 110
St. Louis, MO 63141
Tel:  314-726-6670
Fax:  314-726-2106
jte@eckenrode-law.com
kkp@eckenrode-law.com

Attorneys for Defendants Corizon LLC, William McKinney, Glen Babich, T.K. Bredeman, Diana Larkin, Kimberley S. Randolph, Dawn Wade, Stormi Moeller, Shirley Eyman, Elizabeth Atterberry, and Kim Foster

                    s/Kevin L. Schriener

17