UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JESSICA HICKLIN,                     )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )          Case No. 4:16-cv-01357-NCC
                                     )
GEORGE LOMBARDI, *et. al.*,          )
                                     )
          Defendants.                )

## OPPOSITION TO PLAINTIFF'S
## MOTION FOR A PRELIMINARY, MANDATORY INJUNCTION

## Introduction

The federal Constitution does not guarantee any right to "lipstick", "mascara" or "panties" – *for anyone*, whether or not incarcerated, male or female.  No court has ever suggested otherwise.  Nor, in this case, can Plaintiff prove a right to any sex-change therapy beyond that which is now being provided.  Plaintiff, in fact, is receiving extensive and continuing medical and psychological care for the gender dysphoria at issue here, far more than that could possibly be required by the federal Constitution.

The evidence in this case precludes any showing of the "cruel and unusual punishment" necessary to prevail under the 8th Amendment.  Plaintiff, therefore, cannot demonstrate a likelihood of success on the merits, or any threat of irreparable harm.  Plaintiff's motion for a mandatory preliminary injunction should be denied.  Fed. R. Civ. P. 65.

## Statement of Facts

"Plaintiff has been sentenced to life without the possibility of parole and 100 years, to be served concurrently. She[1] has served 21 years of that sentence." Interrogatory Response # 4, Exh. A.

Plaintiff is genetically and physically male, but identifies as female. In March of 2015, doctors with the Missouri Department of Corrections diagnosed Plaintiff as having a condition known as "gender dysphoria". In August of 2015, Plaintiff – formerly named "James Hicklin" – then started going by the name "Jessica Hicklin". After 21 years in prison, Plaintiff has determined that she should now be receiving additional treatment, beyond that which the DOC has been providing for her gender dysphoria.

The physicians and counselors at the Potosi Correctional Center have provided Plaintiff care and treatment required for her gender dysphoria far beyond that which the Constitution could possibly require. Indeed, the record in this case shows that Plaintiff has been provided and has benefitted from extensive and continuing counseling and psychological care.

It was a public psychiatrist at the Potosi Correctional Center who first diagnosed Plaintiff as having gender dysphoria. That diagnosis was made after a March 23, 2015 evaluation. Exh. B, p. 2, April 27, 2015. Plaintiff

---

[1] While Plaintiff is physically a male, for purposes of this litigation, the parties have agreed to refer to Plaintiff with female pronouns.

then for the first time requested hormonal therapy, and, in response, the DOC addressed Plaintiff's request with the DOC physicians whom it had provided to examine Plaintiff. Based on those exams, the DOC determined that hormonal therapy was unwarranted in Plaintiff's case. "In conclusion, per DOC and Corizon Health discussion, there are no plans to proceed with your request to receive hormonal treatment". Exh. B, p. 2, April 27, 2015.

A month later, Plaintiff again requested hormone therapy for her gender dysphoria, and, again, the DOC evaluated that request. After discussion with Plaintiff's treating physicians, the DOC determined that the requested hormone therapy was unwarranted. Exh. B, p. 2, April 27, 2015.

While such analysis and treatment was far more than that required by the federal Constitution, the DOC did not stop there. And – contrary to Plaintiff's argument – it certainly did not ignore or disregard Plaintiff's condition. The DOC, rather, has provided Plaintiff with continuing psychiatric care and counseling. *See e.g.* Exh. C, p. 2, June 7, 2015 (directing Plaintiff to attend "scheduled Mental Health appointments or seek the counseling of Mental Health providers as needed").

The DOC has further examined and treated Plaintiff with both psychological and medical care for her gender dysphoria. Plaintiff, in fact, was "seen by Dr. McKinney on 6/19/15 for [her] request for a TRIA device or formal electrolysis. Dr. McKinney discussed [Plaintiff's] request with PCC

Warden and ARMD Dr. Babich. ... '**Dr. Babich confirmed that neither the electrolysis or TRIA hair removal device is medically necessary.**'" (Exh. C, p. 2, July 20, 2015) (emphasis added).

The DOC also encouraged Plaintiff to "continue to make [her] needs and concerns known through health requests" and assured Plaintiff that "nursing staff is available 24/7 and should be notified in the event of urgent or emergent medical or mental health concern or complaint. ... Please notify staff immediately if you develop an urgent or emergency medical or mental health complaint or concern." Exh. D, p. 2, July 20, 2015; *see also* Exh. E, p. 2, August 12, 2015 ("medical staff did evaluate you on 6/15/2015 and it was determined at that time that the procedure(s) you are requesting are not a medical necessity, and as such will not be provided").

This evidence shows that the DOC has not been "deliberately indifferent" to Plaintiff's gender dysphoria. To the contrary, the DOC – every time – has responded to Plaintiff's requests, has provided medical treatment and evaluation, and has treated Plaintiff and continues to provide to Plaintiff any and all needed psychological care and counseling. Plaintiff has not shown any "deliberate indifference" on the part of the DOC.

Indeed, contrary to what is argued in support of the pending motion, the DOC has assigned a "treatment team" to address Plaintiff's condition, and that treatment team has provided to Plaintiff "an assigned therapist on a

regular basis to help identify and strengthen coping skills for [Plaintiff's] increased anxiety." Exh. F, p. 2, August 12, 2015. The "mental health treatment team" that the DOC has provided to Plaintiff has continued not only to encourage Plaintiff "to continue working with [her] assigned therapist (at the prison), but also with [the prison] psychiatrist … on a regular basis." The DOC also has made sure that Plaintiff is aware that "All involved with [Plaintiff's] current care are very knowledgeable about the symptoms of [Plaintiff's] diagnosis and will be more than happy to continue working with [Plaintiff] on any concerns or changes as they occur." Exh. F, p. 2, August 12, 2015, signed by "Meredith L. Throop, Psychiatrist"; *see also* Exh. G, p. 2, October 21, 2015 (analyzing and determining that Plaintiff's request for hormone therapy is not "medically necessary" and that Plaintiff's request for canteen items such as lipstick, mascara and panties "is not a medical issue").

The DOC has kept records of the extensive and continuing treatment it has provided for Plaintiff's gender dysphoria. *See* "Complete Mental Health History", attached as Exhibit H. These records demonstrate that the DOC has **not** been "deliberately indifferent" to Plaintiff's condition. These records, for instance, show that the DOC also has provided, and continues to provide, Plaintiff with bi-monthly counseling and therapy sessions. At these sessions, the DOC's psychotherapists discuss with Plaintiff how best to cope with her gender dysphoria, and, in fact, Plaintiff herself has agreed to the "treatment

plan" developed and provided in her counseling sessions.  Exh. H, Complete Mental Health History, p. EM 0837.  To this day, the DOC staff is counseling Plaintiff and assisting her in achieving the goals of this plan to respond to and deal with the gender dysphoria that prison doctors have diagnosed for Plaintiff.  Exh. H, Complete Mental Health History, p. EM 0837.

More generally, the DOC and Corizon have developed explicit procedures to respond to inmates who, like Plaintiff, are dealing with gender dysphoria.  Such procedures include the establishment of a "Transgender Committee" at each State prison – including Potosi – that requires that "a transgender or intersex offender's own views with respect to his safety shall be given serious consideration".  Exh. I, p. 3, Missouri Dept. of Corrections Instit. Services Proc. Manual.  Such directives from the DOC further provide that:  "Transgender or intersex offenders shall be given the opportunity to shower separately from other offenders".  Exh. I, p. 3, Missouri Dept. of Corrections Institutional Services Procedure Manual.  These published procedures and the fact that the DOC has adhered to these procedures precludes any finding that the DOC has somehow been "deliberately indifferent" to Plaintiff's gender issues.

Similar to the DOC, Corizon has likewise issued to its Medical and Mental Health Staff at Missouri's State prisons specific guidelines for "the treatment or continuation of treatment for patients with Gender Dsyphoria."

6

Exh. J, p. 1, Corizon Memo re "Gender Dysphoria Patients" in Missouri State prisons.  As stated in Corizon's Memo:  "Each Department of Corrections (DOC) institution will have a transgender committee comprised of the health services administrator (HSA), the medical director, institutional chief of mental health services (ICMHS), and the deputy warden or prison rape elimination act (PREA) site coordinator.  The deputy warden or PREA site coordinator will serve as the chair of the committee."  Exh. J, p. 2, Corizon Memo re "Gender Dysphoria Patients" in Missouri State prisons.

These facts clearly refute the claim that the DOC has been "deliberately indifferent" to Plaintiff's gender dysphoria.  The Motion for a mandatory preliminary injunction, therefore, must be denied.  Moreover, this conclusion is reaffirmed and made all the more clear by the governing case law.

## The Governing Case Law

1. There is no constitutional right to sex-reassignment therapy.

The 8th Circuit Court of Appeals has held that Medicaid recipients have no right to treatment for gender dysphoria.  *Smith v. Rasmussen*, 249 F.3d 755 (8th Cir. 2000).  The plaintiff in *Rasmussen,* like Plaintiff in the case at bar, had been diagnosed with "gender identity disorder" and, under § 1983, sought to compel the State of Iowa to pay for "sex reassignment surgery (essentially a transition from female to male physical features)".  *Id.* at 756-

57.  In support of this claim, the plaintiff presented the expert testimony of his "primary treating psychiatrist and a specialist in gender identity disorder".  *Id.* at 757.  The psychiatrist testified that the sex reassignment therapy sought by the plaintiff "is the necessary treatment for [the plaintiff]".  *Id.*

The district court agreed with the psychiatrist and accordingly ordered the State of Iowa and its Department of Human Services to pay the cost of the plaintiff's sex reassignment surgery.  The 8th Circuit reversed.  *Id.*

In so doing, the 8th Circuit held that the plaintiff – although diagnosed with gender identity disorder – had no right under § 1983 to have the State of Iowa pay for the care necessary to treat that disorder.  In so ruling, the court deferred to the State of Iowa and, in particular, its regulations that specifically exclude payment for "[p]rocedures related to gender identity disorder".  *Id.* at 760.

In deferring to the State, the 8th Circuit in *Rasmussen* also relied upon the findings of a federally designated medical peer review organization that analyzes what medical procedures are appropriate "for payment under Medicare and Medicaid programs".  *Id.*  These findings showed that there was "a lack of consensus in the medical community" regarding what treatments were necessary or appropriate for the treatment of gender dysphoria.  The 8th Circuit, therefore, concluded that "the State's prohibition

on funding of sex reassignment surgery is both reasonable and consistent with the Medicaid Act." *Id.* at 761.

Is a convicted murderer entitled to medical care that the 8th Circuit has denied to a law-abiding Medicaid patient? At this stage of the litigation and on the record now before the Court, the answer clearly is not just "No", but "No way".

   2. <u>Plaintiff has not shown that the medical and psychological care and counseling she has received and continues to receive somehow amounts to "cruel and unusual punishment".</u>

The Eighth Amendment to the federal Constitution does not outlaw cruel and unusual "conditions"; rather, it outlaws cruel and unusual "punishments." *Farmer v. Brennan*, 511 U.S. 825, 837–38, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 811 (1994). Therefore, in order to prove her claim in this case, Plaintiff must come forward with evidence to show that she has been denied hormone replacement therapy as part of her punishment, rather than as a condition or consequence of her confinement with the DOC. *Id.*

Plaintiff cannot make this showing, and nothing submitted in support of her motion for a mandatory preliminary injunction suggests that she will ever be able to make this showing. At most, the evidence shows that while the DOC is providing Plaintiff the care and counseling needed for her gender dysphoria, the DOC is not providing all that Plaintiff desires and has requested. Such evidence, while suggesting Plaintiff's discomfort in prison,

does not show the "cruel and unusual punishment" that Plaintiff must prove in order to prevail in this case. The doctors, nurses, psychologists and counselors that have been treating Plaintiff's gender dysphoria for the past two years have not been punishing Plaintiff; they have been caring for Plaintiff. To suggest otherwise is offensive and insulting. But, more to the point for purposes of Plaintiff's pending motion, this suggestion has no support in the evidence or under the governing case law.

On the record now before the Court, there is no evidence of "cruel and unusual punishment". Plaintiff's motion for a mandatory preliminary injunction, therefore, must be denied.

**3.** Plaintiff has not shown "deliberate indifference" on the part of the DOC.

The Supreme Court has outlined the general standards necessary to evaluate a prisoner's claim that the conditions of his or her confinement violate the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97 (1976). In *Estelle*, the Court ruled that in order to prove a violation of the Eighth Amendment, a prisoner must allege and prove "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs". *Id.* at 106. Accordingly, in the Eighth Circuit, in order to support a claim of constitutionally-deficient medical care, a prisoner must demonstrate

"deliberate indifference" on the part of the prison's medical and administrative staff. *Barton v. Taber*, 820 F.3d 958, 964–65 (8th Cir. 2016).

Such "deliberate indifference" entails a showing of "more than negligence, more even than gross negligence". *Id.* at 965. "This showing requires a mental state 'akin to criminal recklessness.' " *Id.* (quoting *Jackson v. Buckman,* 756 F.3d 1060, 1065 (8th Cir. 2014)); *see also Feeney v. Corr. Med. Servs., Inc.* 464 F.3d 158, 162 (1st Cir. 2006) (in order for a prisoner to establish deliberate indifference, "[t]he care provided [to the inmate] must have been so inadequate as to shock the conscience").

None of Plaintiff's evidence comes close to showing that the care and counseling she has received in prison amounts to "criminal recklessness" or that such care and counseling somehow "shocks the conscience". Therefore, on this record and under the governing case law, Plaintiff's motion for mandatory preliminary injunction must be denied. *Id.*

**4.** The Eighth Amendment does not require the DOC to "cure" Plaintiff of her gender dysphoria.

The Court of Appeals for the 7th Circuit has ruled that prisons have no duty to pay the cost of curing an inmate's gender dysphoria. *Maggert v. Hanks*, 131 F.3d 670, 671 (7th Cir. 1997). (Eighth Amendment does not guarantee curative treatment for a prison inmate's gender dysphoria).

Moreover, for purposes of this lawsuit, there is an important distinction to be made between what medical professionals recommend and what the federal constitution requires.  Specifically, long-standing precedent dictates that prison officials need not "cure" a prisoner's illness but, rather, are required only to ensure that needless suffering is avoided by providing adequate care.  *See* Bradley A. Sultan, Note, Transsexual Prisoners:  How Much Treatment is Enough?, 37 New Eng. L. Rev. 1195, 1219-20 (2003) (prison is not required to cure transsexuals of gender dysphoria through surgery); *see also Phillips v. Mich. Dep't of Corrections*, 731 F.Supp 792, 800 (W.D. Mich. 1990), aff'd, 932 F.2d 969 (6th Cir. 1991) (finding that a prison's denial of curative treatment for transgender inmate was not unconstitutional)

It is undisputed that the DOC is continuing to provide and pay for the treatment of Plaintiff's gender dysphoria.  The fact that Plaintiff wants additional and more costly treatment is not evidence either of cruel and unusual punishment or of deliberate indifference on the part of the DOC. Plaintiff has come forward with no evidence or case law to show otherwise.

The evidence shows, rather, that Missouri taxpayers have provided and have paid for the psychological care and counseling that Plaintiff has received and continues to receive as treatment for her gender dysphoria.  Plaintiff has accepted and benefitted from this care, and she has relied upon such care to

help her cope with her condition.  Plaintiff now wants more.  She wants not just to cope with her condition; she wants to be cured of it.  This is certainly understandable, but the federal constitution does not require it.  Missouri taxpayers cannot be forced to bear the cost necessary to "cure" Plaintiff of her gender dysphoria.  *Id.*

This court should rule accordingly.  Under the governing case law, Plaintiff's motion for a mandatory preliminary injunction should be denied.

**5.** It remains doubtful that the requested medical procedures will provide the relief Plaintiff seeks for her gender dysphoria.

Contrary to what is argued in support of Plaintiff's motion, there is legitimate disagreement in the scientific community about what treatment is or is not appropriate for a patient with gender dysphoria.  A recent report – prepared by Dr. Lawrence S. Mayer, an epidemiologist trained in psychiatry, and Dr. Paul R. McHugh – shows that some of the most frequently heard claims about sexuality and gender identification are not supported by scientific evidence.  *See* Mayer and McHugh, "Sexuality and Gender: Findings from the Biological, Psychological, and Social Services", The New Atlantis, A Journal of Technology and Society, Number 50, Fall 2016.[2]

Dr. McHugh is the former chief of psychiatry at Johns Hopkins Hospital and is arguably the most important American psychiatrist of the

---

[2] http://www.thenewatlantis.com/docLib/20160819_TNA50SexualityandGender.pdf.  A copy of some of the more relevant portions of this Study are filed herewith as Exhibit K.

last half century.  The Report that Dr. Lawrence prepared with Dr. McHugh is based purely on "science and medicine, nothing more and nothing less".  *Id.* at p. 4.  Among the key findings of the Report are the following:

1. "The hypothesis that gender identity is an innate, fixed property of human beings that is independent of biological sex – that a person might be 'a man trapped in a woman's body' or 'a woman trapped in a man's body' – is ***not*** supported by scientific evidence" (*Id.* p. 8) (emphasis added);

2. "Compared to the general population, ***adults who have undergone sex-reassignment surgery continue to have*** a higher risk of experiencing poor mental health outcomes.  One study found that, compared to controls, ***sex-reassigned individuals were about 5 times more likely to die by suicide***" (*Id.* p. 8) (emphasis added).

One section of the in-depth Report is devoted to "Gender Dysphoria".  This section of the Report recognizes that "some individuals experience an incongruence between their biological sex and their gender identity", and the Report notes that, "if this struggle causes them to seek professional help, then the problem is classified as 'gender dysphoria'".  *Id.* at p. 93.  The Report, however, notes that there is no consensus among the scientific community as to what, precisely, constitutes gender dysphoria.  "The exact definition of gender dysphoria, however well-intentioned, is somewhat vague and confusing".  *Id.* at p. 95; *see also Id.* at p. 96 (listing an array of questions that arise out of a survey of "the biological and social research on gender dysphoria").  The distinguished authors of this Report conclude as follows:

> "The available evidence from brain imaging and genetics **does not
> demonstrate** that the development of gender identity as different
> from biological sex is innate.   Because scientists have not
> established a solid framework for understanding the cause of
> cross-gender identification, ongoing research should be open to
> psychological and social causes, as well as biological ones."

*Id.* at 105 (emphasis added).

Thus, the causes and proper treatment for Plaintiff's gender dysphoria
are anything but clear, and there is no consensus among scientists that the
gender dysphoria with which Plaintiff has been diagnosed can be treated,
much less cured, by the hormone replacement therapy she now seeks to
compel the DOC to provide to her in this case.   In light of such uncertainty
and disagreement among scientists on this point, Plaintiff have not shown
any likelihood of success on the merits.   The Court, therefore, at this time
must deny Plaintiff's motion for a mandatory preliminary injunction.

## Conclusion

The federal Constitution does not require Missouri taxpayers to pay the
cost of providing any of the feminizing hormones, lipstick, eye liner, waxing
or panties that Plaintiff seeks in this case.   The DOC already has provided
Plaintiff with more and better treatment than the 8th Amendment could
possibly require.   Plaintiff is not likely to succeed on the merits, and his
motion for a mandatory preliminary injunction should be denied.

Respectfully submitted,

**JOSHUA HAWLEY**
Attorney General

*/s/Henry F. Luepke*
Henry F. Luepke, #38782MO
Assistant Attorney General
Missouri Attorney General's Office
P.O. Box 861
St. Louis, MO  63188

Telephone:  (314) 340-7652
Facsimile:  (314) 340-7029
Bud.Luepke@ago.mo.gov

*Attorneys for Defendants*
*Cindy Griffith, Dwayne Kempker,*
*George Lombardi, Scott O'Kelly,*
*Stan Payne, Ian Wallace,*
*and Deloise Williams*


## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties.

Demoya Renee Gordon
Richard Saenz
Lambda Legal Defense
120 Wall St., 19th Fl.
New York, NY  10005-3919
dgordon@lambdalegal.org
rsaenz@lambdalegal.org

Kevin L. Schriener
Law and Schreiner, LLC
141 N. Meramec Ave., Ste. 314
St. Louis, MO  63105
kschriener@schrienerlaw.com

Kyle Anthony Palazzolo
Lambda Legal Defense
105 W. Adams St., Ste. 2600
Chicago, IL  60603
kpalazzolo@lambdalegal.org
*Attorneys for Plaintiff*

J. Thaddeus Eckenrode
ECKENRODE-MAUPIN
11477 Olde Cabin Rd., Ste. 110
St. Louis, MO  63141
jte@eckenrode-law.com
*Attorney for Defendant Corizon, LLC*

*/s/ Henry F. Luepke*
Assistant Attorney General