# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| JESSICA HICKLIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ANNE PRECYNTHE[1], | ) |
| IAN WALLACE, | ) |
| CINDY GRIFFITH, STAN PAYNE, | ) |
| SCOTT O'KELLY, DELOISE WILLIAMS, | ) |
| CORIZON HEALTH, INC., | ) |
| WILLIAM MCKINNEY, GLEN BABICH, | ) |
| T.K. BREDEMAN, DIANA LARKIN, | ) |
| KIMBERLEY S. RANDOLPH, | ) |
| DAWN WADE, STORMI MOELLER, | ) |
| SHIRLEY EYMAN, | ) |
| ELIZABETH ATTERBERRY, and | ) |
| KIM FOSTER, | ) |
| | ) |
| Defendants. | ) |

Case No. 4:16-cv-01357-NCC

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff Jessica Hicklin's Motion for Preliminary

Injunction (Doc. 63). The Motion is fully briefed and ready for disposition. The parties have

consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(c) (Doc. 57). For the following reasons, Plaintiff's Motion will be **GRANTED, in**

**part** and **DENIED, in part**.

---

[1] Anne Precynthe is the current Missouri Department of Corrections (MDOC) Director and is therefore substituted for the former director of the MDOC George Lombardi. Fed. R. Civ. P. 25(d).

# I. FACTS AND BACKGROUND[2]

On August 22, 2016, Plaintiff Jessica Hicklin ("Ms. Hicklin")[3] filed this action for injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 against Defendant Corizon, LLC[4] ("Corizon"), the Individual Corizon Defendants,[5,6] and the MDOC Defendants[7] (collectively "Defendants") for their alleged deliberate indifference to Ms. Hicklin's serious medical needs (Doc. 19).  Ms. Hicklin specifically alleges that despite knowing that she has gender dysphoria, a serious medical condition, Defendants have refused to provide Ms. Hicklin with medically necessary care including hormone therapy, permanent hair removal, and access to "gender-affirming" canteen items (*Id.* at 2-3).  Ms. Hicklin asserts that Defendants refuse to provide her with this hormone therapy, citing a policy or custom of providing hormone therapy only to those transgender inmates who were receiving it prior to incarceration (the so-called "freeze-frame" policy) (*Id.*).

---

[2] Facts and conclusions determined by a court in granting or denying a preliminary injunction are provisional and nonbinding.  *See Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995).

[3] In July 2015, Ms. Hicklin changed her name and has since updated her social security card and offender identification card as well as her prison-issued clothing.  The parties have agreed to use female pronouns when addressing Plaintiff Jessica Hicklin.

[4] Defendant is improperly named as Corizon Health, Inc.

[5] Defendants William McKinney, Glen Babich, T.K. Bredeman, Diana Larkin, Kimberley S. Randolph, Dawn Wade, Stormi Moeller, Shirley Eyman, Elizabeth Atterberry, and Kim Foster.

[6] Corizon and the Individual Corizon Defendants will be collectively referred to as the "Corizon Defendants."

[7] Defendants George Lombardi, Dwayne Kempker, Ian Wallace, Cindy Griffith, Stan Payne, Scott O'Kelly, and Deloise Williams.

On April 4, 2017, Ms. Hicklin filed a Motion for Preliminary Injunction (Doc. 63) requesting a preliminary injunction order that (1) directs Defendants to provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for gender dysphoria, including but not limited to providing her hormone therapy, access to permanent body hair removal, and access to "gender-affirming" canteen items; and (2) enjoins Defendants from enforcing the unconstitutional policies, customs, or practices that deny inmates with gender dysphoria individualized medically necessary treatment and care, which are contrary to widely accepted standards of care and the recommendations of Ms. Hicklin's treating mental health professionals (Doc. 64 at 5). As to gender-affirming canteen items, Ms. Hicklin seeks to have access to, and purchase herself, the same items available to women in the MDOC (Doc. 83 at 9).

The Court held a hearing on the Motion on May 23, 2017 during which the Parties presented oral argument (Doc. 75). The Court subsequently granted Plaintiff leave to supplement the record no later than June 28, 2017 (Doc. 85). Plaintiff filed two Motions to Supplement the Preliminary Injunction Record (Docs. 88, 98). In the first of these Motions, filed on June 28, 2017, Plaintiff seeks leave to supplement the record with two letters written by Ms. Hicklin to her treating psychiatrist (Doc. 88-2). While the Court will allow Plaintiff to supplement the preliminary injunction record with these two letters, it will take into consideration the Corizon Defendants' arguments in their opposition to the Motion to Supplement (Doc. 89). The Second Motion to Supplement the Preliminary Injunction Record (Doc. 98), however, is untimely and will be denied. Accordingly, the facts before the Court are as follows.

Ms. Hicklin is a thirty-eight year old pre-operative transgender woman in the custody of the Missouri Department of Corrections ("MDOC") and housed at Potosi Correctional Center ("PCC"), a facility for male inmates, in Mineral Point, Missouri (Doc. 19 at 5). Ms. Hicklin has

been in the custody of the Missouri Department of Corrections ("MDOC") since the age of 16,

serving a sentence of life without the possibility of parole and 100 years, to be served

concurrently (*See* Doc. 16 at ¶64; Doc. 64-1 at 12; Doc. 68-1 at 3). Ms. Hicklin suffers from

gender dysphoria (also known as gender identity disorder or transsexualism), a medical condition

caused by the incongruence between a person's gender identify and the sex they were assigned at

birth (Doc. 64-1 at 3).

*Gender Dysphoria Background*

Gender dysphoria is listed in the American Psychiatric Association's Diagnostic and

Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V") (Doc. 64-1 at 3). The

diagnostic criteria for gender dysphoria in adolescents and adults are as follows:

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated sex characteristics).

3. A strong desire for the primary and/or secondary sex characteristics of the other gender.

4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational or other important areas of functioning.

(*Id.* at 3-4 (citing DSM-V)).

According to the Declaration of Dr. Randi C. Ettner ("Dr. Ettner"), a clinical and forensic psychologist retained by Ms. Hicklin as an expert, individuals with untreated gender dysphoria experience clinically significant depression, anxiety, and mental impairment, and, when left untreated, additional serious medical problems including suicidality and the compulsion to engage in self-castration and self-harm (Doc. 64-1 at 4-5).[8] Ms. Hicklin asserts that she should be provided treatment consistent with the World Professional Association for Transgender Health's ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (the "Standards of Care") (Doc. 19 at 2-4). Dr. Ettner notes that these Standards of Care are "the internationally recognized guidelines for the treatment of persons with gender dysphoria" and have been endorsed by numerous professional medical organizations including the American Medical Association, the American Psychological Association, the American Psychiatric Association, the World Health Organization, and the National Commission of Correctional Health Care (Doc. 64-1 at 5, 8). The Standards of Care explicitly state that they are equally applicable to patients in prison (*Id.* at 7).

*The Standards of Care*

The following provisions of the Standards of Care are pertinent to this case. Once a diagnosis of gender dysphoria is established, individualized treatment should be initiated (*Id.* at 6). Such treatment may include (1) living in the gender role that is consistent with one's gender identity, (2) hormone therapy to feminize or masculinize the body, (3) surgery to change primary and/or secondary sex characteristics and/or (4) psychotherapy (*Id.*). Changes in gender expression including clothing and grooming that affirm one's gender identity as well as permanent body hair removal are significant in alleviating gender dysphoria (*Id.* at 8). "For

individuals with persistent, well-documented gender dysphoria, hormone therapy is an effective, essential, medically indicated treatment to alleviate the distress of the condition" (*Id.*). Dr. Ettner indicates that the therapeutic effects of hormone therapy are twofold: (1) the patient acquires congruent secondary sex characteristics (i.e., breast development, retribution of body fat, cessation of male pattern baldness, and reduction of body hair) and (2) the hormones act directly on the brain lessening the gender dysphoria and associated psychiatric symptoms (*Id.* at 9). In regards to psychotherapy:

> Merely providing counseling and/or psychotropic medication to a severely gender dysphoric patient is a gross departure from medically accepted practice. Inadequate treatment of this disorder puts an individual at serious risk of psychological and physical harm.

(*Id.* at 11 (quoting WPATH Medical Necessity Statement, 2016)).

As Dr. Ettner explains,

> Psychotherapy can provide support for the many issues that arise in tandem with gender dysphoria. However, psychotherapy alone is not a substitute for medical intervention when medical intervention is required, nor is it a precondition for medically indicated treatment. By analogy, counseling can be useful for patients with diabetes by providing psychoeducation about living with chronic illness and nutritional information, but counseling doesn't obviate the need for insulin.

(*Id.* at 10).

*The Medical Record*

Pursuant to PCC policy, on March 4, 2015, Ms. Hicklin requested an initial evaluation for gender dysphoria (Doc. 19 at ¶70). As a result, Dr. Meredith Throop ("Dr. Throop"), a psychiatrist, evaluated Ms. Hicklin on March 23, 2015 (Doc. 64-4 at 2-4). Based on this assessment, Dr. Throop determined that Ms. Hicklin met the diagnostic criteria for gender dysphoria outlined in the DSM-V (*Id.* at 4). Dr. Throop referred Ms. Hicklin to an endocrinologist "for evaluation of cross-sex hormone [treatment]. Currently, hormone therapy

---

[8] The Defendants did not object to Dr. Ettner's declaration.

(estrogen, testosterone blockers) is the accepted treatment for individuals with [a] Gender Dysphoria diagnoses" (*Id.*). In an addendum to Dr. Throop's notes from the evaluation, Dr. Throop notes, "after researching DOC protocols, it was found that endocrinology consult is NOT the appropriate next step for psychiatry in the [treatment] of Gender Dysphoria. Endocrinology consult was not requested" (*Id.*). Ms. Hicklin was thereafter referred to the Chronic Care Clinic for mental health symptoms, PTSD and anxiety, related to her diagnosis of gender dysphoria and she continued to see Dr. Throop (Doc. 64-4 at 4-6). During her treatment with Dr. Throop, Ms. Hicklin reported that she "continues to experience much discomfort and anxiety surrounding [her] assigned gender [(male).]" (*Id.* at 7). Ms. Hicklin also reported "occasional feelings of hopelessness" and "distress pertaining to male attributes (body hair, lack of gender affirming canteen items, male attire)" (*Id.* at 10). Dr. Throop continued to recommend hormone therapy, noting, "It is the opinion of this provider that neglecting to treat this [patient] with the currently accepted standards of care for gender dysphoria as per the APA and WPATH [Standards of Care] is detrimental to [her] mental/emotional/psychiatric well-being" (*Id.* at 9, 11). Dr. Throop left MDOC for another position in December 2015 (Doc. 64-3 at 2). Dr. Throop indicates, in a declaration provided by Ms. Hicklin, that "[i]f called to testify in this matter, I would do so consistent with my notes and evaluation of Ms. Hicklin, including testimony to confirm her diagnosis of gender dysphoria, and my recommended course of treatment in accordance with the medically accepted Standards of Care" (Doc. 64-2 at 1).

During the same time period, on June 19, 2015, Ms. Hicklin was evaluated for a TRIA hair removal device[9] she requested or formal electrolysis (Doc. 64-6 at 31). Defendant Associate

---

[9] A laser hair-removal device for personal use at home. *See Tria Beauty, Inc. v. Nat'l Fire Ins. Co. of Hartford,* No. C 12-05465 WHA, 2013 WL 2181649, at *1 (N.D. Cal. May 20, 2013).

Regional Medical Director Dr. Glen Babich determined that neither treatment option was medically necessary (*Id.* at 32; Doc. 68-4; Doc. 68-5; Doc. 68-7).

Ms. Hicklin continued her treatment with a new psychiatrist, Dr. Evelynn Stephens ("Dr. Stephens") (Doc. 64-6 at 4). Dr. Stephens diagnosed Ms. Hicklin with "gender dysphoria with associated panic secondary to current body characteristics" on December 16, 2015 (*Id.* at 6). Dr. Stephens prescribed medication for panic and body anxiety symptoms (*Id.*). Dr. Stephens also recommended that Ms. Hicklin be treated with "hair removal device and hormone therapy as these are likely to greatly decrease patient's current level of discomfort and intrusive thoughts" (*Id.*). After this initial evaluation, Dr. Stephens met with the gender dysphoria committee on January 13, 2016 to discuss next steps (*Id.*). Dr. Stephens noted that her "overall suggestion is to utilize the standard of care discussed by the 2012 APA task force on treatment of gender identity disorder (now gender dysphoria)" and specifies "the patient initially requires psychotherapy during a period that patient is presenting as desired gender, then I would suggest referral to medicine to initiate hormone therapy" (*Id.*). Dr. Stephens added:

> [Ms. Hicklin's] symptoms are escalating with age given risk of male pattern baldness more likely at this time if hormone therapy not initiated. This should be taken into account when considering the time table for starting treatment. The patient does meet the requirements for diagnosis of gender dysphoria and has now been diagnosed by two psychiatrists.

> (*Id.* at 10).

During this time, Ms. Hicklin discontinued anxiety medication shortly after its prescription (*Id.* at 14). At her next visit with Dr. Stephens on or about February 3, 2016, Dr. Stephens recommended "psychotherapy ongoing, 3-6 months living as a female with access to products that females in DOC have access to for self care [sic], then referral to medicine for hormone therapy. Suggest weekly psychotherapy if possible given the severity of illness" (*Id.* at 15). However, on March 14, 2016, Dr. Stephens suggests the use of medication to prevent hair

loss as "this could be used while pending decision on DOC policy of use of hormone treatment of gender dysphoria diagnosed while incarcerated. Defer to medical" (*Id.* at 17). Then again, Dr. Stephens in a plan note dated April 22, 2016, states:

> Per discussion from Gender Dysphoria council at PCC, still pending decision from recent request on policy surrounding treatment of gender dysphoria with hormonal treatment if diagnosed in prison.
>
> Suggest consideration of addition of hormone treatment as patient showing improved sense of self during therapy sessions and addition of this treatment likely to aid in partial decrease of anxiety symptoms. Defer final decision to medical and pending decision as noted above. Gender dysphoria committee continues to follow.

(*Id.* at 21). On June 6, 2016, while Dr. Stephens notes that she will defer the final decision regarding whether Ms. Hicklin can begin hormone therapy to the medical team, she states, "[f]ormal request for hormone therapy consideration was submitted again today as the patient has successfully lived as a female with ongoing therapy for over 6 months" (*Id.* at 24). *See also id.* at 35 (formal referral to medical to consider hormone replacement, noting "[t]his is the next step in accordance with APA guidelines"). On September 20, 2016, Dr. Stephens notes, "[g]iven this increased agitation, self harm [sic] thoughts and reported active symptoms of male pattern baldness will refer to gender dysphoria committee to consider dermatology referral and treatment for hair loss (head) and removal (body) as at this time symptoms [constitute] medical necessity" (*Id.* at 35).

On August 31, 2016, Ms. Hicklin's case was discussed during a conference call of the Gender Dysphoria Clinical Supervision Group ("GDCSG") members (Doc. 64-6 at 28). During the call, the members concurred with Dr. Stephens' diagnosis of gender dysphoria, and "[a] referral to the Gender Dysphoria Committee was agreed upon" and "[a]ppropriate hormone therapy was agreed upon" (*Id.*). While it is unclear to the Court which group determined a referral to the Gender Dysphoria Committee was warranted, in a note dated September 20, 2016,

Dr. Stephens indicates, "[r]eferral for hormone therapy treatment placed previously, gender dysphoria committee in Jefferson City in agreement with referral - - Defer further steps to medical" (*Id.* at 34).

On September 29, 2016, Dr. Stephens added an addendum to these notes indicating that she has received a letter from Ms. Hicklin regarding Ms. Hicklin's hair removal difficulties (*Id.* at 34). Dr. Stephens notes that Ms. Hicklin's agitation is at "higher levels than previously reported" as Ms. Hicklin describes an "'overwhelming feeling of dread," in the context of thinning hair on head" and "increasing intrusive self harm [sic] thoughts to remove own testicles in order to remove offensive testosterone" (*Id.* at 34-35). While Dr. Stephens references just one letter, the record reflects that Dr. Stephens received two letters from Ms. Hicklin and Dr. Stephen's notes clearly refer to both letters. *See* Doc. 88-2 (the referenced letters sent to Dr. Stephens from Ms. Hicklin). Upon receiving these letters, Dr. Stephens set a follow-up visit within a week of her prior visit with Ms. Hicklin (Doc. 64-6 at 35). In her notes, Dr. Stephens indicates that Ms. Hicklin suffered from "some increased dysphoria symptoms with body/facial hair growth . . . and increase in intrusive thoughts to remove testicles with fear of active male pattern baldness symptoms" (*Id.* at 36).

On November 10, 2016, Dr. Stephens again notes that she plans to "[c]ontinue to follow [up] with gender dysphoria committee which has already suggested hormone treatment" (Doc. 68-8 at 9). On January 25, 2017, the GDCSG again convened to discuss Ms. Hicklin's case (Doc. 68-8 at 16). The group determined that Ms. Hicklin's diagnosis was confirmed and approved her treatment plan (*Id.*). The treatment plan appears to address Ms. Hicklin's "gender integration" and does not include any reference to hormone therapy, "gender affirming" canteen items, or hair removal (*See id.* at 17-18).

During her treatment with Dr. Stephens, Ms. Hicklin reported "panic symptoms" with "active body anxiety, tachycardia,[10] sob, diaphoresis[11]noted almost daily" (Doc. 64-6 at 5). Notably, Ms. Hicklin frequently discussed, and Dr. Stephens noted, Ms. Hicklin's anxiety as it relates to her gender dysphoria. *See also id.* at 14 ("Body anxiety and obsessive body hair removal directly related to gender dysphoria."); *id.* at 34 ("increased body anxiety noted"); *id.* at 36 ("notable body anxiety"); Doc. 68-8 at 12 ("Anxiety related to gender issues and personal necessities are on going [sic] issues for [her]. Offender reports anxiety is higher than usual this month."). Ms. Hicklin also described "disgust surrounding [her] testicles for multiple reasons [including. . .] the fact that they produce testosterone which is causing [her] body to not look like [her] own" (Doc. 64-6 at 23). Indeed, Dr. Stephens diagnosed Ms. Hicklin with Anxiety NOS[12] occasionally as "acute exacerbation secondary to hair removal difficulty" (*see* Doc. 68-8 at 5) and otherwise listed as "Anxiety NOS (2/2 gender dysphoria vs co-occurring personality disorder with chronic fixed false beliefs-likely combination with improving insight)" (*see* Doc. 68-8 at 12). Ms. Hicklin also reported experiencing intrusive thoughts of cutting off her testicles (Doc. 64-6 at 5, 18, 35) and counsel stated on the record that Ms. Hicklin has attempted to remove her testicles and has a past history of suicidal attempts (Doc. 83 at 6). *See also* Doc. 64-1 at 12-13 ("Ms. Hicklin avoids contact with her genitals, and, typical of incarcerated gender dysphoric individuals without access to care, she has thoughts of removing them. On one occasion, Ms. Hicklin tried to amputate her testicles with a tourniquet, but was stopped by the awareness of the consequences . . . and a lack of necessary tissue for future surgical treatment.").

---

[10] Tachycardia is defined as "rabid beating of the heart, conventionally applied to rates over 90 beats per minute." Stedman's Medical Dictionary 895100 (2014).

[11] Diaphoresis is a synonym for perspiration. Stedman's Medical Dictionary 244680 (2014).

As of today's date, Ms. Hicklin is not receiving hormone therapy and does not have access to "gender-affirming" canteen items or the means for permanent hair removal. The MDOC Defendants indicate that medical staff continues to provide Plaintiff with psychiatric care and counseling (*Id.* at 26; Doc. 83 at 18).

*Expert Testimony—Dr. Ettner's Evaluation of Ms. Hicklin*

On January 27, 2017, Plaintiff's expert, Dr. Ettner, met with and evaluated Ms. Hicklin. Dr. Ettner diagnosed Ms. Hicklin with "intractable, untreated gender dysphoria" (Doc. 64-1 at 15). Upon review of Ms. Hicklin's medical records, Dr. Ettner found that:

> [The] lack of appropriate treatment for gender dysphoria is causing Ms. Hicklin to experience serious psychological and physical symptoms including panic attacks, anxiety, racing heartbeat (tachycardia), shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating. She also experiences intrusive thoughts of cutting off her testicles, and has attempted to amputate them with a tourniquet[.]

(Doc. 64-1 at 16).

Dr. Ettner further indicated that, "Ms. Hicklin has a history of suicide ideation and two suicide attempts" (*Id.* at 12). At the evaluation conducted by Dr. Ettner, Dr. Ettner administered four standardized psychometric indices and, from their outcomes, concluded that "Ms. Hicklin experiences moderately severe depressive symptoms. These include changes in appetite and sleep irritability, loss of energy, suicidal thoughts, fatigue, and agitation" (Doc. 64-1 at 14). Dr. Ettner recommended the immediate initiation of feminizing hormone therapy (Doc. 64-1 at 20). She further stated that, "[i]ntegral to successful treatment of gender dysphoria is the ability to present as a female" and,"[t]herefore, Ms. Hicklin should also be allowed access to items and clothing available to female inmates, and effective, permanent means of body hair removal" (Doc. 64-1 at 20).

---

[12] NOS stands for not otherwise specified.

*Relevant Policy and Procedures*

The MDOC Defendants have provided the Court with limited written policies and procedures relating to the care of transgender individuals within MDOC custody. First, the MDOC Defendants provide the Court with the Missouri Department of Corrections Institutional Services Procedure Manual Procedure IS5-3.1 titled "Offender Housing Assignments" (Doc. 68-9). The following are the relevant portions of this policy. The MDOC defines a transgender individual as "[a] person shows a gender identity (i.e., internal sense of feeling male or female) is different from the person's assigned gender at birth" (*Id.* at 1). Each MDOC institution has a transgender committee comprised of the health service administrator, medical director, institutional chief of mental health services and the deputy warden or Prison Rape Elimination Act (PREA) site coordinator (*Id.*). "The transgender committee is responsible for determining a permanent housing assignment for each transgender . . . offender, and prior to this assignment shall meet with each offender to determine his vulnerability within the general population and length of time living as the acquired gender" (Id. at 3). Of note, the housing policy does not address any medical issues.

Second, during the Preliminary Injunction Hearing, the MDOC Defendants provided the Court and opposing counsel with a single paragraph on a sheet of paper without any identifying information and stated that it was the freeze-frame policy at issue (hereinafter "the Policy") (Doc. 77). The Policy of unknown origin reads in its entirety as follows:

> [The Prison Rape Elimination Act (PREA)] is designed to keep all offenders safe from sexual assault and harassment, particularly those at greater risk of sexual victimization. The Department has adopted and is committed to enforce [sic] PREA zero tolerance of sexual abuse and harassment by complying with all PREA standards and making every effort to keep our offenders safe. The Department believes the initiation of Hormone Replacement Therapy (HRT) is not appropriate in a prison environment. An attempt at such transition in the prison venue severely compromises the safety of the offender and places them at substantial risk of sexual abuse and harassment. Therefore, after carefully balancing the potential benefit of HRT therapy [sic] to an offender, the increased risk to

their personal safety as well as impact on the safety and security of other offenders and staff, we conclude such therapy is not appropriate in a prison setting and is not approved. Although HRT therapy [sic] is not approved, Mental Health is directed to and shall continue to provide all counseling and support deemed necessary.

(Doc. 77).

Third, the MDOC Defendants also indicate that they, in conjunction with Corizon have developed explicit procedures to respond to inmates with gender dysphoria (Doc. 68 at 6). In support of this assertion, the MDOC Defendants provide an August 2016 Corizon Memo regarding "Gender Dysphoria Patients"(Doc. 68-10). In the memo, Corizon outlines its "initial guidance into the treatment or continuation of treatment for patients with Gender Dysphoria" (Doc. 68-10). Corizon defines gender dysphoria using the DSM-V definition as provided in full above (*Id.* at 2). Relevant to the current case, the memo indicates that the following steps should be taken when a new diagnosis of Gender Dysphoria is under consideration or suspected, to be "ruled in or ruled out:"

a. The patient will be scheduled with a Psychiatrist for an evaluation to include a thorough history and for a consideration of a provisional diagnosis of Gender Dysphoria.

b. Before a diagnosis of Gender Dysphoria can be ruled in, the Gender Dysphoria Clinical Supervision Group must convene to review the case.

c. During this meeting a review of all medical records, medication records, and independent reports detailing their findings, and evaluations by site staff must occur, and a diagnosis of Gender Dysphoria will be ruled in or ruled out.

d. Once the final diagnosis of Gender Dysphoria is ruled in, the individualized medical and mental health treatment plans will be developed by site health care staff and will then be forwarded to the Gender Dysphoria Clinical Supervision Group for their review and approval.

e. Once the treatment plans are approved by the Gender Dysphoria Clinical Supervision Group, they will forward such plans to the DOC Transgender Committee for their review and subsequent referral to the DOC Central Office.

f. At this time, the patient's diagnosis should be noted on the problem list and treatment documented and when implemented with the involvement of the offender within the electronic medical record.

g. On a case-by-case base, hormonal replacement therapy (HRT) may need to be considered. In such a situation, the Gender Dysphoria Clinical Supervision Group will be forward [sic] such decision on to the DOC Transgender Committee for their review and subsequent referral to DOC Central Office.

h. Upon review, DOC Central Office will provide direction to the DOC Transgender Committee, and copy the appropriate facility [Health Services Administrator (HSA)], facility medical director, and the [Intuitional Chief of Mental Health Services (ICMHS)].

i. With the approval of the DOC Central Office, the offender will be scheduled for a medical evaluation to include a thorough history, complete physical examination, and baseline laboratory studies and initiate HRT as clinically indicated.

j. Also, if the patient is transferred to another facility, it is expected the sending site HSA and ICMHS will notify the receiving site's HSA and ICMHS of this patient, treatment plan and expectations for fulfilling the requirements of this plan.

(*Id.* at 4-5). The Gender Dysphoria Clinical Supervision Group is comprised of the healthcare professionals who are assigned to work with a patient diagnosed with Gender Dysphoria, the contractual Regional Director of Psychiatry, the appropriate contractual Mental Health Director, the contractual Regional Medical Director, and a contractual Specialty Physician Consultant based upon identified need (*Id.* at 1). This Group meets as needed to conduct an ongoing review of the management of patients diagnosed with Gender Dysphoria (*Id.*). Each Department of Corrections (DOC) institution will have a transgender committee comprised of the health services administrator (HSA), the medical director, institutional chief of mental health services (ICMHS) and the deputy warden or prison rape elimination act (PREA) site coordinator (*Id.* at 2). Defendants also provided a copy of the Corizon Transgender MTF (Male to Female) Hormone Protocol and Patient Consent form (*Id.* at 6-7).

Plaintiff's counsel also indicated during oral argument that it was her understanding that other individuals were being treated for gender dysphoria, including being given hormone therapy (Doc. 83 at 9). Although MDOC counsel indicated otherwise, stating at the hearing that

he was not aware, "at this stage of the litigation," of any other inmates in male facilities receiving hormone treatment (*Id.* at 22), the MDOC Defendants admitted in their answer that "hormone therapy has been provided to transgender inmates in the MDOC" (Doc. 42 at 2).

*Internal Grievance Procedure*

The parties do not dispute that Ms. Hicklin has exhausted the MDOC's internal grievance process (*See* Doc. 68-2 (Informal Resolution Request Response dated April 27, 2015); Doc. 68-3 (Grievance Response dated June 7, 2015); Doc. 68-4 (Informal Resolution Request Response dated July 20, 2015); Doc. 68-5 (Grievance Response dated August 12, 2015); Doc. 68-6 (Grievance Response dated August 12, 2015); Doc. 68-7 (Offender Grievance Appeal Response dated October 21, 2015)). One such grievance response, dated April 27, 2015, although partially cut off, appears to read, "On that [date,] physician [sic] recorded that per PCC administration, after discussions between DOC and [Corizon] Health representatives, there are no plans to proceed with hormone treatment" (Doc. 68-2 at 2). The MDOC Defendants admit that when Ms. Hicklin met with Defendant Nurse Diana Larkin to discuss whether this grievance could be resolved through discussion, Defendant Larkin informed Ms. Hicklin that she had received an email from Dwayne Kempker, previously named in this action as a defendant and the former Deputy Director, Division of Adult Institutions, MDOC, stating that Ms. Hicklin would not receive hormone therapy because MDOC policy prohibited an inmate who was not on such therapy upon entering MDOC from receiving it while in MDOC (Doc. 19 at 21-22; Doc. 42 at 14). Another grievance response, dated August 12, 2015 and signed by Dr. Throop, appears to read, "The treatment team agre[es] the Standards of Care, in regard to Mental health professionals helping clients become psych[ologically] prepared in every way as they consider hormone therapy. This preparation would also include[e] recently being told that you would not receive hormone therapy treatment, and being able to p[rocess] this news" (Doc. 68-6).

## II. DISCUSSION

Federal Rule of Civil Procedure 65 gives courts the authority to grant preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Munaf v. Green*, 553 U.S. 674, 689-90 (2008)). "Whether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant, (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that movant will succeed on the merits, and (4) the public interest." *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). Although "'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance,* 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Barrett v. Claycomb,* 705 F.3d 315, 320 (8th Cir. 2013)) (internal citations omitted). "The burden of demonstrating that a preliminary injunction is warranted is a heavy one where, as here, granting the preliminary injunction will give plaintiff substantially the relief [she] would obtain after a trial on the merits." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991). *See also Blankenship v. Chamberlain*, 2008 WL 4862717, at *2 (E.D. Mo. Nov. 7, 2008) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001)) (In seeking a mandatory injunction that disrupts the status quo, the plaintiff "must demonstrate not only that the four requirements for a preliminary injunction are met but also that they weigh heavily and compellingly in [her] favor.").

### A. Threat of Irreparable Harm

"The threshold inquiry is whether the movant has shown the threat of irreparable injury." *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 738 (8th Cir. 1989) (en banc). "The failure to show irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." *Id.* Irreparable harm must be certain and imminent such that there is a

clear and present need for equitable relief. *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). Possible or speculative harm is not sufficient. *Local Union No. 884, United Rubber, Cork, Linoleum, & Plastic Workers of Am. v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995). When there is an adequate remedy at law, a preliminary injunction is not appropriate. *Modern Computer Sys.*, 871 F.2d at 738.

The Court finds that Plaintiff has met her burden to show the threat of irreparable injury. Plaintiff asserts that she has and will continue to suffer irreparable harm in the absence of a preliminary injunction because she suffers from depression, anxiety, and intrusive thoughts of self-castration as a result of Defendants' conduct (Doc. 64 at 7-9). Defendants' assertion that Ms. Hicklin cannot establish irreparable injury because any injury is merely speculative is inaccurate (Doc. 69 at 4). The medical records establish that Ms. Hicklin suffers and will continue to suffer from "panic symptoms" with "active body anxiety, tachycardia, sob, [with] diaphoresis noted almost daily" (Doc. 64-6 at 5). The record also reflects that these symptoms are as a result of Ms. Hicklin's gender dysphoria. Indeed, Plaintiff's expert, Dr. Ettner indicates, that:

> [The] lack of appropriate treatment for gender dysphoria is causing Ms. Hicklin to experience serious psychological and physical symptoms including panic attacks, anxiety, racing heartbeat (tachycardia), shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating.

(Doc. 64-1 at 16). The records further indicate that Ms. Hicklin's symptoms have been worsening and would continue to do so absent treatment for her gender dysphoria. For example, Dr. Stephens, upon receiving several letters from Ms. Hicklin and after an urgent follow-up appointment with her, found that Ms. Hicklin suffered from "some increased dysphoria symptoms with body/facial hair growth . . . and increase in intrusive thoughts to remove testicles with fear of active male pattern baldness symptoms" (Doc. 64-6 at 36).

The records also establish that Ms. Hicklin is at severe risk of self-harm. While Ms. Hicklin has consistently indicated that she does not have suicidal ideations or that she will commit self-harm, she has a history of suicide ideation and has indicated on more than one occasion the inclination to remove her own testicles. Specifically, "Ms. Hicklin has a history of suicide ideation and two suicide attempts" (Doc. 64-1 at 13). Ms. Hicklin has also attempted to remove her testicles with a tourniquet (Doc. 64-1 at 12-13, 16; Doc. 83 at 6). Dr. Ettner notes that "Ms. Hicklin avoids contact with her genitals, and, typical of incarcerated gender dysphoric individuals without access to care, she has thoughts of removing them. On one occasion, Ms. Hicklin tried to amputate her testicles with a tourniquet . . ." (Doc. 64-1 at 16). "Emotional distress, anxiety, depression and other psychological problems can constitute irreparable injury." *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal.), *appeal dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015) (citing *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709 (9th Cir. 1988); *Stanley v. University of Southern California*, 13 F.3d 1313, 1324 n.5 (9th Cir.1994)). *See also cf. Reid v. Kelly*, No. 5:13CV00249 JLH-JTK, 2013 WL 6231149, at *2 (E.D. Ark. Dec. 2, 2013) (suggesting self-harm may be sufficient to establish a threat of irreparable harm).

Finally, as addressed in more detail below, the deprivation of Ms. Hicklin's constitutional rights under the Eighth Amendment is alone sufficient to establish irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Michigan State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) (internal quotation marks omitted) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court properly relied on the presumption of irreparable injury that flows from a violation of constitutional

rights."); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

Therefore, because Ms. Hicklin has established that she suffers from and will continue to suffer from severe emotional distress as well as a substantial risk of self-harm and that she has been deprived of her constitutional rights, Ms. Hicklin has met her burden to show the threat of irreparable harm.

**B. Likelihood of Success**

The Court will next consider the likelihood that Plaintiff will succeed on the merits as the Eighth Circuit has long held this factor to be the most significant. *Dataphase,* 640 F.2d at 113. In considering this factor, the Court need not decide whether Ms. Hicklin, as the moving party, will ultimately succeed on her claims but, rather, whether Ms. Hicklin has a "fair chance of success on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008). Here, Ms. Hicklin asserts that she suffers from an objectively serious medical condition that Defendants, acting with deliberate indifference, have failed to treat in violation of the Eighth Amendment (Doc. 64 at 13).

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). The "deliberate indifference" standard applies to a prisoner's challenge to medical treatment. *Wilson v. Seiter,* 501 U.S. 294, 303 (1991). Deliberate indifference has both subjective and objective components. A plaintiff must show (1) that she suffered from an objectively serious medical need and (2) that the prison officials actually knew of, but deliberately disregarded, that need. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

### 1. Serious Medical Need

First, Ms. Hicklin must demonstrate that she suffers from an objectively serious medical need. To be objectively serious, the medical need must be "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Johnson v. Busby,* 953 F.2d 349, 351 (8th Cir. 1991). In this case, Ms. Hicklin asserts that both her diagnosis for gender dysphoria disorder and her risk of self-harm constitute serious medical needs. Defendants do not contest that Ms. Hicklin's gender dysphoria is a serious medical need (Doc. 83 at 24). Regardless, the Court will engage in the analysis.

The Court finds that Ms. Hicklin suffers from an objectively serious medical need. A diagnosis of gender dysphoria disorder alone may constitute a serious medical need. *See White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988) ("We therefore conclude that transsexualism is a serious medical need."). *See also Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011) (upholding district court decision recognizing gender identity disorder as a serious medical need); *Fields v. Smith*, 712 F. Supp. 2d 830, 862 (E.D. Wis. 2010) (gender identity disorder is a serious medical need for purposes of the Eighth Amendment), *aff'd*, 653 F.3d 550 (7th Cir. 2011); *Phillips v. Mich. Dep't of Corr.*, 731 F. Supp. 792, 800 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991) (same). Two separate psychiatrists diagnosed Ms. Hicklin with gender dysphoria and noted that she required specific treatment in order to treat her disorder. *See Kosilek v. Maloney*, 221 F. Supp. 2d 156, 184 (D. Mass. 2002) (finding a gender identity disorder diagnosis by two doctors to be significant in establishing a serious medical need). Further, upon review of Ms. Hicklin's medical records, the Court finds that her gender dysphoria disorder is especially severe. *Id.* (D. Mass. 2002) (citing *Farmer v. Moritsugu*, 163 F.3d 610, 615 (D.C. Cir.1998)). As addressed in more detail above, as a result of her gender dysphoria, Ms. Hicklin suffers from

the severe symptoms of anxiety, panic attacks, shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating (*See, e.g.,* Doc. 64-1 at 16). The evidence also indicates that Ms. Hicklin is at significant risk of self-harm and has attempted on one occasion to remove her own testicles with a tourniquet (Doc. 64-1 at 12-13, 16; Doc. 83 at 6). *De'lonta v. Angelone ("De'lonta I")*, 330 F.3d 630, 634 (4th Cir. 2003) (citing *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981) ("[P]rison officials have a duty to protect prisoners from self-destruction or self-injury.")). *See also Soneeya v. Spencer*, 851 F. Supp. 2d 228, 244-52 (D. Mass. 2012) (incarcerated individual with gender identity disorder and history of suicide attempts and self-mutilation has a serious medical condition).

### 2. Deliberate Indifference

"In order to demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Allard v. Baldwin*, No. 14-1087, 2015 WL 921006, at *3 (8th Cir. Mar. 5, 2015) (internal quotation omitted) (quoting *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009)). Negligence or medical malpractice does not constitute a constitutional violation. *Estelle,* 429 U.S. at 106.

The Court finds that Ms. Hicklin is likely to succeed in establishing that Defendants were deliberately indifferent to her serious medical need. Ms. Hicklin has presented compelling evidence that Defendants' refusal to provide her with hormone therapy after her diagnosis is based on the Policy rather than on a medical judgment concerning Ms. Hicklin's specific circumstances.

Medical professionals, including members of several reviewing committees, are generally in consensus that Ms. Hicklin requires hormone therapy to treat her gender dysphoria in accordance with the Standards of Care. Both of Ms. Hicklin's physiatrists, Dr. Throop and Dr.

Stephens, recommended hormone therapy in accordance with the Standards of Care (*See, e.g.,* Doc. 64-6 at 35; Doc. 64-4 at 9, 11). *Cf. Smith v. Hayman,* 489 F. App'x 544, 547 (3d Cir. 2012) (unpublished) (footnote omitted) ("While in certain circumstances the failure to provide hormones and other courses of treatment can be constitutionally impermissible, the allegations of the present case do not show ignorance or an affirmative failure to treat, but rather caution and diagnostic disagreement. Such circumstances, in the absence of aggravating factors such as previous GID treatment or even a definitive GID diagnosis, do not rise to the level of constitutional violation."). The Gender Dysphoria Clinical Supervision Group also agreed on appropriate hormone therapy to treat Ms. Hicklin's gender dysphoria (Doc. 64-6 at 28).

Despite these recommendations, the evidence indicates that the decision to refuse Ms. Hicklin the hormone therapy rests solely on the Policy. The Policy is mentioned extensively throughout the medical record as the reason for the refusal to provide Ms. Hicklin with hormone therapy. For example, after her initial review of Ms. Hicklin, Dr. Throop referred Ms. Hicklin to an endocrinologist "for evaluation of cross-sex hormone [treatment]. Currently, hormone therapy (estrogen, testosterone blockers) is the accepted treatment for individuals with [a] Gender Dysphoria diagnoses" (Doc. 64-4 at 4). However, in an addendum to her notes from the evaluation, Dr. Throop indicates, "after researching DOC protocols, it was found that endocrinology consult is NOT the appropriate next step for psychiatry in the [treatment] of Gender Dysphoria" (*Id.*). Dr. Stephens also references the Policy multiple times. For example, Dr. Stephens states in a plan note dated April 22, 2016, "Per discussion from Gender Dysphoria council at PCC, still pending decision from recent request on policy surrounding treatment of gender dysphoria with hormonal treatment if diagnosed in prison" (Doc. 64-6 at 21). *See also Id.* at 17 ("pending decision on DOC policy of use of hormone treatment of gender dysphoria diagnosed while incarcerated"). The MDOC Defendants also admit that when Ms. Hicklin met

with Defendant Nurse Diana Larkin to discuss whether one of her grievances could be resolved through discussion, Defendant Larkin informed Ms. Hicklin that she had received an email from Dwayne Kempker, the former Deputy Director, Division of Adult Institutions, MDOC, stating that Ms. Hicklin would not receive hormone therapy because MDOC policy prohibited an inmate who was not on such therapy upon entering MDOC from receiving it while in MDOC (Doc. 19 at 21-22; Doc. 42 at 14). The denial of hormone therapy based on a blanket rule, rather than an individualized medical determination, constitutes deliberate indifference in violation of the Eighth Amendment. *See, e.g., Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (en banc); *Fields v. Smith*, 653 F.3d 550, 556-57 (7th Cir. 2011); *De'lonta I*, 330 F.3d at 635; *Allard v. Gomez*, 9 Fed.Appx. 793, 794 (9th Cir. 2001) (unpublished).

The MDOC Defendants do not contest that the medical staff at PCC recommends hormone therapy for Ms. Hicklin nor do they appear to dispute that the treatment was denied based on the Policy, instead they argue, "there is an important distinction to be made between what medical professionals recommend and what the federal constitution requires" (Doc. 68 at 12). Citing *Smith v. Rasmussen*, 249 F.3d 755 (8th Cir. 2001), a case upholding a state Medicaid regulation prohibiting payment for sex reassignment surgery, the MDOC Defendants specifically assert that "[t]here is no constitutional right to sex-reassignment therapy" (*Id.* at 7). Reliance of *Rasmussen* is misplaced here and Plaintiff has not asked for surgery (*Id.*). The MDOC Defendants also argue, citing portions of a report entitled, "Sexuality and Gender: Findings from the Biological, Psychological, and Social Services," by Dr. Lawrence S. Mayer and Dr. Paul R. McHugh, that "there is a legitimate disagreement in the scientific community about what treatment is or is not appropriate for a patient with gender dysphoria" (Doc. 68 at 13). Similarly, the Corizon Defendants indicate that they have not "refused the particular care that Plaintiff seeks" but that this is, "at best, merely . . . a disagreement regarding treatment decisions that

have been made" (Doc. 69 at 3). Defendants assert that Plaintiff is receiving extensive and continuing medical and psychological care for her gender dysphoria, "far more than that could possibly be required by the federal Constitution" (Doc. 68 at 1). *See also id.* at 9-10 ("Plaintiff has not shown that the medical and psychological care and counseling she has received and continues to receive somehow amounts to 'cruel and unusual punishment.'").

Defendants' decision to provide "*some* treatment" is inadequate and, therefore, not constitutional. *De'lonta v. Johnson (De'lonta II)*, 708 F.3d 520, 526 (4th Cir. 2013) (emphasis in original). *See also Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (internal quotation marks omitted) ("[A] total deprivation of care is not a necessary condition for finding a constitutional violation: Grossly incompetent or inadequate care can also constitute deliberate indifference . . . ."). As aptly put by the District Court of Massachusetts, "if [Ms. Hicklin] had cancer, and was depressed and suicidal because of that disease, the DOC would discharge its duty to [her] under the Eighth Amendment by treating *both* [her] cancer and [her] depression." *Kosilek v. Maloney*, 221 F. Supp. 2d 156, 188 (D. Mass. 2002) (emphasis added). *See also e.g., Kothmann v. Rosario*, 558 F. App'x 907, 910 (11th Cir. 2014) (unpublished) (denying qualified immunity to prison official who denied transgender prisoner hormone therapy while providing anti-anxiety and anti-depression medications, mental health counseling, and psychotherapy treatments); *De'lonta II*, 708 F.3d at 526 (finding counseling and anti-depressants insufficient as defendants had not clearly demonstrated that this treatment was provided for the purpose of alleviating plaintiff's self-harm or that it was deemed to be a reasonable method of preventing further mutilation); *Fields*, 653 F.3d at 556 ("Although DOC can provide psychotherapy as well as antipsychotics and antidepressants, defendants failed to present evidence rebutting the testimony that these treatments do nothing to treat the underlying [gender dysphoria].");
*Soneeya*, 851 F. Supp. 2d at 246-50 (blanket ban on laser hair removal and surgery was

25

deliberately indifferent even though transgender plaintiff was receiving some treatment, including psychotherapy and hormones). Accordingly, while Defendants are correct in their assertion that Ms. Hicklin is not constitutionally entitled to the treatment of her choice, the treatment must nevertheless be adequate to address the prisoner's serious medical need. *See cf. Reid v. Griffin,* 808 F.3d 1191, 1192-93 (8th Cir. 2015) (finding plaintiff unable to establish that the defendants' conduct amounted to deliberate indifference when plaintiff was not diagnosed with gender identity disorder and the medical records and physician affidavits indicated that the care provided was adequate). In light of treating physicians' recommendations, psychiatric care and counseling alone are constitutionally inadequate to address Ms. Hicklin's gender dysphoria.

The Court further finds that Ms. Hicklin is likely to succeed on the merits as to her requests to have access to "gender-affirming" canteen items and permanent hair removal. Pursuant to the Standards of Care, individualized treatment for gender dysphoria may include living in the gender role that is consistent with one's gender identity (Doc. 64-1 at 6). In line with and specifically noting the Standards of Care, Dr. Stephens suggested that Ms. Hicklin be given the opportunity to live as her desired gender (*See* 64-6 at 6, 15). In order to accomplish this, Dr. Stephens recommended "psychotherapy ongoing, 3-6 months living as a female with access to products that females in DOC have access to for self care [sic]" (*Id.* at 5). Dr. Stephens also endorsed the use of medication to prevent hair loss and treatment for hair removal (*Id.* at 35). Specifically, Dr. Stephens notes, on September 20, 2016, "[g]iven this increased agitation, self harm [sic] thoughts and reported active symptoms of male pattern baldness will refer to gender dysphoria committee to consider dermatology referral and treatment for hair loss (head) and removal (body) as at this time symptoms [constitute] medical necessity" (Doc. 64-6 at 35). The basis of the denial of these items is unclear from the record. At one point, in response to an internal grievance, Nurse Wade indicates Dr. Babich, Associate Regional Medical Director,

stated that various forms of permanent hair removal were "not medically necessary" (Doc. 68-4 at 2). However, as discussed above, the medical evidence does not support this blanket assertion and the case law is clear—"gender-affirming" canteen items and permanent hair removal are not merely cosmetic treatments but, instead, medically necessary treatments to address a serious medical disease. *See Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012) (finding plaintiff sufficiently asserted factual allegations to support a claim of deliberate indifference to survive a motion to dismiss when she alleged that she was prescribed laser hair removal and/or electrolysis on at least three occasions but defendants "repeatedly ignored treatment prescriptions given to [p]laintiff by her doctors"). *See also Soneeya,* 851 F. Supp. 2d at 247 (finding the department of corrections' blanket policy prohibiting, among other things, laser hair removal to be unconstitutional and, therefore, entering a permanent injunction enjoining the department of corrections from enforcing it); *Konitzer v. Frank*, 711 F. Supp. 2d 874, 909 (E.D. Wis. 2010) (finding modest makeup, female undergarments, facial hair remover, and hair growth stimulators to be "part of the real-life experience" required under the applicable standards of care such that sufficient evidence supported the conclusion that these items may be medically necessary to survive summary judgment).

Accordingly, the Court finds that Ms. Hicklin is likely to succeed on the merits as to her Eighth Amendment claim that Defendants were deliberately indifferent by failing to provide her with hormone therapy, "gender-affirming" canteen items, and permanent hair removal to treat her serious medical of gender dysphoria.

## C. Balance of Harms

In considering the equities of a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter,* 555 U.S. at 24. "In exercising their sound

discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.*

The balance of harms substantially weighs in favor of granting injunctive relief to Ms. Hicklin. Ms. Hicklin has met her heavy burden to establish that she continues to face irreparable injury absent relief, as addressed in more detail above, including the denial of her constitutional rights. Conversely, the MDOC Defendants contend that they will be harmed, as addressed for the first time during oral argument, by considerations of safety both for Ms. Hicklin as well as other inmates, suggesting that any gender-identity transition places her at substantial risk of sexual abuse and harassment (Doc. 77; Doc. 83 at 17-22). The MDOC Defendants have also tangentially raised the issue of cost (*See, e.g.*, Doc. 68 at 12). The Court is cognizant that Defendants have the difficult task of ensuring staff and inmate safety and security, and appropriate medical care for those incarcerated. However, the challenge of housing thousands of inmates safely cannot impede on the constitutional rights of the individuals in MDOC custody. The Court finds the MDOC Defendants' assertions particularly unavailing in this case because the limited evidence reflects that other inmates within the MDOC system have received hormone therapy. And MDOC Defendants have accommodated Plaintiff by giving her the option to shower without male inmates present (Doc. 83 at 18). Therefore, the Court cannot determine that the MDOC Defendants' decision to deny Ms. Hicklin the medical care she seeks is based on substantiated penological concerns. *Cf. Kosilek v. Spencer,* 774 F.3d 63, 83 (1st Cir. 2014) (internal citations and quotation marks omitted) ("'Wide-ranging deference' is accorded to prison administrators in the adoption and execution of policies and practices that in their judgement are needed to maintain institutional security. In consequence, even a denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security."). Similarly, the MDOC

Defendants' assertions regarding cost are unsupported by specifics. MDOC is already providing—or has provided—this treatment to other inmates and did not provide the Court with *any* information regarding the cost of these treatments for the Court's consideration.[13] Accordingly, the Court finds the balance of harms weighs heavily in favor of Ms. Hicklin.

**D. The Public Interest**

Finally, the public interest weighs strongly in favor of issuing the preliminary injunction. Ms. Hicklin seeks to protect her constitutional rights (*Id.* at 14). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

**E. The Policy**

Additionally, as relief in her Motion for Preliminary Injunction, Ms. Hicklin requests the Court enter an order "enjoining Defendants from enforcing the policies, customs, or practices that have served as a moving force behind their constitutional violations by denying inmates with gender dysphoria individualized medically necessary treatment and care, contrary to widely accepted standards of care and the recommendations of Ms. Hicklin's treating mental health professionals" (Doc. 64 at 19). Although unclear as to the precise meaning of this request, Ms. Hicklin appears to suggest that the Policy is itself unconstitutional and the MDOC Defendants should be enjoined from enforcing it. The Court notes that the Policy categorically restricts inmates who are diagnosed with gender dysphoria after entering the MDOC from receiving hormone treatment. There does not appear to be any rational relationship between the Policy and a legitimate governmental interest or penological purpose especially in light of the evidence

---

[13] By illustration, as noted by the Seventh Circuit, "[i]n 2004, [the Wisconsin Department of Corrections (DOC)] paid a total of $2,300 for hormones for two inmates. That same year, DOC paid $2.5 million to provide inmates with quetiapine, an antipsychotic drug which costs more than $2,500 per inmate." *Fields*, 653 F.3d at 555.

indicating that other inmates in the MDOC system receive hormone therapy. *Turner v. Safley*, 482 U.S. 78, 89 (1987). Further, failure to conduct an individualized review of a prisoner's needs may violate the Eighth Amendment. *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (citing *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011)) (any blanket policy regarding sex reassignment surgery would conflict with the requirement that medical care be individualized based on a particular prisoner's serious medical needs and that such a failure may violate the Eighth Amendment). *See also Fields*, 653 F.3d at 556 (finding blanket law denying access to hormone treatment to be unconstitutional; "Refusing to provide effective treatment for a serious medical condition serves no valid penological purpose and amounts to torture."). However, Ms. Hicklin does not raise this issue in her Complaint nor did any of the Parties present argument on this claim either in their briefs or before the Court during the hearing.

The Court has considered the entire record and the arguments presented at the hearing on this matter. Based upon the foregoing consideration of all of the *Dataphase* factors, the Court finds that Ms. Hicklin is entitled to a preliminary injunction that Defendants' provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to "gender-affirming" canteen items. However, Ms. Hicklin's has failed to meet her burden to warrant a preliminary injunction as to the Policy in general.

**F. Bond**

Federal Rule of Civil Procedure 65(c)'s instruction that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper" has long been interpreted to mean that a district court has discretion to grant injunctive relief without requiring bond or other security, especially when doing so would function to bar poor people from obtaining judicial redress. *See, e.g., Doctor's*

*Assocs., Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996); *Miller v. Carlson,* 768 F. Supp. 1331 (N.D. Cal.1991); *Brown v. Artery Org., Inc.,* 691 F. Supp. 1459, 1462 (D.D.C. 1987).  In this case, Ms. Hicklin is incarcerated and appears to lack sufficient resources from which to provide security.  Requiring a bond in this case would effectively bar Ms. Hicklin from obtaining injunctive relief.  Therefore, the Court will grant injunctive relief without requiring bond or other security.  *See Johnson v. Bd. of Police Comm'rs*, 351 F. Supp. 2d 929, 952 (E.D. Mo. 2004)("[A] district court has discretion to grant injunctive relief without requiring bond or other security, especially when doing so would function to bar poor people from obtaining judicial redress.").

### III. CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff First Motion to Supplement (Doc. 88) is **GRANTED** and Plaintiff's Second Motion to Supplement (Doc. 98) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Jessica Hicklin's Motion for Preliminary Injunction (Doc. 63) is **GRANTED, in part** and **DENIED, in part**.

The Court has carefully considered Plaintiff's specific requests for relief and finds the following injunctive relief to be appropriate:

(1) Defendants are directed to provide Ms. Hicklin with care that her doctors deem to be medically necessary treatment for her gender dysphoria, including hormone therapy, access to permanent body hair removal, and access to "gender-affirming" canteen items.

Dated this 9th day of February, 2018.

    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE