IN THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT
OF MISSOURI EASTERN DIVISION

JESSICA HICKLIN,

                    Plaintiff,

*v.*

ANNE PRECYTHE, in her official capacity as
    Director of the Missouri Department of
    Corrections ("MDOC");
JOAN REINKEMEYER**,** in her official
    capacity as Director, Division of Offender
    Rehabilitative Services, MDOC;
CINDY GRIFFITH, in her official capacity as
    Deputy Director, Division of Adult Institutions,
    MDOC;
CINDY GRIFFITH, in her official capacity as
    Warden of Potosi Correctional Center ("PCC");
STAN PAYNE, in his official capacity as Deputy
    Warden of PCC;
SCOTT O'KELLY, L.P.C., in his official
    capacity as Assistant Division Director, Mental
    Health Services, Department of Offender
    Rehabilitative Services, MDOC;
LATOYA DUCKWORTH, in her
    official capacity as Assistant Division
    Director, Medical Services,
    Department of Offender Rehabilitative
    Services, MDOC;
CORIZON, LLC. ("Corizon");
WILLIAM MCKINNEY, M.D., in his official
    capacity as Medical Director of PCC,
    Corizon;
JOHN DEGHETTO, M.D., in his official
    capacity as Associate Regional Medical
    Director, Corizon;
THOMAS KEVIN BREDEMAN, D.O., in his
    official capacity as Associate Regional
    Medical Director, Corizon;
DIANA LARKIN, R.N., in her official capacity
    as Health Services Administrator, Corizon;

Case No. <u>**4:16-CV-01357-NCC**</u>

<u>**FIRST AMENDED COMPLAINT**</u>
<u>**FOR DECLARATORY AND**</u>
<u>**INJUNCTIVE RELIEF**</u>

1

KIMBERLEY S. RANDOLPH, R.N., B.S.N.,
   C.C.H.P., in her official capacity as Director
   of Operations, Corizon;
DALY SMITH, in her official capacity as
   Director of Nursing, Corizon;
STORMI MOELLER, R.N., in her
   official capacity as an employee of
   Corizon;
ERNEST GRAYPEL, M.D., in his official
   capacity as Regional Psychiatric
   Director, Corizon;
ELIZABETH ATTERBERRY, Psy. D., in her
   official capacity as Regional Mental Health
   Director, Corizon;
KIM FOSTER, L.P.C., in her official capacity as
   Mental Health Director for PCC, Corizon.

Defendants.

## PRELIMINARY STATEMENT

1.      Plaintiff Jessica Hicklin ("Plaintiff" or "Ms. Hicklin") is a thirty-eight year old

transgender woman[1] in the custody of the Missouri Department of Corrections ("MDOC")

and housed at Potosi Correctional Center ("PCC"), a facility for male inmates, in Mineral

Point, Missouri. Defendants are individuals and institutions who, for the duration of Ms.

Hicklin's incarceration, have had authority and responsibility for her medical treatment.

2.      Despite knowing that Ms. Hicklin has gender dysphoria, a serious medical

condition that causes severe psychological suffering and can lead to physical injury when not

properly treated, Defendants have refused to provide Ms. Hicklin with medically necessary

care.

3.      On March 27, 2015, Ms. Hicklin filed a Petition for Change of Name in the

Washington County Circuit Court, seeking to change her name from the traditionally male

---

[1] In keeping with Ms. Hicklin's gender identity, modern judicial practice, and accepted medical
protocol, this Complaint uses female pronouns to refer to her.

2

name given to her at birth to her current legal name, Jessica Hicklin.[2]

4.      Although Defendants' own mental health personnel have evaluated Ms. Hicklin, have diagnosed her with gender dysphoria, and have recommended that she receive hormone therapy to treat her gender dysphoria, Defendants have failed to provide Ms. Hicklin with this therapy pursuant to MDOC's policy or custom of providing hormone therapy only to those transgender inmates who were receiving it prior to incarceration ("the freeze-frame policy").

5.      This type of freeze-frame policy violates the medically accepted standard of care for treating gender dysphoria; similar state and federal policies have been held unconstitutional by federal courts as a violation of the Eighth Amendment of the United States Constitution.

6.      Upon information and belief, Defendants are providing and have provided hormone therapy to other transgender inmates in MDOC, recognizing that it can be medically necessary treatment for gender dysphoria, but unreasonably refuse to provide this medically necessary treatment to Ms. Hicklin due to MDOC's unconstitutional freeze-frame policy.

7.      Defendants have also deprived Ms. Hicklin of other interventions that are also part of the medically necessary treatment Ms. Hicklin requires for her gender dysphoria and have also been recommended by Defendants' mental health personnel, including permanent hair removal and access to gender-affirming canteen items.

8.      Defendants do not deny that Ms. Hicklin has gender dysphoria requiring

---

[2] On July 24, 2015, Ms. Hicklin received an order from the Washington County Circuit Court granting her name change petition.  Pursuant to this Order, Ms. Hicklin's social security card, the labels on her PCC-issued clothing, and her offender identification card have been updated to reflect her legal name.

treatment. Rather, they have been deliberately indifferent to Ms. Hicklin's serious medical needs and have denied her care pursuant to an unconstitutional policy or custom that ignores the recommendations of the MDOC mental health professionals.

9.      MDOC mental health professionals employed by Defendants have recommended that Ms. Hicklin receive treatment in accordance with the World Professional Association for Transgender Health ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("Standards of Care"), which are internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria.

10.     Through their deliberate indifference, Defendants have caused and continue to cause Ms. Hicklin profound pain and suffering, for which she seeks preliminary and permanent injunctive relief and declaratory relief.

11.     Ms. Hicklin has fully exhausted her administrative remedies to no avail.

12.     Ms. Hicklin brings this action pursuant to 42 U.S.C. § 1983, to seek redress for Defendants' deliberate indifference to her serious medical needs, which constitutes cruel and unusual punishment under the Eighth Amendment to the United States Constitution, made applicable to the State through the Fourteenth Amendment.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action seeking preliminary and permanent injunctive relief and declaratory relief pursuant to 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the relevant events occurred within the district.

4

16.     This Court has personal jurisdiction over each and every defendant because, upon information and belief, all Defendants were either residents of Missouri, were employed in Missouri, or conducted business in Missouri, and all were acting under color of state law during all relevant times.

## PARTIES

17.     **PLAINTIFF JESSICA HICKLIN** is a thirty-eight year old white transgender woman, diagnosed with gender dysphoria, who is in the custody of the Missouri Department of Corrections ("MDOC"). At all relevant times, Ms. Hicklin was incarcerated at the Potosi Correctional Center ("PCC"), a facility for male inmates, where she remains at the time of this filing.

18.     **DEFENDANT ANNE PRECYTHE** ("Precythe")[3] is the Director of MDOC, a position formerly held by **GEORGE LOMBARDI** ("Lombardi"). At all relevant times, the Director of MDOC ("the Director") has exercised, and continues to exercise, ultimate policy and decision-making authority over MDOC and control over all MDOC employees and contractors, and is responsible for their training, supervision, and conduct. The Director has ultimate responsibility within MDOC for overseeing day-to-day operation of state prison facilities, including PCC, and is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of MDOC staff. The Director has implemented, condoned, and ratified the custom and practice within MDOC of denying medically necessary treatment for gender dysphoria,

---

[3] Pursuant to Fed. R. Civ. P. 25(d), and to the best of Plaintiff Jessica Hicklin's knowledge and information, this First Amended Complaint substitutes former MDOC Director George Lombardi—and all other former MDOC and Corizon officials who have left their official positions since this lawsuit was originally filed on August 22, 2016—with current MDOC Director Anne Precythe and the other persons currently holding these positions.

including hormone therapy to certain inmates, including Ms. Hicklin, pursuant to MDOC's freeze-frame policy. The Director has also implemented, condoned, and ratified the custom and practice of denying inmates like Ms. Hicklin other forms of medically necessary treatment for gender dysphoria, including permanent hair removal and access to gender-affirming canteen items. The Director has furthermore failed to train and supervise MDOC employees and agents with respect to the proper provision of medically necessary treatment for gender dysphoria, despite knowing that gender dysphoria is a serious medical need and that failing to train and supervise staff with respect to the provision of medically necessary treatment for this serious medical need places inmates like Ms. Hicklin at substantial risk of mental and physical harm. The Director is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

19.     **DEFENDANT JOAN REINKEMEYER** ("Reinkemeyer") is Director, Division of Offender Rehabilitative Services of MDOC ("DORS Director"), a position formerly held by **MATT STURM**. At all relevant times, the DORS Director has exercised, and continues to exercise, authority, direction, and control over MDOC's Division of Offender Rehabilitative Services, including its employees and contractors. The DORS Director is responsible for ensuring the provision of adequate medical care to adult inmates in MDOC's custody, including through the implementation of policies and the training and supervision of MDOC staff. The DORS Director is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

20.     **DEFENDANT CINDY GRIFFITH** is the current Deputy Director, Division of Adult Institutions of MDOC ("Deputy DAI Director"), a position formerly held by **DWAYNE KEMPKER** ("Kempker") and **IAN WALLACE**. At all relevant times, the Deputy DAI Director has exercised, and continues to exercise, authority, direction, and control over

6

MDOC's adult institutions and their employees and contractors. The Deputy Director DAI is responsible for ensuring the provision of adequate medical care to adult inmates in MDOC's custody, including through the implementation of policies and the training and supervision of MDOC staff. The Deputy Director DAI is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

21.    **DEFENDANT CINDY GRIFFITH**[4] was, at relevant times, Warden of PCC ("Warden"). At all relevant times, the Warden has exercised, and continues to exercise, authority, direction, and control over PCC and its employees and contractors. The Warden is responsible for ensuring the provision of adequate medical care to inmates in PCC, including through the implementation of policies and the training and supervision of PCC staff. The Warden is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

22.    **DEFENDANT STAN PAYNE** ("Payne") is Deputy Warden of PCC. At all relevant times, the Deputy Warden of PCC has exercised, and continues to exercise, authority, direction, and control over PCC and its employees and contractors. The Deputy Warden of PCC is responsible for ensuring the provision of adequate medical care to inmates in PCC and is among those responsible for denying Ms. Hicklin medically necessary care. He is sued in his official capacity.

23.    On information and belief, **DEFENDANT SCOTT O'KELLY, L.P.C.** ("O'Kelly") is, and has been at all relevant times, the Assistant Division Director, Mental Health Services, Department of Offender Rehabilitative Services at MDOC ("Asst. DORS

---

[4]To the best of Plaintiff Jessica Hicklin's knowledge and information, Cindy Griffith is no longer Warden at PCC.  As of the time of filing of this First Amended Complaint, to the best of Ms. Hicklin's knowledge and information, there has been no official replacement.

Director-Mental Health"). At all relevant times, the Asst. DORS Director-Mental Health has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and has the authority to grant or deny medical care to inmates. The Asst. DORS Director-Mental Health is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. The Asst. DORS Director-Mental Health is among those responsible for denying Ms. Hicklin medically necessary care and is sued in his official capacity.

24.     On information and belief, **DEFENDANT LATOYA DUCKWORTH** is the Assistant Division Director, Medical Services, Department of Offender Rehabilitative Services at MDOC ("Asst. DORS Director-Medical"), a position formerly held by **DELOISE WILLIAMS, R.N., B.S.N.** ("Williams"). At all relevant times, the Asst. DORS Director-Medical has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and has the authority to grant or deny medical care to inmates. The Asst. DORS Director-Medical is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. The Asst. DORS Director-Medical is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

25.     **DEFENDANT CORIZON, LLC** ("Corizon") is and was at all relevant times the contracted medical provider for MDOC. Through its employees and agents, Corizon exercises policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and has the authority to grant or deny medical care to inmates. Corizon is responsible for ensuring the provision of adequate medical care to inmates,

8

including through the implementation of policies and the training and supervision of staff. Corizon is among those responsible for denying Ms. Hicklin medically necessary care.

26.     **DEFENDANT WILLIAM MCKINNEY, M.D.** ("McKinney") is, and has been at all relevant times, Medical Director of PCC.  At all relevant times, the Medical Director of PCC has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and has the authority to grant or deny medical care to inmates. The Medical Director of PCC is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. In making decisions related to Ms. Hicklin's medical care, the Medical Director of PCC failed to follow WPATH Standards of Care, which are internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria. The Medical Director of PCC is among those responsible for denying Ms. Hicklin medically necessary care and is sued in his official capacity.

27.     On information and belief, **DEFENDANT JOHN DEGHETTO, M.D.** ("DeGhetto") and **DEFENDANT THOMAS KEVIN BREDEMAN, D.O.** ("Bredeman") are Associate Regional Medical Directors of Corizon, a position formerly held by **GLEN BABICH, M.D.** ("Babich"). At all relevant times, the Associate Regional Medical Directors have exercised, and continue to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and have the authority to grant or deny medical care to inmates. The Associate Regional Medical Directors are responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. In making decisions related to Ms. Hicklin's medical care, the Associate Regional Medical Directors failed to follow the

9

WPATH Standards of Care, which are internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria. The Associate Regional Medical Directors are among those responsible for denying Ms. Hicklin medically necessary care and are sued in their official capacities.

28.     On information and belief, **DEFENDANT DIANA LARKIN, R.N.** ("Larkin") is currently Health Services Administrator for Corizon. At all relevant times, the Health Services Administrator has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and has the authority to grant or deny medical care to inmates. The Health Services Administrator is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. In making decisions related to Ms. Hicklin's medical care, the Health Services Administrator failed to follow the WPATH Standards of Care, which are internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria. The Health Services Administrator is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

29.     On information and belief, **DEFENDANT KIMBERLEY S. RANDOLPH, R.N., B.S.N., C.C.H.P** ("Randolph") is and was at all relevant times Corizon's Director of Operations. At all relevant times, Corizon's Director of Operations has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and the authority to grant or deny medical care to inmates. Corizon's Director of Operations is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. In making decisions related to Ms. Hicklin's medical care, Corizon's

10

Director of Operations failed to follow the WPATH Standards of Care, which are internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria. Corizon's Director of Operations is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

30.     On information and belief, **DEFENDANT DALY SMITH, R.N.** ("Smith") is the Director of Nursing, a position formerly held by **DAWN WADE, R.N.** ("Wade") and Defendant Larkin.  At all relevant times, the Director of Nursing has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and the authority to grant or deny medical care to inmates.  The Director of Nursing is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. In making decisions related to Ms. Hicklin's medical care, the Director of Nursing failed to follow the WPATH Standards of Care, which are internationally recognized as the authoritative articulation of professional consensus on the treatment of gender dysphoria. The Director of Nursing is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

31.     On information and belief, **STORMI MOELLER, R.N.** ("Moeller") is and was at relevant times employed by Corizon in a capacity requiring the exercise of policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and the authority to grant or deny medical care to inmates. On information and belief, Defendant Moeller is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. In making decisions related to Ms. Hicklin's medical care, Defendant Moeller failed to follow the WPATH Standards of Care, which are internationally recognized

as the authoritative articulation of professional consensus on the treatment of gender dysphoria. Defendant Moeller is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

32.     On information and belief, **ERNEST GRAYPEL, M.D.,** is the Regional Psychiatric Director of Corizon ("Regional Psychiatric Director"), a position formerly held by **SHIRLEY EYMAN, M.D.** ("Eyman").  At all relevant times, the Regional Psychiatric Director has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and the authority to grant or deny medical care to inmates. The Regional Psychiatric Director is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. The Regional Psychiatric Director is among those responsible for denying Ms. Hicklin medically necessary care and is sued in his official capacity.

33.     On information and belief, **ELIZABETH ATTERBERRY, PSY. D.,** ("Atterberry") is and was at all relevant times Regional Mental Health Director of Corizon. At all relevant times, the Regional Mental Health Director has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and the authority to grant or deny medical care to inmates. The Regional Mental Health Director is responsible for ensuring the provision of adequate medical care to inmates, including through the implementation of policies and the training and supervision of staff. The Regional Mental Health Director is among those responsible for denying Ms. Hicklin medically necessary care and is sued in her official capacity.

34.     On information and belief, **KIM FOSTER, L.P.C.** ("Foster") is and was at all relevant times the Mental Health Director of PCC. On information and belief, at all relevant

times, the Mental Health Director of PCC has exercised, and continues to exercise, policy and decision-making authority regarding the care and treatment of MDOC inmates, control of health care personnel, and the authority to grant or deny medical care to inmates. The Mental Health Director of PCC is responsible for ensuring the provision of adequate medical care to inmates and is among those responsible for denying Ms. Hicklin medically necessary care. She is sued in her official capacity.

## FACTS

### *Background on Gender Dysphoria and Its Medical Treatment and Standards of Care*

35.     A person's gender identity refers to that person's internal sense of belonging to a particular gender. It is a deeply felt, core component of a person's identity and the most important determinant of a person's sex.

36.     Emerging research points to the influence of biological factors, most notably the role of sex differentiation in the brain, in gender identity development.

37.     Everyone has a gender identity. For most people, the sex they were assigned at birth matches their gender identity. For transgender people like Ms. Hicklin, the sex they were assigned at birth does not accurately reflect their gender identity.

38.     There is medical consensus that gender identity cannot be changed and attempts to change a person's gender identity are both futile and unethical.

39.     Transgender people may experience discomfort or distress caused by the discrepancy between gender identity and sex assigned at birth. Where this distress reaches a clinical level, it may support a formal diagnosis of gender dysphoria.

40.     Gender dysphoria is a condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013) ("DSM- V"), and by the other leading medical and mental health professional groups,

13

including the American Medical Associations and the American Psychological Association.

41.    As set forth in the DSM-V, the diagnostic criteria for gender dysphoria are:

a.   A marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration, as manifested by at least two of the following:

i.   A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).

ii.   A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).

iii.   A strong desire for the primary and/or secondary sex characteristics of the other gender.

iv.   A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

v.   A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

vi.   A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

b.   The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

42.    There is medical consensus that gender dysphoria is a serious medical condition

14

that if not properly treated is known to cause clinical distress; debilitating depression, anxiety, mental impairment; the impulse to engage in self-surgery and self-harm; and even suicidal thoughts or acts.

43.     Incarcerated transgender women like Ms. Hicklin are at a particularly high risk of engaging in self-harm, including attempts at self-surgery, when treatment is withheld.

44.     Gender dysphoria often intensifies with time. The longer an individual goes without treatment, the greater the risk of severe harms to the individual's physical and psychological health.

45.     The medically recognized protocols for the treatment of gender dysphoria are set forth in the World Professional Association for Transgender Health ("WPATH") Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People ("Standards of Care").

46.     The American Psychological Association, the American Medical Association, and the Endocrine Society have recognized the Standards of Care as the authoritative articulation of professional consensus on the treatment of gender dysphoria. Courts that have considered the issue have also consistently relied on the Standards of Care.

47.     The Standards of Care provide for the following treatments, some or all of which will be required, depending on the individual medical needs of the patient:

    a.  Changes in gender expression and role (which may involve living part time or fulltime in another gender role, consistent with one's gender identity);

    b.  Hormone therapy to feminize or masculinize the body in order to reduce the distress caused by the discordance between one's gender identity and sex assigned at birth;

    c.  Surgery to change primary and/or secondary sex characteristics;

    d.   Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

48.    The Standards of Care also specifically provide that, for some people, permanent hair removal is a valid part of the treatment of gender dysphoria. A procedure can be medically necessary for some individuals, even though the same procedure may not be medically necessary for others, depending on whether the procedure is treatment for a medical condition.

49.    A critical component of the treatment for gender dysphoria as prescribed by the Standards of Care is a process often referred to as the "social role transition," which requires living in accordance's with one's gender identity through changes in gender expression and role, including dressing, grooming, and otherwise outwardly expressing oneself consistently with one's gender.

50.    Psychotherapy or counseling can provide support and affirmation to individuals diagnosed with gender dysphoria, but is not a substitute for treatments such as hormone therapy or social role transition where such treatments are medically necessary. Likewise, the use of antidepressants and psychotropic medications are inadequate treatments for gender dysphoria where treatments such as hormone therapy or social role transition are medically necessary.

51.    Attempting to treat a person who needs hormone therapy, social role transition, or other forms of medically necessary treatment for gender dysphoria with mental health counseling alone, or in combination with psychotropic drugs, is a dangerous deviation from the Standards of

Care that puts the person at risk of physical injury, decompensation, and death.

52.     Likewise, attempting to "cure" a person of gender dysphoria by attempting to force them to disregard their gender identity and live as their assigned gender is dangerous and unethical and puts them at substantial risk of serious harm.

53.     The Standards of Care apply with equal force to persons who are incarcerated and persons who are not incarcerated, and have been endorsed by the National Commission on Correctional Healthcare and the U.S. Department of Justice National Institute of Corrections as the medically accepted standard for the treatment of inmates with gender dysphoria.

54.     The Standards of Care state that a freeze-frame approach to the provision of hormone therapy to people who are incarcerated is not considered appropriate care and warn that "the consequences of . . . lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality."

55.     The National Commission on Correctional Healthcare ("NCCHC") recommends that the medical management of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the Standards of Care. The NCCHC also explains that "policies that make treatments available only to those who received them prior to incarceration or that limit transition and/or maintenance are inappropriate and out of step with medical standards and should be avoided."

56.     The Federal Bureau of Prisons and many state and local corrections agencies administer hormone therapy to prisoners in their custody with gender dysphoria, including to prisoners who did not receive such therapy at the time of incarceration.

57.     The mental health providers who have evaluated and diagnosed Ms. Hicklin with gender dysphoria, including the mental health providers at PCC employed by MDOC and

17

Defendant Corizon, recognize that treatment for gender dysphoria should follow the Standards of Care and have recommended hormone therapy for Ms. Hicklin's gender dysphoria.

58.     The mental health providers who have evaluated and diagnosed Ms. Hicklin with gender dysphoria, including the mental health providers at PCC employed by MDOC and Defendant Corizon, agree that access to permanent hair removal and gender-affirming canteen items are medically necessary parts of Ms. Hicklin's treatment.

### *Ms. Hicklin's Gender Dysphoria*

59.     Ms. Hicklin is a thirty-eight-year-old white woman, who is transgender.

60.     Although Ms. Hicklin was assigned male at birth, her identity as a woman is just as valid as that of women assigned female at birth.

61.     From an early age, Ms. Hicklin experienced a marked incongruence between her internal sense of her own gender and the gender to which she was assigned at birth.

62.     For as long as she can remember, Ms. Hicklin has felt different and uncomfortable in her skin. She recalls feeling most comfortable when playing dress-up by wearing traditionally female clothing or playing with dolls with her sister and female classmates. She felt uncomfortable with the contact sports she was expected to pursue, including football and basketball. She has always felt that her anatomy was wrong and did not understand why she did not have the same anatomy as other women.

63.     Since being incarcerated in MDOC at age 16, Ms. Hicklin has repeatedly sought treatment for the depression and anxiety caused by her gender dysphoria, but did not discover there was a "name" for her experience until recently.

64.     Although she has struggled with the effects of her gender dysphoria since childhood, Ms. Hicklin has only recently been able to articulate her core identity as a woman who is transgender.

65.     In 2015, mental health providers at PCC employed by MDOC and Defendant Corizon, diagnosed Ms. Hicklin with gender dysphoria. These mental health providers have consistently recognized Ms. Hicklin as a woman.

66.     Ms. Hicklin experiences severe distress and serious impairments in her daily life due to gender dysphoria. She has discomfort with her body and has experienced and continues to experience psychological and physical symptoms due to her improperly treated gender dysphoria including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating. Defendants' denial of treatment has caused Ms. Hicklin to experience intrusive thoughts of cutting off her testicles.

67.     Under the Standards of Care, hormone therapy and social role transition, including permanent hair removal and access to gender-affirming canteen items, are medically necessary treatments for Ms. Hicklin.

### *Defendants' Denial of Medically Necessary Treatment for Ms. Hicklin's Gender Dysphoria*

68.     In or around early 2015, after struggling for decades with her gender identity, Ms. Hicklin came to terms with the fact that she is a transgender woman and could not suppress the fact that she is female.

69.     Under PCC policy, on March 4, 2015, Ms. Hicklin submitted a Health Services Request seeking an initial evaluation for gender dysphoria. Pursuant to that request, Qualified Mental Health Professional ("QMHP") Katherine Klein evaluated Ms. Hicklin on March 12, 2015 and March 17, 2015. After evaluation, Klein presented Ms. Hicklin's case to MDOC's "Treatment Team," which referred her to Dr. Meredith Throop, a psychiatrist, for assessment.

70.     On March 23, 2015, Dr. Throop conducted an assessment of Ms. Hicklin. In

her evaluation notes, Dr. Throop states that Ms. Hicklin has identified as female since she was eight years old and documents Ms. Hicklin's longstanding discomfort with her body and with traditionally male clothes and activities. Dr. Throop also discusses the many struggles Ms. Hicklin has faced throughout her life as a result of her gender identity. Ms. Hicklin shared that she was raised in a small town with very traditional attitudes about gender roles. She has been violently assaulted both physically and sexually due to her gender identity and lack of societal understanding and acceptance of transgender people. As a teenager, she resorted to drug use to cope with the psychological pain she suffered.  At age 16, Ms. Hicklin was convicted of a drug-influenced crime and sentenced to life without the possibility of parole.[5]  Ms. Hicklin also explained to Dr. Throop that she continues to face serious impairments in her daily life due to her distress with her body. She expressed a desire to transition physically, with the help of hormone treatment, and ultimately, gender-affirming surgery.

71.     Based on this assessment, Dr. Throop determined that Ms. Hicklin met the diagnostic criteria set forth in the DSM-V for gender dysphoria and planned to refer her to an endocrinologist for evaluation for hormone therapy. Dr. Throop's notes state that "Currently, hormone therapy (estrogen, testosterone blockers) is the accepted treatment for individuals with Gender Dysphoria diagnoses."

72.     Despite Dr. Throop's assessment and plan as indicated in her notes, Ms. Hicklin was never referred to an endocrinologist, because, as Dr. Throop later learned, MDOC policy prohibited providing hormone therapy for gender dysphoric inmates who were not already receiving such therapy prior to incarceration, as evidenced by a paragraph at the

_____

[5] On information and belief, pursuant to the recently passed Missouri Senate Bill 590, Ms. Hicklin will be eligible for parole in approximately 4 years, after completing 25 years of her sentence.

end of Dr. Throop's evaluation notes that reads: "Addendum: Please note, that after researching DOC protocols, it was found that endocrinology consult is NOT the appropriate next step for psychiatry in the txt of Gender Dysphoria.  Endocrinology consult was not requested."

73.     In addition to seeking an assessment for gender dysphoria, Ms. Hicklin filed a Petition for Change of Name in the Washington County Circuit Court to change her name from the traditionally male name given to her at birth to her current legal name, Jessica Hicklin.

74.     On April 5, 2015, Ms. Hicklin submitted a 32-page request to Defendants Griffith and McKinney, laying out the Standards of Care and specifically requesting hormone treatment, gender-affirming canteen items, and body hair removal.

75.     On April 22, 2015, Ms. Hicklin had a consultation with Defendant McKinney to discuss her request for hormone therapy. Defendant McKinney's notes from that consult state that MDOC's mental health staff had diagnosed Ms. Hicklin with gender dysphoria. Despite this diagnosis, Defendant McKinney's notes go on to state that he "informed [Ms. Hicklin] that [Defendant] Griffith informed [Defendant McKinney] this AM that she was informed by her superiors that per discussions of [Defendant Corizon] and DOC, no plans to proceed with hormone treatment."

76.     The next day, on April 23, 2015, Ms. Hicklin began MDOC's three-step grievance process by filing Informal Resolution Request ("IRR") #PC-15-476, in which she reiterated her request for hormone treatment, gender-affirming canteen items, and permanent hair removal.

77.     Ms. Hicklin requested that IRR #PCC-15-476 be designated as an Emergency IRR, per MDOC policy, which provides for expedited processing of IRRs "concerning matters

that, under regular time limits would subject the offender to a substantial risk of personal

injury, or cause other serious risk or irreparable harm." Per MDOC policy, this request was

referred to Defendant Griffith who denied the request to treat IRR #PCC-15-476 as an

Emergency IRR.

78.     Per MDOC policy, on April 27, 2015, Ms. Hicklin met with Defendant Larkin

to determine whether IRR #PCC-15-476 could be resolved through discussion. During that

meeting, Defendant Larkin informed Ms. Hicklin that she had received an email from

Defendant Kempker stating that Ms. Hicklin would not receive hormone therapy because

MDOC policy prohibited an inmate who was not on such therapy upon entering MDOC from

receiving it while in MDOC. Defendant Larkin also told Ms. Hicklin that MDOC was

responding solely to the request for hormones, not the request for canteen items or hair

removal.

79.     On April 30, 2015, Ms. Hicklin received a letter from Defendant Griffith

erroneously construing Ms. Hicklin's request for permanent hair removal and gender-

affirming canteen items as non-medical and instructing Ms. Hicklin to grieve "other issues

besides your medical treatment . . . as a separate complaint (IRR) from your medical

concerns." Defendant Payne was copied on this letter.

80.     Based on her understanding that her request for medically necessary treatment

(including electrolysis and gender-affirming canteen items) had been misconstrued as a request

for hormone therapy only, on May 5, 2015, Ms. Hicklin wrote a letter to Defendant Griffith

clarifying that all of the items requested in IRR #PCC-15-476 were part of the medically

necessary treatment for her gender dysphoria. Ms. Hicklin also sought clarification of DOC

policy as it relates to access to gender-affirming canteen items. In this letter, Ms. Hicklin noted

that, pursuant to MDOC's Offender Property Control Policy, female inmates in MDOC's

custody have access to the requested items. Ms. Hicklin further noted that the approved personal property list for PCC (which is designated as a men's facility) also indicates that female inmates are allowed access to the requested items. Thus, Ms. Hicklin noted that both MDOC and PCC policy allowed her to purchase and possess the requested gender-affirming canteen items.

81.    On May 12, 2015, Defendant Griffith responded to Ms. Hicklin's letter, stating that statewide policy prevented access to the requested items and arguing that the items were not medical in nature. Yet, at the same time, Defendant Griffith also conceded that "the warden's office is not in a position to determine what treatment(s) are medically necessary for your diagnosis. That is something you would have to discuss with your mental health/medical services professionals."  Defendant Payne was copied on this letter.

82.    In addition to writing to Defendant Griffith about access to gender-affirming canteen items, Ms. Hicklin also submitted a Health Services Request specifically for permanent hair removal.

83.    On May 19, 2015, Ms. Hicklin received an official denial of IRR #PC-15-476, dated April 27, 2015 and signed by Defendant Larkin, which stated that "per PCC administration, after discussion between DOC and Corizon Health representatives, there are no plans to proceed with hormone treatment."

84.    In response, Ms. Hicklin filed a second-stage grievance on May 21, 2015. In this grievance, Ms. Hicklin again clarified that her request was for medically necessary treatment in accordance with the Standards of Care, and that such treatment included not only hormone therapy, but also permanent hair removal and access to gender-affirming canteen items. She also noted that Defendants' ongoing denial of medical necessary treatment for her gender dysphoria violated both the Standards of Care and federal constitutional law.

85.    On May 27, 2015, Ms. Hicklin wrote to Defendant Larkin seeking an

official response to her request for permanent hair removal.

86.     Pursuant to Ms. Hicklin's request, Defendant Larkin's successor, Defendant Wade, arranged a meeting between Ms. Hicklin and Defendant McKinney on June 19, 2015. Ms. Hicklin had requested that a mental health professional be present at this meeting. Despite this request, neither her therapist, Katherine Klein, nor her psychiatrist, Dr. Meredith Throop, nor any other mental health professional was present.  During the meeting, Defendant McKinney stated repeatedly that the determination of medical necessity for the hair removal request would be made by Defendant Babich in consultation with Defendant Griffith.

87.     On June 22, 2015, a nurse informed Ms. Hicklin that Defendant Babich had denied the request for permanent hair removal as not medically necessary. On information and belief, Defendant Babich did not evaluate Ms. Hicklin before making this determination. Additionally, on information and belief, he spoke neither to her therapist, QMHP Klein, nor her psychiatrist, Dr. Throop -- though he apparently consulted with Defendant Griffith.

88.     On June 23, 2015, Ms. Hicklin filed IRR #PC-15-734 related specifically to the permanent hair removal denial. She again requested that this IRR be treated as an Emergency IRR, as provided for under MDOC policy.  This request was again denied by Defendant Griffith.

89.     Ms. Hicklin also stated in IRR #PC-15-734 that Defendants' continued denial of medically necessary treatment for her gender dysphoria, including their denial of permanent hair removal specifically, has severely impaired her ability to function, leading to negative outcomes including lack of sleep, depression, lack of motivation, and inability to focus.  She also stated that the continued denial of permanent hair removal causes her severe mental anguish and noted that her attempts to self-treat via shaving does not address this anguish and has instead resulted in physical injury in the form of cuts, scarring, and rashes on her body, as

she has to shave a large part of her body regularly and with dull and ineffective razors.

90.     On July 10, 2015, having not received a response within the allotted time to her second-level grievance on IRR # PC-15-476 related to her initial request for hormones, permanent hair removal, and access to gender-affirming canteen items, Ms. Hicklin filed a Grievance Appeal, the final step in the grievance process for IRR # PC-15-476. In this appeal, Ms. Hicklin again discussed Defendants' ongoing denial of medically necessary treatment for her gender dysphoria and the serious psychological distress this denial causes her. She noted that therapy sessions and psychotropic medications (the only treatment Defendants have provided her) are not adequate treatment for gender dysphoria.  Ms. Hicklin also reiterated that Defendants' continued denial of medically necessary treatment for her gender dysphoria violates the Standards of Care and applicable law.

91.     On July 14, 2015, Ms. Hicklin received the late response to her second-step grievance for IRR # PC-15-476, dated June 7, 2015 and signed by Defendants Randolph, McKinney, and Griffith. The response reiterated that "hormone therapy will not be ordered to treat your Gender Dysphoria." The response also instructed Ms. Hicklin to "continue to attend Mental Health appointments or seek the counseling of Mental Health staff as needed."

92.     On July 22, 2015, Ms. Hicklin received a denial of IRR #PC-15-734, the IRR she had filed regarding Defendant Babich's denial of her permanent hair removal request.  The denial was dated July 20, 2015, and signed by Defendant Wade. The denial reiterated that after meeting with Ms. Hicklin on June 19, 2015, "[Defendant] McKinney discussed your request with PCC Warden [Defendant Griffith] and [Defendant] Babich" and that Defendant Babich "confirmed" that permanent hair removal was not medically necessary.

93.     In response, on July 28, 2015, Ms. Hicklin filed a second-stage grievance on IRR #PC-15-734. Again, Ms. Hicklin noted that the requested permanent hair removal was part of

the medically necessary treatment for her gender dysphoria as set forth in the Standards of Care.

94.     On or about August 26, 2015, Ms. Hicklin had her regularly scheduled meeting with her psychiatrist, Dr. Throop. During that meeting, Ms. Hicklin discussed with Dr. Throop Defendants' failure to provide treatment for her gender dysphoria in accordance with the Standards of Care, despite Ms. Hicklin's repeated requests for such treatment.  Ms. Hicklin also discussed her continued symptoms of gender dysphoria. The allotted time for the meeting expired before Dr. Throop had completed her examination of Ms. Hicklin, so she provided Ms. Hicklin written questions, to which Ms. Hicklin provided written answers.

95.     On information and belief, around the time of this meeting, Defendants chastised Dr. Throop for following the Standards of Care by properly using female pronouns to refer to Ms. Hicklin.

96.     On August 26, 2015, Ms. Hicklin received the denial of her second-step grievance on IRR #PC-15-734, related to her request for permanent hair removal. The denial was dated August 12, 2015 and was signed by Defendants Larkin, McKinney, and Payne. In response, on August 27, 2015, Ms. Hicklin filed the final grievance appeal required for this request.

97.     On September 2, 2015, Ms. Hicklin wrote letters to Defendants Foster, Atterberry, Eyman, Williams, and O'Kelly, and to Mental Health Contract Monitor Page Nichols, informing them of the ongoing denial of medically necessary treatment for her gender dysphoria despite her attempts to obtain such treatment.

98.     On September 8, 2015, Defendant O'Kelley responded to Ms. Hicklin informing her that "this issue and all correspondence has been forwarded to Department of Corrections Legal Department to address same."

99.     On September 24, 2015, Ms. Hicklin received a response from Defendant

26

Williams informing her that her letter had been received and that, since she had a grievance appeal pending, she should be patient.

100.    On October 30, 2015, almost two weeks beyond the allotted time, Ms. Hicklin received the final denial of IRR #PC-15-476. The response was dated October 21, 2015, and signed by Defendants Moeller and Bredeman.

101.    On November 6, 2015, Ms. Hicklin wrote to Defendant Larkin, attaching the NCCHC Position Statement regarding transgender health care in correctional settings and noting where Defendants had deviated from the Position Statement in addressing Ms. Hicklin's gender dysphoria. The Position Statement is part of a larger body of standards put forth by the NCCHC, which, on information and belief, is quoted as an authority in MDOC's Quality Improvement Policy among others.

102.    Despite knowing that Ms. Hicklin has been diagnosed with gender dysphoria by their own mental health personnel, and despite receiving multiple requests from Ms. Hicklin for medical necessary treatment of this serious medical condition, Defendants have continually withheld such treatment, exhibiting deliberate indifference to the excessive risk this denial poses to her health and safety.

103.    On information and belief, Defendants have prohibited Ms. Hicklin's mental health providers from creating a treatment plan outlining interventions sufficient to treat her gender dysphoria and have instead limited her care to psychotherapy and anti-anxiety medication.

104.    Despite the fact that this approach violates the WPATH Standards of Care and the NCCHC Position Statement guidelines, Defendants have steadfastly maintained that Ms. Hicklin will receive no other intervention for her gender dysphoria, except psychotherapy and anti- anxiety medication.

105.     As previously noted, psychotherapy and psychotropic medications are not substitutes for treatments such as hormone therapy or social role transition where such treatments are medically necessary to treat gender dysphoria.

106.     On or around December 16, 2015, Ms. Hicklin began treatment with a new psychiatrist, Dr. Evelynn Stephens, for continued care, after Dr. Throop left MDOC.

107.     Ms. Hicklin's medical records from her visits with Dr. Stephens and other mental health staff show that she continues to experience serious psychological and physical symptoms due to her improperly treated gender dysphoria, including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating. She also experiences intrusive thoughts of cutting off her testicles as she worries that continued testosterone exposure will cause permanent male pattern baldness. Ms. Hicklin wears her hair in a traditionally feminine style.  Currently, her hair is the only part of her body that does not contribute to her dysphoria and the thought of losing her hair is extremely distressing.

108.     Like QMHP Klein and Ms. Hicklin's previous psychiatrist, Dr. Throop, on December 16, 2015, Dr. Stephens diagnosed Ms. Hicklin with gender dysphoria "with associated panic secondary to current body characteristics."  Dr. Stephens recommended that Ms. Hicklin be allowed "hair removal and hormone therapy as these are likely to greatly decrease patient's current level of discomfort and intrusive thoughts."  Dr. Stephens has also recommended that Ms. Hicklin have access to the same self-care products as other female inmates.

109.     On or around January 13, 2016, Dr. Stephens noted that "[Ms. Hicklin's] symptoms are escalating with age given risk of male pattern baldness more likely at this time if hormone therapy not initiated.  This should be taken into account when considering the time

28

table for starting treatment. The patient does meet the requirements for diagnosis of gender

dysphoria and has now been diagnosed by two psychiatrists." On March 16, 2016, Dr. Stephens

again noted that Ms. Hicklin was at risk for "male pattern baldness" and recommended that

finasteride or dutasteride be considered to halt any noted hair loss.

110.    As the foregoing paragraphs illustrate, although Defendants' own mental health

personnel have diagnosed Ms. Hicklin with gender dysphoria and have recommended that she

receive medically necessary treatment for this serious medical condition, Defendants continue

to refuse to provide Ms. Hicklin with such treatment.

111.    Ms. Hicklin's gender dysphoria can be effectively treated only by providing her

the medically necessary treatments she requires as prescribed by the Standards of Care, namely:

hormone therapy and female gender expression, including permanent hair removal and access to

gender-affirming canteen items. Defendant's continued denial of these medically necessary

treatments have caused and will continue to cause her severe psychological pain and physical

discomfort and puts her at continued risk of depression, anxiety, mental impairment, self-

surgery and self-harm, and suicidal thoughts or acts.

112.    At all relevant times, the freeze-frame policy has been MDOC Defendants'

official policy regarding medical care for all transgender prisoners. Pursuant to the freeze-

frame policy, decisions regarding whether to initiate hormone therapy for transgender

prisoners like Ms. Hicklin are not based on individualized assessments of each prisoner's

medical needs. Rather, hormone therapy is automatically denied to *any* transgender prisoner

with gender dysphoria who was not receiving such therapy before entering MDOC—despite

being provided for those who were.

113.    As a proximate cause of the enforcement of the freeze-frame policy, Ms.

Hicklin has suffered and continues to suffer irreparable harm and the deprivation of her

constitutional rights.

## CLAIM FOR RELIEF

### COUNT I
Refusal to Provide Medically Necessary Care
In Violation of the Eighth Amendment to the U.S.
Constitution (against all Defendants)

114.　　Ms. Hicklin incorporates paragraphs 1 through 113 as though fully set forth herein.

115.　　At all relevant times, Defendants knew that Ms. Hicklin has gender dysphoria, a serious medical need that jeopardizes an individual's physical health and mental well-being when not properly treated.

116.　　Defendants knew that the medically accepted standards for the treatment of gender dysphoria are the Standards of Care, and that hormone therapy and social role transition, not merely psychotherapy and psychotropic drugs, are the medically necessary treatment for Ms. Hicklin's gender dysphoria. Defendants knew that denying Ms. Hicklin hormone therapy and social role transition placed her at a substantial risk of serious harm, including depression, anxiety, mental impairment, physical self-harm, and suicide.

117.　　Despite this knowledge and despite Ms. Hicklin's repeated requests for care, Defendants, while acting under color of state law, have refused to provide Ms. Hicklin with the medically necessary treatment for her gender dysphoria, in deliberate indifference to her serious medical needs, and in violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

118.　　Each of the Defendants has also implemented, condoned, ratified, followed, and/or enforced, and continues to implement, condone, ratify, follow, and/or enforce a policy or custom, having the force of law, of refusing requests to initiate appropriate and effective gender dysphoria treatment, irrespective of an inmate's medical need, and providing counseling and

psychotropic drugs alone, when each knew that this was inadequate care that placed Ms. Hicklin at substantial risk of further mental and physical distress.

119.     Each of the Defendants has also failed and continues to fail to train and supervise MDOC and/or Corizon staff with respect to the proper provision of medically necessary treatment for gender dysphoria, despite knowing that gender dysphoria is a serious medical need and that failing to train and supervise staff with respect to the provision of medically necessary treatment for this serious medical need places inmates like Ms. Hicklin at substantial risk of serious mental and physical harm.

120.     Defendants' continuous denial of medically necessary care is causing and will continue to cause irreparable harm to Ms. Hicklin, including severe anxiety and distress. It also puts her at serious risk of continued irreparable harm including permanent male pattern baldness, physical self-harm, and suicidal thoughts or acts.

121.     Each of the Defendants disregarded, and continues to disregard the known or obvious consequences of their actions and inactions, as set forth herein, resulting in a substantial risk of serious harm to Ms. Hicklin.

122.     By failing to provide Ms. Hicklin with effective treatment for gender dysphoria while incarcerated, Defendants have deprived Ms. Hicklin of her right to medically necessary treatment guaranteed by the Eighth Amendment of the United States Constitution.

## COUNT II
### Enforcement of the Freeze-Frame Policy in Violation
### of the Eighth Amendment to the U.S. Constitution (against all Defendants)

123.     Ms. Hicklin incorporates paragraphs 1 through 113 as though fully set forth herein.

124.     At all relevant times, decisions regarding whether to provide hormone therapy for MDOC inmates with gender dysphoria were made, and continue to be made, pursuant to

an unconstitutional freeze-frame policy that categorically bars all transgender inmates who did not receive hormone therapy for gender dysphoria before entering MDOC from receiving such therapy while in MDOC.

125.     Pursuant to the freeze-frame policy, decisions regarding whether to initiate hormone therapy for transgender prisoners like Ms. Hicklin are not based on individualized assessments of each prisoner's medical needs.

126.     Rather, hormone therapy is automatically denied to *any* transgender prisoner with gender dysphoria who was not receiving such therapy before entering MDOC—despite being provided for those who were.

127.     The freeze-frame policy serves no legitimate governmental interest or penological purpose.

128.     As a proximate cause of the enforcement of the freeze-frame policy, Ms. Hicklin has suffered and continues to suffer irreparable harm and the deprivation of her constitutional rights.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Hicklin respectfully requests that this Court enter judgment:

A.     Declaring that Defendants' refusal to provide Ms. Hicklin medically necessary care related to her gender dysphoria violates the Eighth Amendment to the Unites States Constitution;

B.     Declaring that the freeze-frame policy, both on its face and as applied to Ms. Hicklin, violates the Eighth Amendment to the United States Constitution;

C.     Entering preliminary and permanent injunctive relief requiring Defendants to provide Ms. Hicklin with medically necessary treatment for her gender dysphoria under the Standards of Care, including but not limited to hormone therapy, permanent hair removal, and

access to gender-affirming canteen items;

      D.      Entering permanent injunctive relief enjoining the enforcement of the freeze-frame policy by Defendants;

      E.      Awarding Ms. Hicklin costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

      F.      Granting such other and further relief as the Court deems just and proper.

Respectfully submitted this 23rd day of February 2018.

s/ *Demoya Gordon*_____
Demoya R. Gordon*
Richard Saenz*
Lambda Legal Defense &
Education Fund, Inc.
120 Wall Street, Floor 19
New York, NY 10005
Tel:  212-809-8585
Fax:  212-809-0055
dgordon@lambdalegal.org
rsaenz@lambdalegal.org

Marla R. Butler*
Sharon E. Roberg-Perez*
Rajin S. Olson*
Robins Kaplan LLP
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402
Tel:  612-349-8500
Fax:  612-339-4181
mbutler@robinskaplan.com
sroberg-perez@robinskaplan.com
rolson@robinskaplan.com

Frederick A. Braunstein*
Robins Kaplan LLP
399 Park Avenue
Suite 3600
New York, NY 10022
Tel:  212-980-7400

Fax:  212-980-7499
fbraunstein@robinskaplan.com

Kevin L. Schriener, #35490MO
Law & Schriener, LLC
141 N. Meramec Avenue
Suite 314
St. Louis, MO 63105
Tel: (314) 721-7095
Fax: (314) 863-7096
kschriener@schrienerlaw.com

Attorneys for Plaintiff Jessica
Hicklin

*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

On February 23, 2018, pursuant to agreement of the undersigned counsel to accept service

on behalf of their respective clients, I served the foregoing First Amended Complaint on counsel

of record as set forth below via email and the Court's CM/ECF system.  I hereby certify that I

have served the following counsel of record by email and the Court's CM/ECF system.

D. John Sauer, # 58721MO
First Assistant and Solicitor
David Dean, # 67190MO
Assistant Attorney General
Missouri Attorney General's Office
P.O. Box 861
St. Louis, MO  63188
Tel: 314-340-7652
John.Sauer@ago.mo.gov
David.Dean@ago.mo.gov

Attorneys for Defendants Anne Precythe, Dwayne Kempker, Joan Reinkmeyer, Cindy Griffith,
Stan Payne, Scott O'Kelly, and Latoya Duckworth

J. Thaddeus Eckenrode, MoBar #31080
Kevin K. Peek, MoBar # 67440
Eckenrode-Maupin
11477 Olde Cabin Rd
Suite 110
St. Louis, MO 63141
Tel:  314-726-6670
Fax:  314-726-2106
jte@eckenrode-law.com
kkp@eckenrode-law.com

Attorneys for Defendants Corizon LLC, William McKinney, John DeGhetto, Thomas Kevin
Bredeman, Diana Larkin, Kimberley S. Randolph, Daly Smith, Stormi Moeller, Ernest Graypel,
Elizabeth Atterberry, and Kim Foster

_s/  Richard Saenz_____