IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JESSICA HICKLIN, | |
| Plaintiff, | |
| v. | Case No. 4:16-CV-01357-NCC |
| ANNE PRECYTHE, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DECLARATORY RELIEF AND A PERMANENT INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………………………..i

TABLE OF AUTHORITIES…………………………………………………………………..ii

INTRODUCTION…………………………………………………………………………1

STATEMENT OF UNCONTROVERTED FACTS……………………………………….2

ARGUMENT………………………………………………………………………………7

I.   Defendants Violated the Eighth Amendment by Knowingly Disregarding Ms. Hicklin's Serious Medical Needs…………………………………………………………………8

   A.   Defendants Failed to Provide Ms. Hicklin Medically Necessary Hormone Therapy Pursuant to the Freeze-Frame Policy, Which is Unconstitutional on Its Face and As Applied to Ms. Hicklin…………………………………………………...……8

     1. Ms. Hicklin's gender dysphoria and risk of self-harm are objectively serious medical needs…………………………………………………………………9

     2. Defendants knew of Ms. Hicklin's serious medical needs but disregarded them by denying her hormone therapy pursuant to the freeze-frame policy………………10

   B.   Defendants' Refusal to Provide Ms. Hicklin Access to Permanent Body Hair Removal and Gender-Affirming Canteen Items Also Violated the Eighth Amendment………………………………………………………………………12

II.   This Court Should Declare Defendants' Actions Unconstitutional and Permanently Enjoin Them from Withholding Medically Necessary Gender Dysphoria Treatments from Ms. Hicklin and from Enforcing the Freeze-Frame Policy…………………………………………………………...………………………..12

CONCLUSION………………………………………………………………………...15

# TABLE OF AUTHORITIES

*Alexander v. Weiner*,
    841 F. Supp. 2d 486 (D. Mass. 2012) .................................................................................. 12

*Allard v. Gomez*,
    9 F. App'x 793 (9th Cir. 2001) ........................................................................................... 11

*Alsager v. Dist. Ct. of Polk Cnty.*,
    518 F.2d 1161 (8th Cir. 1975) ........................................................................................ 7, 13

*Amos v. Higgins*,
    996 F. Supp. 2d 810 (W.D. Mo. 2014) ............................................................................... 14

*Bank One, Utah v. Guttau*,
    190 F.3d 844 (8th Cir. 1999) .................................................................................... 8, 13, 14

*Barrett v. Coplan*,
    292 F. Supp. 2d 281 (D.N.H. 2003) ............................................................................. 11, 15

*Battista v. Clarke*,
    645 F.3d 449 (1st Cir. 2011) ............................................................................................. 10

*Brown v. Plata*,
    563 U.S. 493 (2011), .......................................................................................................... 13

*Coleman v. Rahija*,
    114 F.3d 778 (8th Cir. 1997) ............................................................................................... 8

*De'lonta v. Angelone (De'lonta I)*,
    330 F.3d 630 (4th Cir. 2003) ....................................................................................... 10, 11

*De'lonta v. Johnson (De'lonta II)*,
    708 F.3d 520 (4th Cir. 2013) ............................................................................................. 11

*DePaola v. Clarke*,
    No. 16-7360, 2018 WL 1219611 (4th Cir. Mar. 9, 2018) ..................................................... 8

*Elrod v. Burns*,
    427 U.S. 347 (1976)…………………………………………………………………………..14

*Estelle v. Gamble*,
    429 U.S. 97, 104 (1976) .......................................................................................... 9, 10, 11

*Fields v. Smith*,
    712 F. Supp. 2d 830 (E.D. Wis. 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011) ................ 9, 11, 13

*Friends of the Earth v. Laidlaw Envt'l Servs., Inc.*,
    528 U.S. 167 (2000) .......................................................................................................... 13

*Gammett v. Idaho State Bd. of Corr.*,
    No. CV05-257-S-MHW 2007 WL 2186896 (D. Idaho July 27, 2007).................................. 15

*Gordon ex rel. Gordon v. Frank*,
    454 F.3d 858 (8th Cir. 2006).................................................................................. 10

*Helling v. McKinney*,
    509 U.S. 25 (1993) ................................................................................................ 9

*Hicklin v. Precynthe*,
    No. 4:16-CV-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) .......................... *passim*

*Houston v. Trella*,
    No. 2:04-cv-1393, 2006 WL 2772748 (D.N.J. Sept. 22, 2006) ............................................ 11

*Langford v. Norris*,
    614 F.3d 445 (8th Cir. 2010)................................................................................... 11

*Layton v. Elder*,
    143 F.3d 469 (8th Cir. 1998)............................................................................... 14, 15

*Konitzer v. Frank*,
    711 F. Supp. 2d 874 (E.D. Wis. 2010) ...................................................................... 12

*Melendres v. Arpaio*,
    695 F.3d 990 (9th Cir. 2012).................................................................................. 15

*Mental Health Ass'n of Minn. v. Heckler*,
    720 F.2d 965 (8th Cir. 1983)................................................................................... 13

*Nelson v. Corr. Med. Servs.*,
    583 F.3d 522 (8th Cir. 2009).................................................................................... 8

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015)................................................................... 14, 15

*Phelps-Roper v. Nixon*,
    545 F.3d 685 (8th Cir. 2008)................................................................................... 15

*Phillips v. Mich. Dep't of Corr.*,
    731 F. Supp. 792 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991) .................... 10, 15

*Soneeya v. Spencer*,
    851 F. Supp. 2d 228 (D. Mass. 2012)....................................................... 9, 10, 11, 12

*White v. Farrier*,
    849 F.2d 322 (8th Cir. 1988)................................................................................... 9

## INTRODUCTION

In its February 9, 2018 Memorandum and Order (Doc. 145)[1], this Court thoroughly
analyzed the evidence and the applicable law and concluded that Ms. Hicklin was likely to
succeed on the merits, Ms. Hicklin faced irreparable harm due to Defendants' denial of
medically necessary gender dysphoria treatment, and both the balance of harms and the public
interest favored Ms. Hicklin. *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764,
at *9-14 (E.D. Mo. Feb. 9, 2018). Since filing her preliminary injunction motion, Ms. Hicklin
has unearthed additional evidence that decisively moves her success on the merits from likely to
actual.

This evidence shows that, despite knowing Ms. Hicklin faced a substantial risk of serious
harm without adequate treatment, Defendants Missouri Department of Corrections ("MDOC")
and its private medical contractor, Corizon LLC ("Corizon") (collectively, "Defendants")
repeatedly failed to provide her with medically necessary hormone therapy, permanent body hair
removal, and gender-affirming canteen items, contrary to the recommendations of her
psychiatrists. The evidence also shows conclusively that Defendants failed to provide Ms.
Hicklin with hormone therapy based on MDOC's unconstitutional blanket administrative policy,
practice, custom, or usage of banning the provision of hormone therapy to any transgender
inmate who was not receiving such therapy before entering MDOC ("the freeze-frame policy").

The Court's previous findings, combined with Ms. Hicklin's Amended Complaint (Doc.
152) and the newly discovered evidence, warrant a declaration that the freeze-frame policy is
unconstitutional on its face and as applied to Ms. Hicklin and that Defendants' failure to provide
Ms. Hicklin with medically necessary gender dysphoria treatment violates the Eighth

---

[1] Hereinafter "the 2/9/18 Order."

Amendment. The evidence and applicable law also warrant entry of a permanent injunction

directing Defendants to provide Ms. Hicklin with care that her doctors deem medically necessary

(including hormone therapy, access to permanent body hair removal, and access to gender-

affirming canteen items) and enjoining Defendants from enforcing the freeze-frame policy.

## STATEMENT OF UNCONTROVERTED FACTS

The following uncontroverted facts, and the facts set forth in Plaintiff's briefing in

Support of her Motion for Preliminary Injunction (Docs. 64 and 70) and the 2/9/18 Order,[2]

illustrate the need for declaratory relief and a permanent injunction in this case.

## I.     PLAINTIFF JESSICA HICKLIN'S GENDER DYSPHORIA DIAGNOSIS

1.      Ms. Hicklin is a transgender woman in the custody of the Missouri Department of

Corrections ("MDOC") housed at Potosi Correctional Center, a facility for male inmates. Doc.

152 at ¶ 1.

2.      Ms. Hicklin suffers from gender dysphoria (previously known as gender identity

disorder or transsexualism), a medical condition characterized by clinically significant distress

due to the incongruence between a person's gender identity—their innate sense of their own

gender—and the sex they were assigned at birth. Doc. 64-4 at 2-4 (March 2015 diagnosis by

Corizon psychiatrist Dr. Meredith Throop); Doc. 64-6 at 4-6 (Dec. 2015 diagnosis by Corizon

psychiatrist Dr. Evelynn Stephens); Doc. 64-1 at ¶¶ 12-13; Doc. 154 at ¶ 8; Doc. 158 at ¶ 8.

3.      Ms. Hicklin has exhibited symptoms of severe gender dysphoria, including

recurring intrusive thoughts of removing her testicles. Doc. 64-1 at ¶ 60.

---

[2] Ms. Hicklin hereby incorporates by reference all facts set forth in Docs. 64, 70, and 145.

## II.      GENDER DYSPHORIA AND THE STANDARDS OF CARE

4.      Gender dysphoria appears in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Doc. 64-1 at ¶ 12.

5.      Gender dysphoria is an objectively serious medical need. Doc. 83 at 24; Doc. 145 at 21.

6.      Individuals with untreated gender dysphoria experience clinically significant depression, anxiety, and mental impairment, and, when left untreated, additional serious medical problems including suicidality and the compulsion to engage in self-castration and self-harm. Doc. 64-1 at ¶¶ 15-16; Excerpted Transcript of Deposition of Corizon's 30(b)(6) Representative ("Corizon 30(b)(6) Depo.")[3] at 6:19-7:1, 95:2-96:4, 99:6-100:12, 102:7-103:12, 103:15-18; Gordon Decl. Ex. B, Excerpted Transcript of Deposition of Elizabeth Atterberry, Corizon's Regional Mental Health Director ("Atterberry Depo.") at 11:4-7, 147:19-149:2.

7.      The World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (the "Standards of Care") are "the internationally recognized guidelines for the treatment of persons with gender dysphoria." Doc. 64-1 at ¶ 18. Numerous professional medical organizations, including the American Medical Association, the American Psychological Association, the American Psychiatric Association, and the National Commission on Correctional Health Care, endorse the Standards of Care. *Id.* at ¶ 19. The Standards of Care explicitly state that they are equally applicable to patients in prison. *Id.* at ¶¶ 23-24; Gordon Decl. Ex. C, Excerpted Standards of Care, at PL000712-13.

---

[3] Attached as Ex. A to Declaration of Demoya R. Gordon ("Gordon Decl.").

8.      Under the Standards of Care, persons with gender dysphoria should be individually assessed by qualified health care providers and referred for treatment, which can include:  (1) living in another gender role that is consistent with one's gender identity; (2) hormone therapy to feminize or masculinize the body; and/or (3) surgery to change primary and/or secondary sex characteristics. Doc. 64-1 at ¶¶ 20-21.

9.      Changes in gender expression, including clothing and grooming that affirm one's gender identity and permanent body hair removal, are significant in alleviating gender dysphoria. *Id.* at ¶¶ 26-27; *see also* Doc. 70-10 (National Commission on Correctional Health Care Position Statement on Transgender Health Care in Correctional Settings ("NCCHC Position Statement") stating that commissary items consistent with an individual's gender identity should be made available).

10.     Hormone therapy is fundamental to the treatment of gender dysphoria, and the denial of hormone therapy for patients for whom such therapy is medically necessary leads to significant deterioration and impairment in patients, including a high likelihood of depression, suicidal ideation, and surgical self-treatment by auto-castration (removal of the testicles) or autopenectomy (removal of the penis). Doc. 64-1 at ¶¶ 28-33.

11.     Counseling can provide support for some individuals with gender dysphoria, but it is not a substitute for medical intervention. *Id.* at ¶ 35. Merely providing counseling and/or psychotropic medication to a severely gender dysphoric patient is a significant departure from medically accepted practice. *Id.* at ¶ 36. Inadequate treatment of this condition puts an individual at serious risk of psychological and physical harm. *Id.*

### III.   THE FREEZE-FRAME POLICY

12.     At all relevant times prior to the 2/9/18 Order, MDOC maintained and enforced the freeze-frame policy. Doc. 77 (Hicklin v. Lombardi 00616); Gordon Decl. Ex. D, Excerpted Deposition of Matt Sturm, MDOC's Deputy Director ("Sturm Depo.") at 26:24-27:1, 81:13-24, 99:7-21, 132:9-133:6, 145:4-149:1; Corizon 30(b)(6) Depo. at 105:14-106:5, 108:5-23, 113:1-114:9, 143:1-11; Gordon Decl. Ex. E, MDOC Defendants' Responses to Plaintiff's Second Set of Requests for Admissions ("MDOC 2d RFA Responses"), Nos. 4-6.

13.     Pursuant to the freeze-frame policy, decisions regarding whether to initiate hormone therapy for transgender prisoners like Ms. Hicklin are not based on individualized assessments of each prisoner's medical needs. Doc. 77; Sturm Depo. at 81:13-24, 99:7-21, 132:9-133:6. Instead, hormone therapy is automatically denied to any transgender prisoner with gender dysphoria who was not receiving such therapy before entering MDOC—despite being provided for those who were receiving such therapy prior to entering MDOC. Doc. 152 at ¶¶6, 112; Doc. 77; Sturm Depo. at 81:13-24, 99:7-21, 132:9-133:6, 145:4-149:1; Gordon Decl. Ex. F, MDOC's Second Supplemental Response to Interrogatory No. 16; Corizon 30(b)(6) Depo. at 108:5-23, 143:1-11; Atterberry Depo. at 32:24-33:7.

14.     The Standards of Care state that a freeze-frame approach is not considered appropriate care and warn that "the consequences of . . . lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by auto-castration, depressed mood, dysphoria, and/or suicidality." Doc. 64-1 at ¶ 70; *see also* Doc. 70-10 (NCCHC Position Statement stating that freeze-frame policies are "out of step with medical standards and should be avoided").

## IV.     DEFENDANTS' FAILURE TO PROVIDE MEDICALLY NECESSARY GENDER DYSPHORIA TREATMENT FOR MS. HICKLIN

15.     Corizon psychiatrists Dr. Meredith Throop and Dr. Evelynn Stephens diagnosed Ms. Hicklin with gender dysphoria and prescribed medically necessary hormone therapy for her in 2015. Doc. 64-4 at 2-4; Doc. 64-6 at 4-6, 21; *see also* Doc 64-1 at ¶ 75. Yet, for almost three years, Defendants failed to provide hormone therapy for Ms. Hicklin due to the freeze-frame policy. *See* Doc. 64-6 at 17, 21 (Dr. Stephens's notes referencing the freeze-frame policy as the basis for the denial of hormone therapy for Ms. Hicklin); Doc 64-6 at 30-31; Gordon Decl. Ex. G at GF 0107, 127; Gordon Decl. Ex. H at Hicklin v. Lombardi 00911-912, 00941-945; Sturm Depo. at 81:13-24, 99:7-21, 132:9-133:6, 145:4-149:1, 154:24-157:3, 160:10-164:25, 172:4-9, 173:15-175:11, 179:2-184:1; MDOC 2d RFA Responses, Nos. 4-6.

16.     Without conducting an individualized evaluation of Ms. Hicklin, Defendants also failed to provide her access to medically necessary permanent body hair removal and gender-affirming canteen items (*i.e.*, canteen items made available to other female inmates), contrary to the recommendations of her current treating psychiatrist Dr. Stephens, gender dysphoria expert Dr. Randi Ettner, and the Standards of Care. Doc. 64-6 at 6, 15, 31-32; Doc. 64-1 at ¶ 77; Ex. G at GF 0046, 0151, 0155; Docs. 114-12, 114-16, 114-18, 114-20, 114-21, 114-22, 114-23, 114-30; Gordon Decl. Exs. I, J, K.

17.     Both Dr. Throop and Dr. Stephens have noted that neglecting to treat Ms. Hicklin in accordance with the Standards of Care put her at risk of serious harm. *See, e.g.*, Doc. 64-4 at 11 (noting denial of treatment in accordance with the Standards of Care as "detrimental currently to [her] mental/emotional/psychiatric well-being"); Doc. 64-6 at 10 (noting escalating symptoms), 34-36 (noting "overwhelming sense of dread" and "increased agitation [and] self

6

harm [sic] thoughts"), Doc. 98-2 (noting worsening anxiety, increased gender dysphoria symptoms, and thoughts of self-harm).

18.     Medical records show that lack of appropriate treatment for gender dysphoria caused Ms. Hicklin to experience serious psychological and physical symptoms (including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating) and put her at substantial risk of self-harm, including auto-castration and suicidal thoughts or acts. Doc. 64-6 at 2-6, 17-18, 33-40; Doc. 68-8 at 5, 12; Doc. 88-2; Doc 98-2; Gordon Decl. Ex. L at EM1319, 1363-64, 1370-71;  Gordon Decl. Ex. M, Excerpted Transcript of Deposition of Jessica Hicklin at 21:18-23:21, 39:11-21; *see also* Doc. 64-1 at ¶¶ 46, 52, 54, 59; Doc. 152 at ¶¶ 66, 107; Doc 145 at 18-19.

19.     The documents and testimony produced in discovery do not support denying medically necessary gender dysphoria treatment based on cost, safety, or any other reason. *See, e.g.*, Sturm Depo. at 145:4-149:1, 172:4-9; Ex. H at Hicklin v. Lombardi 00913-14, 00925-26, 00946-47, 00957-58, 05592-93; Corizon 30(b)(6) Depo. at 105:14-106:5, 113:1-114:9; Gordon Decl. Ex. N, Excerpted Deposition of Vevia Sturm, MDOC's PREA Coordinator, at 55:22-57:7; Doc. 145 at 27-29; Doc. 154 at ¶ 6; Doc. 158 at ¶ 6.

## ARGUMENT

"The two principal criteria guiding the policy in favor of rendering declaratory judgments," namely "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings," are present here. *See Alsager v. Dist. Court of Polk Cty.*, 518 F.2d 1161, 1163-64 (8th Cir. 1975) (internal citations omitted). Moreover, Ms. Hicklin's motion for permanent injunction meets all four factors considered in

the Eighth Circuit: (1) actual success on the merits; (2) threat of irreparable harm; (3) the harm to

the movant outweighs any possible harm to others; and (4) an injunction serves the public

interest. *See Bank One, Utah v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999). These factors are

identical to those required for preliminary injunction, except that success on the merits must be

actual instead of likely. *Id.*

     As discussed in more detail below, the evidence establishes that Defendants' actions

violated the Eighth Amendment. Thus, this Court should so declare and should permanently

enjoin Defendants from withholding medically necessary gender dysphoria treatments from Ms.

Hicklin or enforcing the freeze-frame policy.

## I.   Defendants Violated the Eighth Amendment by Knowingly Disregarding Ms. Hicklin's Serious Medical Needs.

     Despite knowing that Ms. Hicklin has serious medical needs, Defendants disregarded

those needs by failing to provide her with medically necessary hormone therapy pursuant to an

unconstitutional freeze-frame policy and by denying her medically necessary gender-affirming

canteen items and permanent body hair removal—all in violation of the Eighth Amendment.

### A.   Defendants Failed to Provide Ms. Hicklin Medically Necessary Hormone Therapy Pursuant to the Freeze-Frame Policy, Which is Unconstitutional on Its Face and As Applied to Ms. Hicklin.

     "Under the Eighth Amendment, prisoners have the right to receive adequate medical care

while incarcerated." *DePaola v. Clarke*, No. 16-7360, 2018 WL 1219611, at *3 (4th Cir. Mar. 9,

2018). An incarcerated plaintiff can establish an Eighth Amendment violation by showing that

"she had an objectively serious medical need and that the defendant knew of and disregarded that

need." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (citations omitted); *see also Nelson

v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009). Both requirements are met here.

There is no question that Ms. Hicklin suffers from an objectively serious medical condition—namely, her gender dysphoria—and the evidence shows that "Defendants [have been] deliberately indifferent to her serious medical need." *See Hicklin*, 2018 WL 806764, at *11. Moreover, because the freeze-frame policy at issue fails by its very nature to account for the individual medical needs of transgender prisoners who suffer from the well-recognized serious medical condition of gender dysphoria, it violates the Eighth Amendment both on its face and as applied to Ms. Hicklin. *See Soneeya v. Spencer*, 851 F. Supp. 2d 228, 242 (D. Mass. 2012).

### 1. Ms. Hicklin's gender dysphoria and risk of self-harm are objectively serious medical needs.

An incarcerated person meets the objective requirement of the deliberate indifference standard by showing the existence of a serious medical need, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), or a substantial risk of future serious harm resulting from the action or inaction of prison officials, *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Here, Ms. Hicklin has established both a serious medical need—serious psychological and physical symptoms of distress from untreated gender dysphoria—and a substantial risk of future serious harm—ongoing anguish, auto-castration, and possibly suicide—if her medically necessary treatment is withheld. *See* Statement of Uncontroverted Facts, *supra* ("SUF"), at ¶¶ 3, 5, 6, 11, 14, 17, 18.

Two separate psychiatrists diagnosed Ms. Hicklin with gender dysphoria and noted that she required specific treatment, including hormone therapy, in order to treat her condition. SUF ¶¶ at 2, 15. Defendants do not contest that Ms. Hicklin's gender dysphoria is a serious medical need (Doc. 83 at 24). Nor could they, as courts have routinely held that a diagnosis of gender dysphoria alone may constitute a serious medical need. *See Hicklin*, 2018 WL 806764, at *10; *see also White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Fields v. Smith*, 712 F. Supp. 2d 830, 862 (E.D. Wis. 2010), *aff'd*, 653 F.3d 550 (7th Cir. 2011); *Phillips v. Mich. Dep't of Corr.*,

9

731 F. Supp. 792, 800 (W.D. Mich. 1990), *aff'd*, 932 F.2d 969 (6th Cir. 1991) (same). Moreover, as this Court has already found, Ms. Hicklin's gender dysphoria is especially severe. *Hicklin*, 2018 WL 806764, at *10.

Additionally, deprivation of medically necessary hormone therapy, permanent body hair removal, and gender-affirming canteen items places Ms. Hicklin at a very high risk of resorting to self-harm. SUF ¶¶ 3, 6, 10, 11, 14, 17, 18. Indeed, the record "indicates that Ms. Hicklin is at significant risk of self-harm and has attempted on one occasion to remove her own testicles with a tourniquet." *Hicklin*, 2018 WL 806764, at *10. Moreover, her medical records show that lack of appropriate treatment for gender dysphoria caused her to experience serious psychological and physical symptoms and put her at substantial risk of self-harm, including auto-castration and suicidal thoughts or acts. SUF at ¶¶ 17, 18. Thus, the evidence establishes that Ms. Hicklin's gender dysphoria and risk of self-harm are objectively serious needs. *See De'lonta v. Angelone ("De'lonta I")*, 330 F.3d 630, 634 (4th Cir. 2003) (internal citation omitted); *Soneeya*, 851 F. Supp. 2d at 244-52 (incarcerated plaintiff with gender identity disorder and history of suicide attempts and self-mutilation has a serious medical condition).

### 2.     Defendants knew of Ms. Hicklin's serious medical needs but disregarded them by denying her hormone therapy pursuant to the freeze-frame policy.

To prevail on the subjective prong of the deliberate indifference test, Ms. Hicklin need only show that Defendants "disregard[ed] a known risk to [her] health." *See Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006). "Knowledge of risk may be inferred from the record." *Id.* This indifference is impermissible "whether . . . manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05; *see also Battista v. Clarke*, 645 F.3d 449 (1st Cir. 2011).

"Ms. Hicklin has presented compelling evidence that Defendants' refusal to provide her with hormone therapy after her diagnosis is based on the Policy rather than on a medical judgment concerning Ms. Hicklin's specific circumstances." *Hicklin*, 2018 WL 806764, at *11. Defendants are aware of and do not contest Ms. Hicklin's gender dysphoria diagnosis and they have knowledge of her escalating distress, anxiety, and thoughts of self-harm as a result of their failure to provide her adequate care. SUF at ¶¶ 2, 3, 6, 17, 18. Despite this knowledge, before this Court entered the preliminary injunction, Defendants failed to provide Ms. Hicklin medically necessary treatment for her gender dysphoria, including hormone therapy, even as their own mental health professionals repeatedly warned them of the serious risks posed to Ms. Hicklin by this continued denial.[4] SUF at ¶¶ 15-17.

Moreover, the evidence shows that the freeze-frame policy, which requires automatic denial of hormone therapy to any transgender inmate who was not receiving it before entering MDOC, formed the basis of Defendants' failure to provide hormone therapy for Ms. Hicklin. SUF at ¶¶ 12, 13, 15. "The denial of hormone therapy based on a blanket rule, rather than an individualized medical determination, constitutes deliberate indifference in violation of the Eighth Amendment." *Hicklin*, 2018 WL 806764, at *11. *See also Fields*, 653 F.3d at 559; *De'lonta I*, 330 F.3d at 634-35; *Allard v. Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001); *Soneeya*, 851 F. Supp. 2d at 249, 253; *Houston v. Trella*, No. 2:04-cv-1393, 2006 WL 2772748, at *8 (D.N.J. Sept. 22, 2006); *Barrett v. Coplan*, 292 F. Supp. 2d 281, 286 (D.N.H. 2003). This is

---

[4] It is immaterial that Defendants provided Ms. Hicklin psychotherapy and psychotropic medications; prison officials may not avoid liability by adopting an "easier and less efficacious treatment" that does not adequately address an incarcerated individual's serious medical needs. *Estelle*, 429 U.S. at 103-06; *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("a total deprivation of care is not a necessary condition for finding a constitutional violation"); *see also De'lonta v. Johnson (De'lonta II)*, 708 F.3d 520, 526 (4th Cir. 2013); *Fields*, 653 F.3d at 556; *Soneeya*, 851 F. Supp. 2d at 246-50.

because "[a]dequate care is based on an individualized assessment of an inmate's

medical needs in light of relevant medical considerations." *Soneeya*, 851 F. Supp. 2d at 242.

Additionally, such policies serve no legitimate governmental interest or penological purpose. *See*

*Hicklin*, 2018 WL 806764, at *14. Thus, by their very nature, blanket policies like the freeze-

frame policy at issue are facially unconstitutional under the Eighth Amendment.

> **B.      Defendants' Refusal to Provide Ms. Hicklin Access to Permanent Body Hair Removal and Gender-Affirming Canteen Items Also Violated the Eighth Amendment.**

In line with the Standards of Care, and based on their own individualized assessments of

Ms. Hicklin, Ms. Hicklin's psychiatrist Dr. Stephens, and gender dysphoria expert Dr. Randi

Ettner, both determined that access to permanent hair removal and gender-affirming canteen

items are medically necessary for Ms. Hicklin. SUF at ¶ 16; *see also id.* at ¶¶ 8-9. Yet, without

conducting an individualized evaluation, Defendants failed to provide her access to these items

based on unfounded assertions that they are not medically necessary. *Id.*

As this Court has concluded, "[t]he case law is clear – 'gender-affirming' canteen items

and permanent hair removal are not merely cosmetic treatments but, instead, medically necessary

treatments to address a serious medical disease." *Hicklin*, 2018 WL 806764, at *12. Thus,

Defendants' refusal to provide Ms. Hicklin these items, despite know that doing so placed her at

substantial risk of serious harm, constitutes deliberate indifference in violation of the Eighth

Amendment. *See, e.g.*, *Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012); *Soneeya*,

851 F. Supp. 2d at 246-48; *Konitzer v. Frank*, 711 F. Supp. 2d 874, 909-11 (E.D. Wis. 2010).

> **II.      This Court Should Declare Defendants' Actions Unconstitutional and Permanently Enjoin Them from Withholding Medically Necessary Gender Dysphoria Treatments from Ms. Hicklin and from Enforcing the Freeze-Frame Policy.**

Because Defendants' actions and policy have violated the Eighth Amendment, this Court

should declare their unconstitutionality and permanently enjoin them. While Defendants have

stated that they are complying and intend to continue complying with the 2/9/18 Order and will no longer enforce the freeze-frame policy (Doc. 153 at 3:9-13; 4:24-5:9; 7:6-19), declaratory and injunctive relief are nevertheless warranted because Defendants could later reinstate the unconstitutional freeze-frame policy and withdraw Ms. Hicklin's medically necessary gender dysphoria treatment. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (a defendant's voluntary cessation of a challenged practice ordinarily does not deprive a federal court of its power to determine the practice's legality). Declaring Defendants' failure to provide Ms. Hicklin medically necessary gender dysphoria care and their application of the freeze-frame policy (generally and to Ms. Hicklin specifically) unconstitutional would both settle the legal relations in issue and provide Ms. Hicklin—and other similarly situated inmates—relief from the uncertainty, insecurity, and controversy surrounding this issue in MDOC's prison system. *See Alsager*, 518 F.2d at 1163-64.

Moreover, Ms. Hicklin has met all four factors required for this Court to issue a permanent injunction directing Defendants to provide Ms. Hicklin with care that her doctors deem medically necessary and enjoining the enforcement of the freeze-frame policy. *See Bank One*, 190 F.3d at 847; *see also Brown v. Plata*, 563 U.S. 493, 531-32 (2011) (the scope of an order is determined by the constitutional violations established); *Fields*, 653 F.3d at 559 (affirming injunction of facially unconstitutional hormone therapy ban); *Mental Health Ass'n of Minn. v. Heckler*, 720 F.2d 965, 972 (8th Cir. 1983) (courts can provide equitable relief commensurate to the scope of the harm).

First, Ms. Hicklin has established actual success on the merits because discovery has revealed that the material facts in this case are uncontroverted and that Ms. Hicklin should prevail as a matter of law. *See Bank One*, 190 F.3d at 847-50 (movant established actual success

on the merits where there were no disputed facts and the movant was entitled to prevail on the legal questions); *Amos v. Higgins*, 996 F. Supp. 2d 810, 812-14 (W.D. Mo. 2014). Specifically, as discussed in Section I, *supra*, the evidence shows that Defendants knew of Ms. Hicklin's serious medical needs and yet disregarded those needs by failing to provide her with medically necessary hormone therapy pursuant to a facially unconstitutional freeze-frame policy and by denying her medically necessary gender-affirming canteen items and permanent body hair removal. Therefore, this Court should find that Ms. Hicklin has established actual success on the merits.

Second, once a party has demonstrated actual success on the merits, the three remaining factors the Court must consider are identical to that required for a preliminary injunction: (1) the threat of irreparable harm to the movant; (2) the harm to be suffered by the nonmoving party if the injunction is granted; and (3) the public interest at stake. *See, e.g.*, *Bank One*, 190 F.3d at 847. This Court has already concluded based on the preliminary injunction record that all three of these factors weigh in Ms. Hicklin's favor. *Hicklin*, 2018 WL 806764, at *9-10, 13-14. Additional discovery conducted since Ms. Hicklin filed that motion has only strengthened that conclusion.

The evidence establishes that Ms. Hicklin remains at serious risk of irreparable harm should Defendants withdraw her medically necessary gender dysphoria treatments or continue to enforce the freeze-frame policy. SUF at ¶¶ 3, 6, 9-11, 14, 17, 18. *See, e.g.*, *Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) (granting injunction in favor of disabled plaintiffs because they would suffer irreparable harm if the programs and services of the county courthouse were not made accessible); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192-93 (N.D. Cal. 2015).

Moreover, both the balance of harms and the public interest weigh strongly in favor of issuing a permanent injunction. *See, e.g.*, *Layton*, 143 F.3d at 472. While Ms. Hicklin has shown serious risk of irreparable harm stemming from the freeze-frame policy and denial of medically necessary gender dysphoria treatment, the only potential harms identified by either MDOC or Corizon—security risks and costs—are unavailing. As an initial matter, "the challenge of housing thousands of inmates safely cannot impede on the constitutional rights of the individuals in MDOC custody." *Hicklin*, 2018 WL 806764, at *13. Furthermore, Defendants have already been providing hormone therapy to other transgender prisoners and began providing this therapy to Ms. Hicklin after the 2/9/18 Order. SUF ¶¶ 13, 19; Doc. 153 at 3:9-13; 4:24-5:9. Thus, there is no evidence that a permanent injunction would pose any safety or security issues Defendants are not already handling. *Id.*; *cf. Norsworthy*, 87 F. Supp. 3d at 1194; *Gammett v. Idaho State Bd. of Corr.*, No. CV05-257-S-MHW 2007 WL 2186896, at *16 (D. Idaho July 27, 2007).

Additionally, there is no evidence that providing gender dysphoria treatment to Ms. Hicklin and other persons in MDOC's custody for whom it is medically necessary would be cost prohibitive. *See Hicklin*, 2018 WL 806764, at *13. In any event, prison officials cannot withhold medically necessary treatment based on cost. *Barrett*, 292 F. Supp. 2d at 286. Lastly, it is always in the public interest to prevent the violation of constitutional rights. *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Phillips*, 731 F. Supp. at 801.

## CONCLUSION

For the foregoing reasons, Ms. Hicklin respectfully requests that this Court grant her Motion for Declaratory Relief and a Permanent Injunction.

Respectfully submitted this 30th day of March 2018.

s/ Demoya R. Gordon
Demoya R. Gordon*
Richard Saenz*
Lambda Legal Defense &
Education Fund, Inc.
120 Wall Street, Floor 19
New York, NY 10005
Tel:  212-809-8585
Fax:  212-809-0055
dgordon@lambdalegal.org
rsaenz@lambdalegal.org

Marla R. Butler*
Sharon E. Roberg-Perez*
Rajin S. Olson*
Robins Kaplan LLP
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402
Tel:  612-349-8500
Fax:  612-339-4181
mbutler@robinskaplan.com
sroberg-perez@robinskaplan.com
rolson@robinskaplan.com

Frederick A. Braunstein*
Robins Kaplan LLP
399 Park Avenue
Suite 3600
New York, NY 10022
Tel:  212-980-7400
Fax:  212-980-7499
fbraunstein@robinskaplan.com

Kevin L. Schriener, #35490MO
Law & Schriener, LLC
141 N. Meramec Avenue
Suite 314
St. Louis, MO 63105
Tel: (314) 721-7095
Fax: (314) 863-7096
kschriener@schrienerlaw.com
Attorneys for Plaintiff Jessica Hicklin

*Admitted pro hac vice

16

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Declaratory Relief and a Permanent Injunction was made on March 30, 2018 via the Court's CM/ECF system to:

D. John Sauer, # 58721MO
First Assistant and Solicitor
David Dean, # 67190MO Assistant Attorney General
Missouri Attorney General's Office
P.O. Box 861
St. Louis, MO 63188
Telephone: (314) 340-7652
Facsimile: (314) 340-7029
John.Sauer@ago.mo.gov
David.Dean@ago.mo.gov

Attorneys for Anne Precythe, Joan Reinkmeyer, Cindy Griffith, Stan Payne, Scott O'Kelly, and Latoya Duckworth

J. Thaddeus Eckenrode, MoBar #31080
Eckenrode-Maupin
11477 Olde Cabin Rd
Suite 110
St. Louis, MO 63141
Tel:  314-726-6670
Fax:  314-726-2106
jte@eckenrode-law.com
kkp@eckenrode-law.com

Attorneys for Corizon LLC, William McKinney, John Deghetto, Thomas Kevin Bredeman, Diana Larkin, Kimberley S. Randolph, Daly Smith, Stormi Moeller, Ernest Graypel, Elizabeth Atterberry, and Kim Foster

__s/_Demoya R. Gordon__