IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JESSICA HICKLIN,<br><br>    Plaintiff,<br><br>v.<br><br>ANNE PRECYTHE,<br>    et al.,<br><br>    Defendants. | Case No. 4:16-CV-01357-NCC |

**PLAINTIFF'S BRIEF IN OPPOSITION TO THE TERMINATION OF THE PERMANENT INJUNCTION**

In accordance with the Court's June 23, 2021 Order (Dkt. 211), Plaintiff Jessica Hicklin files this brief in opposition to the request by Defendant Missouri Department of Corrections ("MDOC") to terminate the Permanent Injunction entered by this Court on May 22, 2018.

## INTRODUCTION

Following extensive discovery and briefing, and with a full opportunity for all parties to provide input, this Court made explicit findings that MDOC's and Corizon, LLC's (collectively, "Defendants") failure to provide medically necessary care for Ms. Hicklin's gender dysphoria violated the Eighth Amendment of the U.S. Constitution. The constitutional violation at issue was Defendants' refusal to provide *any* medically necessary care for Ms. Hicklin's serious medical condition of gender dysphoria, including the provision of hormone therapy, permanent hair removal, and access to gender-affirming canteen items. (*See* Dkt. 176 at 10.) Accordingly, the Court ordered prospective relief to address the constitutional violation and permanently enjoined MDOC from enforcing its freeze-frame policy, specifically ordering: "[f]or as long as Ms. Hicklin remains in the custody of MDOC, Defendants shall provide Ms. Hicklin with care that her doctors deem medically necessary treatment for her gender dysphoria, including hormone therapy, permanent hair removal, and access to gender-affirming canteen items." (*Id.*).

Though MDOC's behavior shows that it will not provide Ms. Hicklin with *any* medically necessary treatment for gender dysphoria absent a court order, MDOC now moves to terminate the Permanent Injunction in this case, arguing the Permanent Injunction fails to comply with the Prison Litigation Reform Act's ("PLRA") requirements and that MDOC has already provided the three illustrative treatments outlined in the injunction. MDOC does so *years after* the Permanent Injunction was entered, without objection from MDOC, and in the context of a motion to enforce the Permanent Injunction given MDOC's continued refusal to provide Ms. Hicklin with care MDOC's own doctors have explicitly deemed medically necessary.

1

Defendants are wrong on all counts. On its face, the Permanent Injunction is narrowly drawn, extends no further than necessary to remedy the constitutional violation, and is the least intrusive means to correct the constitutional violation. The prospective relief is limited and specific to the injury that Ms. Hicklin suffered due to MDOC's denial of medically necessary care for treatment of her gender dysphoria. It is limited to treatment for gender dysphoria that Ms. Hicklin's doctors determine is medically necessary, which such doctors base upon established and widely accepted medical guidelines and standards of care that this Court has already adopted. Moreover, the fact that the parties are currently before the Court on a dispute about whether MDOC has failed to comply with the Permanent Injunction shows that the injunction continues to be necessary.

The Court should deny MDOC's request to terminate the Permanent Injunction because it complies with the PLRA's requirements and continues to be necessary. Alternatively, the Court should refuse to terminate the Permanent Injunction based on new factual findings "that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 1326(b)(3).

## I.     RELEVANT BACKGROUND AND PROCEDURAL HISTORY[1]

Following entry of the Preliminary Injunction (Dkt. 145 at 31), Ms. Hicklin began to receive hormone therapy. Hormone therapy helped to address some symptoms that Ms. Hicklin experienced, but it has not resolved Ms. Hicklin's on-going symptoms related to her severe gender

---

[1] Ms. Hicklin incorporates all facts and arguments set forth in the record, including her motion for declaratory relief and a Permanent Injunction (Dkt. 163), her reply to Response to Motion (Dkt. 170), her motion for enforcement, or alternatively, to clarify the Permanent Injunction (Dkt. 205), and her reply to Response to Motion (Dkt. 208).

dysphoria, such as significant anxiety, depression, and distress. As early as November 20, 2019, Corizon's Gender Dysphoria Clinical Supervision Group ("GDCSG") approved the treatment plan for Ms. Hicklin to see a urologist for a presurgical consultation regarding gender confirmation surgery ("GCS").[2] (*See* EM-21971 ("Also informed patient that regional treatment team is in the process of seeking a surgeon to refer her to.").) Ms. Hicklin's treating doctor, Dr. Bruce Cornelius, and Corizon Mental Health Regional Director Elizabeth Atterberry each referred Ms. Hicklin for a presurgical consultation with Dr. Gino Vricella, Washington University Physicians, Washington University School of Medicine in St. Louis. (*See, e.g.*, EM-2279 (recommendation from Corizon Psychiatrist Bruce Cornelius stating "I believe that this will help her make significant progress in further treating her gender dysphoria"), EM-2280 (recommendation from Corizon Regional Mental Health Director Elizabeth Atterberry providing, "Ms. Hicklin meets and exceed the criteria set forth by the World Professional Association for Transgender Healthcare."); EM-2251 (Corizon Doctor Thomas Bredeman confirming he spoke with Dr. Vricella and that Dr. Vricella was willing to consult with Ms. Hicklin).) Dr. Cornelius expressly noted in Ms. Hicklin's medical history notes that gender confirmation surgery is medically necessary: "Pt with gender dysphoria as confirmed by the GDCSG. gender confirmation surgery has been deemed medically necessary." (EM-2240.)

Ms. Hicklin's first presurgical evaluation was scheduled for April 1, 2020, but it was canceled due to restrictions caused by the coronavirus pandemic. (*See* EM-2241-43.) Ms. Hicklin's consultation was rescheduled for July. (*See* EM-2244.) That appointment was canceled with no explanation. It was then rescheduled a second time for August. (*See* EM-2286). That appointment, too, was canceled, and no new appointment has been scheduled.

---

[2] References to Bates numbers are documents provided by Corizon to Ms. Hicklin's counsel. Pursuant to the Court's May 7, 2021 Order (Dkt. 199), Ms. Hicklin produced these documents to MDOC.

3

Ms. Hicklin filed grievances related to the denial of healthcare. (*See* GF-00396-00422, GF-00427-00476.) In its January 15, 2021 Offender Grievance Appeal Response to Grievance No. PCC-20-625, MDOC acknowledged that "qualified, licensed medical professionals and both medical and mental health have made recommendations for [Ms. Hicklin] to receive an evaluation for gender reassignment surgery based on assessment of [her] medical condition." (*See* GF-00426.) Despite this admission, the response concluded the Grievance Appeal is not supported. Throughout this entire time, Ms. Hicklin has continued to suffer from significant anxiety, depression, and distress related to her gender dysphoria. (*See* EM-2319-2320.)

On May 27, 2021, Ms. Hicklin filed a Motion to Enforce, or Alternatively, to Clarify, the Permanent Injunction. (Dkt. 205.) Through this motion, Ms. Hicklin seeks to enforce the Permanent Injunction's clear directive that MDOC "provide Ms. Hicklin with care that her doctors deem medically necessary treatment for her gender dysphoria." (Dkt. 176 at 10.) Rather than comply with the plain terms of the Permanent Injunction, MDOC challenged the scope of the Permanent Injunction and cross-moved to terminate it under 18 U.S.C. § 3626(b)(1) and (2). On June 23, 2021, parties presented argument on Ms. Hicklin's Motion to Enforce, or Alternatively, to Clarify, the Permanent Injunction. (Dkt. 211.) At the hearing, the Court struck the cross-motion with leave to refile and ordered the parties to file briefs on the issue of the termination of prospective relief. (*Id.*).

## II.  DISCUSSION

### A.  Legal Standard

Under the Prison Litigation Reform Act, injunctive relief can be granted only when it is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C.

§ 3626(a)(1)(A). A defendant is entitled to the "immediate termination of any prospective relief" when it was "approved or granted in the absence of a finding by the court" that such relief met the need-narrowness-intrusiveness test. *See* 18 U.S.C. § 3626(b)(2); *Hines v. Anderson*, 547 F.3d 915, 917 (8th Cir. 2008). A defendant may also be entitled to termination two years after the entry of prospective relief. *See* 18 U.S.C. § 3626(b)(1). The termination provisions, however, are limited by Section 3626(b)(3), which states that the prospective relief will not be terminated if the court finds that it remains necessary to correct a current or ongoing violation of the federal right, extends no further than necessary to correct the violation, is narrowly drawn, and is the least intrusive means to correct the violation. *Watson v. Ray*, 192 F.3d 1153, 1156 (8th Cir. 1999). For purposes of the PLRA, prospective relief is "all relief other than compensatory monetary damages." 18 U.S.C. § 3626(g)(7); *see also Gavin v. Branstad*, 122 F.3d 1081, 1084 (8th Cir. 1997).

### A. The Permanent Injunction is not subject to immediate termination under Section 3626(b)(2), as it is, on its face, narrowly drawn, extends no further than necessary, and is the least intrusive means to address MDOC's constitutional violations.

The PLRA allows for the immediate termination of prospective relief "in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation." 18 U.S.C. § 3626(b)(2). This is known as the narrowness-need-intrusiveness test. "The narrowness-need-intrusiveness criteria are, to some extent, self-explicating. … The application of those criteria is case-specific and must be undertaken in light of both the magnitude of existing constitutional violations and the available remedial alternatives." *Morales Feliciano v. Rullan*, 378 F.3d 42, 54 (1st Cir. 2004). The Permanent Injunction meets the need-narrowness-intrusiveness test both on its face and based on the underlying detailed factual findings that lead to it.

5

The language of the Permanent Injunction closely tracks the constitutional violation found by the Court. Take the violation of the federal right at issue. The Court explicitly held that:

> "Defendants' *failure to provide Ms. Hicklin medically necessary care related to her gender dysphoria violates the Eighth Amendment* to the United States Constitution."

(Dkt. 176 at 10 (emphasis added).) Now take the Permanent Injunction at issue. It states:

> "For as long as Ms. Hicklin remains in the custody of MDOC, *Defendants shall provide Ms. Hicklin with care that her doctors deem medically necessary treatment for her gender dysphoria*, including hormone therapy, permanent hair removal, and access to gender-affirming canteen items."

(*Id.* (emphasis added).) The language of the Permanent Injunction is virtually a mirror image of the constitutional violation found by the Court. In other words, on its face, the Permanent Injunction is a prime example of prospective relief that is narrowly drawn and extends no further than necessary to correct the violation of the Federal right at issue in a given case. Here, MDOC's own violation made the corresponding scope of the Permanent Injunction necessary. The scope of the remedy is directly proportional to the scope of the violation, and the order extends no further than necessary to remedy the violation. *See Brown v. Plata*, 563 U.S. 493, 531 (2011).

Moreover, aside from the mirrored language, the Permanent Injunction contains two limitations to the prospective relief. First, it is only applicable "[f]or as long as Ms. Hicklin remains in the custody of MDOC." Second, it only orders the provision of care to Ms. Hicklin "that her doctors deem medically necessary." These limitations, combined with the virtually identical language used in defining the violation and drawing the prospective relief, demonstrate that the relief is, on its face, the least intrusive means necessary to correct the violation.

In any event, it is axiomatic that an injunction should be examined as a whole, not in isolated parts. *See Edmo v. Corizon*, 935 F.3d 757, 782 (9th Cir. 2019) ("When 'determining the appropriateness of the relief ordered,' appellate 'courts must do what they have always done':

'consider the order as a whole.'") (citation omitted). Here, the Permanent Injunction must be considered in the context of the Court's detailed findings about MDOC's objective and subjective deliberate indifference and conclusion that Defendants violated the Eighth Amendment by knowingly disregarding Ms. Hicklin's serious medical need of gender dysphoria and through the enforcement of the freeze-frame policy. (Dkt. 176 at 10.)

With regard to the specific condition of gender dysphoria and its treatment or lack thereof, the Court made the following findings:

- "Gender dysphoria is an objectively serious medical need." (*Id.* at 5.)
- "The World Professional Association for Transgender Health's Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (the "Standards of Care") are 'the internationally recognized guidelines for the treatment of persons with gender dysphoria.'" (*Id.* at 5-6.)
- "Under the Standards of Care, persons with gender dysphoria should be individually assessed by qualified health care providers and referred for treatment, which can include: (1) living in another gender role that is consistent with one's gender identity; (2) hormone therapy to feminize or masculinize the body; and/or (3) surgery to change primary and/or secondary sex characteristics." (*Id.* at 6.)
- "Inadequate treatment of [gender dysphoria], such as treatment not based on an individualized assessment, puts a person at serious risk of psychological and physical harm." (*Id.*)

The Court also made detailed findings specific to Ms. Hicklin and the risk of serious harm she did and will suffer. The Court thus found the following in support of the Permanent Injunction:

- "Ms. Hicklin has exhibited symptoms of severe gender dysphoria, including recurring intrusive thoughts of removing her testicles." (*Id.* at 5.)
- "Medical records show that lack of appropriate treatment for gender dysphoria caused Ms. Hicklin to experience serious psychological and physical symptoms (including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating) and put her at substantial risk of self-harm, including auto-castration and suicidal thoughts or acts." (*Id.* at 7-8.)
- Ms. Hicklin "has suffered irreparable injury as a result of Defendants' failure to provide her with medically necessary treatment for her gender dysphoria and their application of the freeze-frame policy and will again suffer such injury if the requested relief is not granted." (*Id.* at 9.)
- "Given the deprivation of constitutional rights that Plaintiff has suffered and will suffer if Defendants withhold medically necessary gender dysphoria treatment from her or continue

to enforce the freeze-frame policy, the public interest favors entry of such an order." (*Id.* at 9-10.)

In light of the above findings, the prospective relief ordered is narrowly drawn and the least intrusive form of relief possible. The prospective relief is narrowly drawn to address the provision of medically necessary care for the serious medical need of gender dysphoria, the absence of which "has caused Ms. Hicklin to experience serious psychological and physical symptoms (including panic attacks, anxiety, racing heartbeat, shortness of breath, sleep disturbance, lack of appetite, headaches, and excessive sweating) and put her at substantial risk of self-harm, including auto-castration and suicidal thoughts or acts." (Dkt. 176 at 7-8.) This is not a case, like *Hines*, where the relief "covered the topic of medical care generally." 547 F.3d at 922. To the contrary, the relief here is "narrowly drawn to address a particular medical problem." *Id.* And as noted above, the relief is also limited to what Ms. Hicklin's doctors determine to be medically necessary for her.[3] Furthermore, the Court also considered the impact on the operation of MDOC's system. Significantly, the Court found, "The documents and testimony produced in discovery to the Plaintiff do not support denying medically necessary gender dysphoria treatment based on cost, safety, or any other reason." (Dkt. 176 at 8.)

MDOC's proposed limitation of the Permanent Injunction to the three illustrative treatments outlined therein is seemingly an effort to suggest a less intrusive means to protect Ms. Hicklin's constitutional rights, but this post-hoc interpretation would neither adequately address MDOC's constitutional violation nor minimize judicial meddling in the day-to-day operations of Missouri's correctional system. Under MDOC's reading, Ms. Hicklin would have to come back to

---

[3] The WPATH Standards of Care, which Ms. Hicklin's doctors have relied on to determine her course of treatment, are also a limitation to the scope of the relief. As noted, the Court made specific findings as to the wide acceptance and recognition of the Standards of Care.

8

Court each time her doctors determine that a treatment for her gender dysphoria is medically necessary. Indeed, that is the genesis of this dispute—Ms. Hicklin's doctors recommended a presurgical consultation as medically necessary, but MDOC insists this care is not within the scope of the Permanent Injunction. (Dkt. 206 at 4-5.) This is the type of "day-to-day oversight on all aspects of medical care" that *Hines* found to be broader than necessary to assure protection of the constitutional right. 547 F.3d at 922; *cf. Morales Feliciano v. Rullan*, 378 F.3d 42, 54 (1st Cir. 2004) ("Congress plainly intended the PLRA to operate as a mechanism that would *decrease* federal judicial involvement in prison administration." (emphasis added)). MDOC's proposed reading would accordingly be far more intrusive than the prospective relief ordered.

Additionally, in furtherance of its recognition that the Eighth Amendment requires MDOC to provide medically necessary care for gender dysphoria, the Court permanently enjoined MDOC from enforcing the freeze-frame policy. (Dkt. 176 at 10.) The Court found that "the freeze-frame policy at issue fails by its very nature to account for the individual medical needs of transgender prisoners who suffer from gender dysphoria, and therefore violates the Eighth Amendment both on its face and as applied to Ms. Hicklin." (*Id.* at 9.) In the context of gender-affirming care, courts in other circuits have not hesitated to find that a broadly applied permanent injunction is nonetheless narrowly tailored when it strikes down a facially unconstitutional statute. *See Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (affirming injunction of facially unconstitutional ban on hormonal therapy and gender confirmation surgery). The prospective relief enjoining the enforcement of the freeze-frame policy is narrowly tailored and remains necessary. Terminating the Permanent Injunction would mean that the freeze-frame policy, which only came to light through Ms. Hicklin's case, could be used to deny medically necessary care.

9

Because the Permanent Injunction meets the narrowness-need-intrusiveness test on its face and is supported by the necessary factual findings, MDOC's motion to immediately terminate the Permanent Injunction pursuant to 18 U.S.C. § 3626(b)(2) should be denied.

### B. MDOC's denial of medically necessary care for treatment of Ms. Hicklin's gender dysphoria evidences a current and ongoing constitutional violation.

Alternatively, should the Court find the Permanent Injunction does not meet the requirements of 18 U.S.C. § 3626(b)(2), the Court should deny termination of the injunction based on new factual findings. Under Section 3626(b)(3), prospective relief will not be terminated if the court finds that it remains necessary to correct a current and ongoing violation of the federal right, extends no further than necessary to correct the violation, is narrowly drawn, and is the least intrusive means to correct the violation. *Watson*, 192 F.3d at 1156. "If the existing relief qualifies for termination under § 3626(b)(2), but there is a current and ongoing violation, the district court will have to modify the relief to meet the [PLRA]'s standards." *Gilmore v. California*, 220 F.3d 987, 1008 (9th Cir. 2000).

Whenever a request for termination of prospective relief is made, "the district court must determine whether prospective relief is justified according to § 3626(b)(3)'s criteria." *Hadix v. Johnson*, 228 F.3d 662, 670 (6th Cir. 2000). In other words, "unless plaintiffs do not contest defendants' showing that there is no current and ongoing violation under § 3626(b)(3), the court must inquire into current conditions at a prison before ruling on a motion to terminate." *Gilmore*, 220 F.3d at 1008; *see also Benjamin v. Jacobson*, 172 F.3d 144, 166 (2d Cir. 1999) (en banc); *Parrish v. Alabama Dep't of Corr.*, 156 F.3d 1128, 1129 (11th Cir. 1998) ("An injunction shall not terminate, however, if the court accurately makes written findings, based on the record, that the injunction "remains necessary to correct a current and ongoing violation of the Federal right" and meets the three criteria in Section 3626(b)(2)."); *Tyler*, 135 F.3d at 598 ("If the court finds that

10

any prospective relief was granted without the § 3626(b)(2) findings, then that relief must be terminated *unless* the court makes the findings specified in § 3626(b)(3)." (emphasis in original)).

As such, "district courts should allow prisoners to supplement the record with evidence of current practices to prove a current and ongoing violation." *Harvey v. Schoen*, 245 F.3d 718, 721 (8th Cir. 2001). And while the ability of the parties to conduct discovery in order to supplement the record is a matter at the discretion of the court, *id.*, at a minimum, "a district court must hold [a pretermination evidentiary] hearing when the party opposing termination alleges specific facts which, if true, would amount to a current and ongoing constitutional violation." *Cagle v. Hutto*, 177 F.3d 253, 258 (4th Cir. 1999); *see also Harvey*, 245 F.3d at 721 (citing *Cagle* for the proposition that "pre-termination evidentiary hearing is discretionary *unless* party opposing termination alleges specific facts amounting to current and ongoing constitutional violation" (emphasis added)); *Benjamin*, 172 F.3d at 166 ("In sum, we interpret §§ 3626(b)(2) and (3), read together, to mean that, when the plaintiffs so request in response to a defendant's motion for termination, the district court must allow the plaintiffs an opportunity to show current and ongoing violations of their federal rights."); *Loyd v. Alabama Dep't of Corrections*, 176 F.3d 1336 (11th Cir. 1999) (district court should have conducted evidentiary hearing on motion to terminate consent decrees and permanent injunction).

To establish an Eighth Amendment violation, plaintiff must show that "she had an objectively serious medical need and that the defendant knew of and disregarded that need." *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (citations omitted); *see also Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 529 (8th Cir. 2009). A plaintiff meets the objective requirement of the deliberate indifference standard by showing the existence of a serious medical need, *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), or a substantial risk of future serious harm resulting from the

11

action or inaction of prison officials, *Helling v. McKinney*, 509 U.S. 25, 35 (1993). Deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted).

The Court found that Ms. Hicklin "has demonstrated actual success on the merits of her claims of violation of her Eighth Amendment rights due to Defendants' denial of medically necessary treatment for her gender dysphoria." (Dkt. 176 at 9.) The Court did so after finding, *inter alia*, that "Gender dysphoria is an objectively serious medical need" (*id.* at 5), and that Ms. Hicklin "has suffered and will suffer if Defendants withhold medically necessary gender dysphoria treatment from her" (*id.* at 10). Indeed, the Court found that "when left untreated, [individuals with gender dysphoria] may also experience additional serious medical problems including suicidality and the compulsion to engage in self-castration and self-harm." (*Id.* at 5.)

Here, it is undisputed that Ms. Hicklin's doctors have determined that she continues to suffer from an objectively serious medical condition—namely, her gender dysphoria—and that they have recommended a course of treatment that MDOC has refused to provide. (*See* Dkt. 214 at 22:9-19 ("THE COURT: Let's get this lined up for a second. Obviously, the legal issues are different than the factual ones. What I am asking is, is there a factual dispute that the doctors have recommended the consult? MR. MORGAN: Without going into, you know, an evidentiary discussion, I mean *there is not a dispute that the doctors have indicated that they believe she should have a consultation for -- a pre-surgical consultation*. I don't believe that there is a dispute about that." (emphasis added)).)

As this court explicitly found, MDOC's failure to provide Ms. Hicklin with medically necessary care related to her gender dysphoria violated her rights under the Eighth Amendment.

12

(Dkt. 176 at 10.) There is a "current" *and* "ongoing" violation of the Eighth Amendment based upon MDOC's "deliberate indifference" to the known risks and injury that Ms. Hicklin continues to suffer because of MDOC's denial of care her doctors have deemed medically necessary to treat her serious medical need of gender dysphoria, namely, a presurgical consultation and subsequent gender confirmation surgery.

It is immaterial that MDOC has complied with the Permanent Injunction to the extent it provided Ms. Hicklin hormone therapy, gender-affirming commissary items, and permanent hair removal. MDOC acknowledges it was required to do so. MDOC represents that it "will continue to provide the specified care of hormone therapy, permanent body hair removal, and access to gender-affirming canteen items after termination of Permanent Injunction relief." (Dkt. 206 at 11.) This is a hollow promise since Ms. Hicklin is once again in court seeking to stop MDOC's constitutional violations and the Permanent Injunction is the very reason that MDOC has provided care and has not enforced its freeze-frame policy. MDOC's conduct to date shows that it has provided some care for Ms. Hicklin's gender dysphoria *only because of* the Permanent Injunction. As noted in briefing relating to her motion for enforce, or alternatively, clarify, the Permanent Injunction (*see* Dkt. 208 at 9), terminating the Permanent Injunction on that basis would be "like throwing away your umbrella in a rainstorm because you are not getting wet." *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).

In any event, prison officials may not avoid liability by adopting an "easier and less efficacious treatment" that does not adequately address an incarcerated individual's serious medical needs. *Estelle*, 429 U.S. at 103-06; *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("a total deprivation of care is not a necessary condition for finding a constitutional violation"); *see also De'lonta v. Johnson (De'lonta II)*, 708 F.3d 520, 526 (4th Cir. 2013); *Fields*, 653 F.3d at

13

556. A failure to schedule a medical appointment or address medical symptoms altogether can constitute deliberate indifference. *See Rosenberg v. Crandell*, 56 F.3d 35 (8th Cir. 1995) (failure to diagnose and treat esophageal cancer).

Additionally, accepted standards of care further establish that MDOC is violating Ms. Hicklin's Eighth Amendment rights. The medical community's accepted standards of care and practice are highly relevant to determining what care is medically appropriate or inappropriate. *See Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). This Court recognized, that "[u]nder the Standards of Care, persons with gender dysphoria should be individually assessed by qualified health care providers and referred for treatment, which can include … surgery to change primary and/or secondary sex characteristics." (Dkt. 176 at 6.) Other federal courts have agreed. *See*, *e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 771 (9th Cir. 2019) ("In summary, the broad medical consensus in the area of transgender health care requires providers to individually diagnose, assess, and treat individuals' gender dysphoria, including for those individuals in institutionalized environments. Treatment can and should include GCS when medically necessary."), *cert. denied*, 141 S. Ct. 610 (2020).

MDOC has not offered *any* explanation for its denial of the presurgical consultation. MDOC has also not identified which individual or individuals made the decision to deny Ms. Hicklin's consultation. However, as noted above, MDOC has conceded that there is no dispute that Ms. Hicklin's doctors have recommended a presurgical consultation and gender confirmation surgery, and MDOC has not refuted that Ms. Hicklin's doctors have determined that a presurgical consultation and gender confirmation are medically necessary. In sum, there is a medical consensus that Ms. Hicklin's presurgical consultation is medically necessary, and no countervailing reason that such care should not be provided.

Because (1) Ms. Hicklin still suffers from the serious medical condition of gender dysphoria, (2) MDOC would not have provided, nor is likely to provide, hormone therapy and gender-affirming canteen items absent the Permanent Injunction, and (3) there is a current and ongoing dispute about MDOC's refusal to provide treatment that Ms. Hicklin's doctors have recommended as medically necessary for her gender dysphoria, termination of the Permanent Injunction under either Section 3626(b)(1) or (b)(2) would be improper.

Ms. Hicklin has alleged specific facts, which if true, would amount to a current and ongoing violation. The record establishes MDOC continues to engage in a practice to deny her with medically necessary treatment for gender dysphoria. This is the constitutional violation at the heart of Ms. Hicklin's case. The Court should allow an opportunity for Ms. Hicklin to present evidence showing the current and ongoing violation of her Eighth Amendment rights due to MDOC's "failure to provide Ms. Hicklin medically necessary care related to her gender dysphoria." Such evidence should include, *inter alia*, Ms. Hicklin's medical records and grievance records detailing that a presurgical consultation and gender confirmation surgery are medically necessary treatment, as per her doctors, for her gender dysphoria, as well as the injury that Ms. Hicklin suffers due to MDOC's interference with and denial of such care.

## **CONCLUSION**

The prospective relief that this Court found necessary to remedy the constitutional violation in Ms. Hicklin's case should not be terminated. The Court's Order complies with the PLRA and there is a current and ongoing constitutional violation— once again, MDOC's denial of medically necessary treatment for gender dysphoria. As such, MDOC's request to terminate the Permanent Injunction should be denied.

Respectfully submitted this 14th day of July 2021.

*s/Richard Saenz*
Richard Saenz*
Omar Gonzalez-Pagan*
Lambda Legal
120 Wall Street, Floor 19
New York, NY 10005
Tel: 212-809-8585
Fax: 212-809-0055
rsaenz@lambdalegal.org
ognozalez-pagan@lambdalegal.org

Kara Ingelhart*
Lambda Legal Defense &
Education Fund, Inc.
65 E. Wacker Pl., Suite 2000
Chicago, IL 60601
Tel 312-663-4413, ext. 4328
Fax 312-663-4307
kingelhart@lambdalegal.org

Rajin S. Olson*
Robins Kaplan LLP
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402
Tel: 612-349-8500
Fax: 612-339-4181
rolson@robinskaplan.com

Kevin L. Schriener, #35490MO
Law & Schriener, LLC
141 N. Meramec Avenue
Suite 314
St. Louis, MO 63105
Tel: (314) 721-7095
Fax: (314) 863-7096
kschriener@schrienerlaw.com

Attorneys for Plaintiff Jessica Hicklin

*Admitted pro hac vice*

16

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Plaintiff's Brief in Opposition to the Termination of the Permanent Injunction was caused to be made on July 14, 2021, on all counsel of record via the Court's CM/ECF system.

*s/ Richard Saenz*